UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARTURO DeLEON-REYES, <br><br> Plaintiff, <br><br> v. <br><br> REYNALDO GUEVARA, et al., <br><br> Defendants. | Case No. 18 C 1028 <br><br> Magistrate Judge Sunil R. Harjani |
| GABRIEL SOLACHE, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF CHICAGO, et al., <br><br> Defendants. | Case No. 18 C 2312 <br><br> Magistrate Judge Sunil R. Harjani |

**MEMORANDUM OPINION AND ORDER**

In these wrongful conviction cases, consolidated for purposes of discovery, non-party Cook County Public Defender ("CCPD") moves to quash or modify Plaintiffs' subpoena for 263 criminal defense files pursuant to Federal Rule of Civil Procedure 45(d)(3). For the reasons stated below, the CCPD's motion to quash or modify the subpoena [*Reyes*-424] is granted in part and denied in part and Plaintiffs' subpoena is modified. Specifically, the Court will permit the production of a statistical sample of 132 criminal defenses files from CCPD.

**Background**

The Court assumes familiarity with its prior written opinions in these two cases, which describe the factual and procedural background in more detail. *See DeLeon-Reyes v. Guevara*, 2021 WL 3109662 (N.D. Ill. July 22, 2021); *DeLeon-Reyes v. Guevara*, 2020 WL 7059444 (N.D.

Ill. Dec. 2, 2020); *DeLeon-Reyes v. Guevara*, 2020 WL 5800727 (N.D. Ill. Sept. 29, 2020); *DeLeon-Reyes v. Guevara*, 2020 WL 3050230 (N.D. Ill. June 8, 2020); *DeLeon-Reyes v. Guevara*, 2020 WL 1429521 (N.D. Ill. March 18, 2020); *DeLeon-Reyes v. Guevara*, 2019 WL 4278043 (N.D. Ill. Sept. 10, 2019). The Court reviews only those facts necessary to resolve the pending motion to quash.

As relevant here, in September 2019, the Court ordered the City of Chicago to produce homicide files from Area Five of the Chicago Police Department ("CPD") for the years 1995 through 1998, finding the homicide files are relevant to a number of Plaintiffs' *Monell* theories, including that the City suppressed evidence, fabricated evidence, and coerced confessions from suspects. *DeLeon-Reyes*, 2019 WL 4278043, at *9. The City then produced 347 homicide files from Area Five. Doc. 468 at 2. On March 12, 2021, Plaintiffs subpoenaed the CCPD's criminal defense files corresponding to the Area Five homicide investigative files that the City produced in these two cases. The CCPD's current motion asks the Court to quash Plaintiffs' subpoena or in the alternative, modify it to require the CCPD to produce only one fifth of the files the CCPD has located. Plaintiffs responded to the motion (doc. 430), and the Court held several hearings on the motion. Docs. 434, 443, 445, 452, 459, 467. The Court also received supplemental status reports from Plaintiffs and Defendants regarding the total number of criminal case files with box numbers for the period 1995 through 1998 located by the CCPD and an affidavit from a consulting expert hired by Plaintiffs to provide an opinion regarding an appropriate sample size should the Court choose to limit the files to be produced based on a random sample. *See* Docs. 446, 447, 449, 451.

## Discussion

Rule 45 requires a subpoena be quashed or modified if it, among other things, "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A). In evaluating whether a subpoena imposes

an undue burden, the Court considers whether the "burden of compliance with it would exceed the benefit of production of the material sought." *Nw. Mem'l Hosp. v. Ashcroft,* 362 F.3d 923, 927 (7th Cir. 2004). The factors to be weighed in this analysis include "whether: (1) the information requested is relevant; (2) the party requesting the information has a substantial need for the documents; (3) the document request is overly broad; (4) the time period the request covers is reasonable; (5) the request is sufficiently particular; and (6) [] compliance with the request would, in fact, impose a burden on the subpoenaed party." *Little v. JB Pritzker for Governor*, 2020 WL 1939358, at *2 (N.D. Ill. Apr. 22, 2020). While "[n]on-party status" is also a significant factor to be considered in determining whether the burden imposed by a subpoena is undue, *U.S. v. Amerigroup Illinois, Inc.*, 2005 WL 3111972, at *4 (N.D. Ill. Oct. 21, 2005), non-parties are not "exempt . . . from the basic obligation of all citizens to provide evidence of which they are capable upon appropriate request." *Uppal v. Rosalind Franklin Univ. of Med. & Sci.*, 124 F.Supp.3d 811, 813 (N.D. Ill. 2015). As the party seeking to quash the subpoena, the CCPD bears the burden of demonstrating that it subjects it to an undue burden. *United States v. $110,000 in United States Currency*, 2021 WL 2376019, at *2 (N.D. Ill. June 20, 2021). "Ultimately, the decision whether to quash or modify a subpoena is within the discretion of district court." *Allstate Ins. Co. v. Electrolux Home Products, Inc., et al.*, 2017 WL 5478297, at *2 (N.D. Ill. Nov. 15, 2017).

The CCPD argues that Plaintiffs' subpoena should be quashed or modified because it imposes an undue burden. In response, Plaintiffs argue that the requested criminal defense files are critical to their suppression of evidence based *Monell* claim and that their offers to pay for vendors and contract attorneys resolves any concerns about the burden to the CCPD. Weighing the factors, as further discussed below, the Court grants the CCPD's motion in part and modifies

3

the subpoena to require production of about 69% of the 191 files located by the CCPD or a total of 132 criminal defense files.

A.  **Relevance and Need for the Criminal Defense Files**

To begin, the Court considers whether the subpoena seeks relevant information as well as Plaintiffs' need for the CCPD's files. "The scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules." *Williams v. Blagojevich*, 2008 WL 68680, at *3 (N.D. Ill. Jan. 2, 2008); *see* Fed. R. Civ. P. 26(b)(1) (allowing "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."). The CCPD does not challenge the relevance of the requested criminal files to these actions. Plaintiffs believe the criminal defense files are critical to proving their *Monell* claim that there was a widespread practice of suppressing evidence in Area Five of the CPD. In their motion, Plaintiffs assert that a comparison of the Area Five homicide files and the criminal defense files "will prove, among other things, that evidence—including, for example, the identities of alternative suspects or other exculpatory information obtained during the course of the criminal investigation—was routinely withheld from criminal defendants as a result of the City's policies and practices." Doc. 403 at 2. Plaintiffs have sufficiently explained why the requested criminal defense files are relevant to Plaintiffs' suppression of evidence based *Monell* claim and fall within the permissible scope of discovery under Rule 26(b)(1).

Plaintiffs have also explained why they have a substantial need for the subpoenaed files. Plaintiffs intend to compare the homicide files produced by the City to the CCPD's files to demonstrate that materials that were in the CPDs possession were not turned over to the defendant. For example, in two prior cases in this district in which the City was held liable for its policies and practices (*Fields v. City of Chicago*, 10 C 1168 (N.D. Ill) and *Rivera v. Guevara*, 12 C 4428 (N.D.

4

Ill.), the plaintiffs' experts compared CPD homicide files to criminal defense attorneys' files as part of their *Monell* claims of systematic underproduction of records by the CPD. *DeLeon-Reyes*, 2019 WL 4278043, at *5-7. Similarly, Plaintiffs here have demonstrated a substantial need to review the criminal defense files in order to prove that there was a purported widespread custom and practice of evidence suppression. Equally important, Plaintiffs are unable to obtain substantially equivalent information through other means. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). Plaintiffs' comparison of the homicide files to CCPD files and expert testimony resulting from this comparison is the primary method at this time for Plaintiffs to advance their evidence-suppression *Monell* claim. Other methods, such as reinvestigating individual homicides to show evidence-suppression has generally been discouraged as unduly burdensome and would potentially extend discovery for years. *See e.g. Sierra v. Guevara, et al.*, 18 C 3029, Doc. 154 at 2, (N.D. Ill. Dec. 3, 2019) (rejecting plaintiff's stated plan to re-investigate the crimes documented in the Area Five homicide cases as unduly burdensome and disproportionate to the needs of the case).

Further, three of the proportionality factors—the importance of the issues at stake in the action, the amount in controversy, and the importance of the discovery in resolving the issues—weigh in favor of production of the CCPD files. *See* Fed. R. Civ. P. 26(b)(1). There is no question that the issues raised in these wrongful conviction cases are significant to the individual Plaintiffs (and the public at large as a result of the *Monell* claims), the amount in controversy is substantial (past plaintiff verdicts in similar cases have been in the millions of dollars), and the CCPD files are important to the suppression of evidence based *Monell* claim given that they are the only source from which such information can readily be obtained. *Velez v. City of Chicago*, 2021 WL 1978364, at *4 (N. D. Ill. May 18, 2021). For all of these reasons, the relevancy factor weighs heavily in favor of production.

B.   **Breadth of the Requested Information**

Second, Plaintiffs' subpoena is not overly broad on its face, and the four-year timeframe covered by the subpoena (1995 to 1998) was previously determined by this Court as a reasonable timeframe to explore Plaintiffs' *Monell* theories. *DeLeon-Reyes v. Guevara*, 2019 WL 4278043 (N.D. Ill. Sept. 10, 2019). Plaintiffs' subpoena is also narrow because it seeks only the specific criminal defense files corresponding to the homicide files produced by the City in this case. Moreover, Plaintiffs' subpoena to the CCPD sought production of only 263 criminal defense files out of the 347 Area Five homicide files the City produced. *See* Doc. 430 at 6 (describing Plaintiffs' efforts to narrow the particular criminal defense files being sought). Because the subpoena request is not overbroad, covers a reasonable time period, and identifies particular criminal defense files, this factor also favors production.

C.   **Burden**

Turning to the issue of burden, "[c]ompliance with any subpoena will impose some burden, as it takes time to collect responsive documents. The operative question is therefore whether the burden imposed is proportional to the needs of the case." *United States*, 2021 WL 2376019, at *5. The CCPD's motion explains the steps involved in retrieving and producing the old criminal defense files that Plaintiffs have requested. The first step involves determining in which boxes the requested files may be located. The CCPD states that there are two staff members located at the Leighton Courthouse who are familiar with how to conduct this type of search. Doc. 424 at 2. In order to determine the box numbers in which the requested files may be stored: (a) the two CCPD staff members look into a Homicide Task Force disposed list that was manually created in the 1990's, which often states "no record" for a requested file; (b) these staff members then look at an Excel sheet which contains some, but not all, information from an AS400 database which was used

from 1988 to 1994, but which is no longer supported; and (c) staff members look in the Clerk of the Circuit Court's Odyssey system for information as to what the charge was and the location of the trial. *Id*. at 2-3. After completing step one, "[s]ome, but not all, box numbers may be found." *Id*. at 3.

The second step involves retrieving the files from the identified boxes at the CCPD warehouse. The CCPD explains that "[m]urder files are usually located on shelves on the sixth floor of the warehouse or on skids on the third floor, with 20 to 25 boxes stacked on each skid." Doc. 424 at 3. Only one CCPD warehouse employee knows how to locate files in the warehouse and retrieve those files. *Id*. After a file is located, the last step in producing an old homicide defense file is reviewing the file, pulling out privileged documents, and creating a privilege log. Doc. 424 at 3. One Deputy Public Defender and one support staff member handle all of the CCPD office's privilege reviews.

Despite the above burdens of production, the CCPD has not shown that the burden of producing criminal defense files in the *Reyes/Solache* cases is so significant that the subpoena must be quashed in its entirety, given that the files will play a key role in resolving the suppression of evidence based *Monell* claim. Here, the CCPD has completed the first and second steps, at the Court's request. This was done because the CCPD could not identify for the Court exactly how many files it had in its physical possession in order for the Court to properly undertake a burden analysis. After that review, the CCPD located the box numbers for 220 out of the 263 subpoenaed files at step one. At step two, the CCPD physically located boxes for which they have 191 case files. Thus, after that two-step process, the CCPD only had possession of approximately 72% of the subpoenaed files. While the Court understands those first two steps themselves imposed a burden on the CCPD, a court cannot evaluate the appropriateness of producing 263 files, and its

7

corresponding burden, if it does not have confidence that this number is accurate. In any event, for present purposes, part of the work that the CCPD argues causes a burden has been already been completed.

Furthermore, at the June 23, 2021 hearing, the Court and counsel discussed the number of days it took the CCPD to conduct its step three privilege review of similar files in the *Fields* and *Rivera* cases. In *Fields*, the CCPD produced 35 files and the privilege review, copying, and scanning took one day. Doc. 443 at 7:6-8:20. In *Rivera*, the CCPD produced 54 files and the same process was completed in two days. *Id.* At this rate, the CCPD could complete a privilege review and production of all 191 files in just over six days. The CCPD does not strenuously argue that expending slightly more six days for privilege review and production—standing alone—creates an undue burden for the CCPD that requires quashing the subpoena. *See* Doc. 443 at 10:15-17 (CCPD acknowledging that "if the only subpoena [it] had received was the subpoena in this case, [it] probably would not have filed a motion to quash.").

Rather, the CCPD attributes the undue burden to the cumulative effect of the subpoenas it has received in these two cases and the *Sierra v. Guevara*, 18 C 3029 (N.D. Ill.) case as well as the anticipated subpoenas in the other cases pending in this district against Detective Guevara and his colleagues in Area Five of the CPD. In seven other cases pending in this district, similar *Monell* discovery is ongoing or pending. *Sierra v. Guevara*, 18 C 3029 (N.D. Ill.) (homicide files for the years 1991 through 1995); *Gomez v. Guevara*, 18 C 3355 (N.D. Ill.) (homicide files from 1991 through 1997); *Johnson v. Guevara* 20 C 4156 (N.D. Ill) (homicide files from 1987 through 1991); *Bouto v. Guevara*¸19 C 2411 (N.D. Ill.) (homicide files from 1989 through 1993); *Maysonet v. Guevara*, 18 C 2342 (N.D. Ill.); *Rodriguez v. City of Chicago*, 18 C 7951 (N.D. Ill.); *Iglesias v.*

8

*Guevara*, 19 C 6508 (N.D. Ill.).[1] In the *Sierra* case, plaintiff's subpoena directed to the CCPD seeks production of 538 criminal defense files.[2] Combined, the two subpoenas in these cases and the *Sierra* case sought a total of 801 CCPD files.

The CCPD argues that the burden of compliance with the subpoena here should be viewed in the context of the cumulative effect of plaintiffs' subpoenas issued to the CCPD in the *Reyes/Solache* and *Sierra* cases as well as the numerous other lawsuits filed against Reynaldo Guevara pending in this district. According to the CCPD, compliance with the subpoenas in these cases and other similar cases would be "extremely time-consuming" and would "siphon staff hours and resources away from the core mission of the CCPD" of defending persons charged with criminal offenses who are unable to afford counsel. Doc. 424 at 4, 8. The CCPD maintains that "[u]nless controlled and limited, these subpoenas will simply overwhelm the CCPD's limited staff and resources." Doc. 424 at 8.

Recognizing that the *Reyes/Solache* and *Sierra* subpoenas "seek an unusually large volume of documents" from the CCPD, Plaintiffs have offered to reduce the burden of the CCPD's production by hiring: (1) a moving company to retrieve the boxes from the warehouse and move them to a staging area where they can be scanned; (2) a vendor to scan all the files, either on-site or off-site, at the CCPD's preference; and (3) contract attorneys to work with the CCPD to conduct privilege reviews. Doc. 430 at 5-6. Moreover, to help streamline the CCPD's search for files, Plaintiffs' counsel searched for and logged all criminal case numbers, criminal defendants' names, and charging information for each of the requested criminal defense files. These steps are

---

[1] The CCPD notes that there are a total of 13 pending lawsuits against Reynaldo Guevara in this district.

[2] The CCPD has located the box numbers for about 300 of 538 subpoenaed files in *Sierra*.

9

consistent with Plaintiffs' obligation under Rule 45(d)(1). *See* Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.").

The Court is cognizant of the CCPD's limited resources. Nevertheless, the burden concern here is substantially diminished by Plaintiffs' specific time and cost-saving offers, such as hiring a copy service to scan CCPD files at its warehouse, a moving company to move files within its warehouse to a staging area, and temporary contract attorneys to conduct the privilege review process. The CCPD acknowledges that some work in responding to the subpoenas (the moving and scanning of files) may be outsourced, and it has agreed to use a copy service and moving company at Plaintiffs' expense. But the CCPD says that these steps represent just a small percentage of the time that the CCPD would have to expend in order to comply with the subpoenas because it would still be responsible for reviewing each file to remove or redact privileged documents. According to the CCPD, the privilege review "process is extremely time-consuming and cannot be outsourced by the CCPD." Doc. 424 at 4.

The steps Plaintiffs must take to avoid imposing an undue burden or expense on the CCPD must be reasonable, and the Court finds that it is reasonable for the CCPD to utilize contract attorneys to assist with privilege review, particularly, where, as here, the cumulative burden of the subpoenas issued and the expected subpoenas that will be issued to the CCPD in other similar pending cases is significant. While the Court understands that as of now, the CCPD "is not comfortable with outsourcing the review of [its] files to pull privileged documents," the use of contract attorneys to review documents for privileged material is common practice in litigation and would substantially reduce the CCPD's burden for privilege review. Doc. 452 at 20:5-10. Indeed, the Cook County State's Attorney's Office has indicated that it would consider using

contract attorneys with supervision by its office if necessary to comply with the City's subpoena in the *Reyes/Solache* cases.[3] Doc. 452 at 20:21-25. It is thus not true that a "significant portion of the work that must be performed in response to the subpoenas (locating the files and removing privileged documents) may only be performed by the CCPD staff." Doc. 424 at 9.

The manner in which the CCPD reviews documents for privilege, whether by its own staff or with the assistance of contract attorneys, is ultimately a choice it is making. The bulk of the burden of compliance is therefore the result of the CCPD's plan to use its own staff to conduct all of the required privilege review. In the end, the Court cannot dictate how the CCPD does its privilege review, but the Court must also consider that the burden imposed on the CCPD when utilizing contract attorneys for privilege review would be significantly less than its own attorney conducting a privilege review. The CCPD's choice to forgo a reasonable time and cost-saving measure does not justify quashing Plaintiffs' subpoena for highly relevant information, and the burden factor weighs against quashing the subpoena.[4]

---

[3] The City has issued a subpoena to the CCSAO for all CCSAO files corresponding to the ones produced by the CCPD. That is because the City maintains that a police officer's duty to disclosure exculpatory evidence is discharged if that evidence is provided to the prosecutor. Doc. 468 at 3. The City claims that its defense to Plaintiffs' suppression of evidence based *Monell* claim thus depends on its ability to review the CCSAO files to "confirm that the police related documents were in fact tendered to the CCSAO, therefore complying with [its] *Brady* obligations." Doc. 468 at 4.

[4] Another significant factor that will reduce the burden of production in the *Reyes/Solache* cases is the parties have agreed to forgo a privilege log. The Court also expects the potential inclusion of electronic privilege review in this litigation, which was not used in the *Rivera* and *Fields* productions, will achieve additional efficiencies. As to the estimated cumulative burden, the Court further notes that some of the same CCPD files will be used across numerous pending cases. For example, the CCPD files sought in *Reyes/Solache* and *Sierra* overlap entirely with the *Monell* discovery period in *Gomez v. Guevara*, 18 C 3355 (N.D. Ill.). So, the burden of responding to the subpoenas in *Reyes/Solache* and *Sierra* will be distributed across multiple cases. And, of course, the Court cannot predict whether other judges in *Guevara*-related cases will permit discovery from the CCPD or how much discovery they will ultimately allow.

In the alternative, the CCPD proposed a production of a random sample of the criminal defense files it has located. Plaintiffs respond that the burden of producing all 191 located is not great enough to justify production of a sample of the files sought in these cases.[5] The Court disagrees with Plaintiffs. The 191 files at issue in the *Reyes/Solache* cases is similar to the total number of files the CCPD produces in an entire calendar year to outside parties. *See* Doc. 424 at 2. The CCPD will still need to supervise the vendors hired to move boxes and scan files, and even if contract attorneys are used, they still need to be trained and their work product reviewed by a CCPD employee. Moreover, the cumulative burden of the subpoenas in all the cases against Detective Guevara provides an additional basis for modifying the subpoena to lessen the burden. Thus, after weighing the relevant factors and considering the cumulative burden to the CCPD, the Court finds that the balance weighs in favor of modifying the subpoena to require production of a random sample of the criminal files Plaintiffs are seeking.

The Court now considers the appropriate sample size in these two particular cases. Plaintiffs contend that without a sufficient number of the criminal defense files, "the City will be able to argue that Plaintiffs failed to meet their heavy evidentiary burden to show a widespread pattern or practice of suppression." Doc. 430 at 3. Plaintiffs have a justified concern about discovering an appropriate sample size to prove their *Monell* claim. To establish an inference that a widespread pattern or practice existed, Plaintiffs need a sufficient number of files to show that any examples of suppressed exculpatory evidence were not isolated acts of misconduct. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (to succeed on a *de facto* custom theory, "plaintiff must demonstrate that the practice is widespread and that the specific violations

---

[5] Plaintiffs would have agreed to accept a random sample of the requested criminal defense files if the City would also agree to a stipulation that the sample is representative of the files as a whole. The City is unwilling to agree that a sample of files is representative.

complained of were not isolated incidents"); *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) ("proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise" for a widespread practice claim under *Monell*). The bottom line is Plaintiffs must show that "there is a policy at issue rather than a random event." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).

Plaintiffs are further concerned that the City may seek to disqualify Plaintiffs' experts on the ground that use of a small set of sample files is not methodologically sound. In this vein, Plaintiffs retained an expert for purposes of consulting about the appropriate sample size from which to draw a conclusion about the set of 191 located files. Doc. 469. Plaintiffs' consulting expert states that the generally accepted method in quantitative analysis is to obtain a sample with a confidence level of at least 95% and a margin of error of no more than 5%. *Id*., ¶ 10. According to the consulting expert, "[c]onfidence levels below 95% and margins of error above 5% are not generally used for quantitative social-scientific research." *Id*.; *see also EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 362 n. 1 (7th Cir. 1988) (Cudahy, J., concurring in part and dissenting in part) (noting "the five-percent convention favored by social scientists."); *Moultrie v. Martin*, 690 F.2d 1078, 1083 n.7 (4th Cir. 1982) ("Statisticians usually use 95% or 99% confidence levels."); *Groupon, Inc. v. Securities Litigation*, 2015 WL 1043321, at *5 (N.D. Ill. March 5, 2015) (holding plaintiff's expert's methodology satisfied *Daubert* where, among other things, his regression analysis produced results "exceeding the 95% confidence level generally used as a threshold for statistical significance."), objections overruled by 2015 WL 13628131 (N.D. Ill. May 12, 2015); *Tevlin v. Metropolitan Water Reclamation Dist. Of Greater Chicago*, 237 F.Supp.2d 895, 906 (N.D. Ill. 2002) ("Generally two standard deviations mark the watershed: They represent an

approximate 95% level of confidence in (or on the obverse side of the coin, a 5% level of disparity from) what might be expected from a random distribution.").

Applying this information to the 191 files in the total population here, Plaintiffs' consulting expert asserts that a random selection of 154 files is required to produce a statistically significant result at a 99 percent confidence level and a margin of error of 5%. Doc. 469, ¶ 12. At 132 files, the result would still be statistically significant at a confidence level of 95% percent and a margin of error of 5%. *Id*., ¶ 13. While the probative value of evidence relating to 154 files would be slightly stronger than evidence relating to 132 files, the evidence of a study for both groups would demonstrate a high level of certainty. This means Plaintiffs do not need all 191 criminal files and 132 files would be sufficient to produce an acceptable level of certainty.

The CCPD proposes a drastically smaller sample size production of 20% of the 191 files or about 38 files. The CCPD claims that its proposed sample size will not prejudice Plaintiffs, but of course, the CCPD has no expert analysis that suggests a statistical sample of 20% would survive a *Daubert* challenge. Moreover, Plaintiffs' consulting expert has explained why a much smaller sample size is problematic to drawing sound conclusions about that set of files. As Plaintiffs point out, "[i]t does not make sense to drastically reduce the volume of documents produced if the result will be to undermine—or altogether eliminate—the evidence necessary to adjudicate the *Monell* claims, which is the point of conducting this discovery in the first place." Doc. 430 at 9-10. The Court thus finds the CCPD's proposed modification insufficient because of the statistical significance concerns.

Considering the reasonable time and cost-savings measures Plaintiffs have offered, the marginal burden of producing 94 more files than the CCPD proposes is not sufficiently onerous. Even without accounting for Plaintiffs' offer of contract attorneys for privilege review, the

CCPD's proposed compromise, by which it would review and produce 20% of the files requested, would require about one day using the *Fields/Rivera* rate. Reviewing and producing 94 more files would require slightly more than three additional days. The likely benefit of ensuring a statistically significant result substantially outweighs the marginal burden placed upon the CCPD, and thus the Court finds that the production of 94 additional files would not be overly burdensome. There is nothing in the record to indicate that a much smaller sample of files would achieve a sufficiently reliable result to infer a widespread pattern or practice and withstand a potential *Daubert* challenge to Plaintiffs' expert's methodology. Given this insufficiency and without any significant marginal burden being placed on the CCPD, the Court finds that for purposes of discovery, production of a representative sample of 69% of the 191 files or 132 files is appropriate here. Weighing the relevant factors, the Court strikes this balance which provides Plaintiffs with an appropriate sample size while reducing some of the burden on the CCPD.

To be clear, the Court's conclusion that Plaintiffs are entitled to discover a sample of the CCPD's files necessary to obtain a result with a confidence level of 95% and a margin of error of 5% is limited to *this case* and the facts presented herein, balancing benefit and burden. This ruling in no way addresses whether a subpoena for CCPD files in another case would be unduly burdensome. It may be in other cases that a smaller sample set is appropriate when evaluating a subpoena for a much larger volume of files and after weighing the benefits and burdens of production.

Finally, as noted, the City has issued a subpoena to the CCSAO for all files corresponding to the ones produced by the CCPD. The CCSAO has moved to quash the subpoena or in the alternative, for a protective order on burden grounds, and its motion remains pending. *See* Doc. 424. The document rider the CCSAO received listed 173 files. Doc. 452 at 40:5-7. As of July 29,

2021, the CCSAO had preliminary located 147 of the 173 files requested in the City's subpoena. Without prejudicing the ultimate merits of the CCSAO's motion, the Court finds that it makes sense for the CCPD's sample production of 132 files to come from the cases for which the CCSAO has located files.[6]

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part the Cook County Public Defender's Motion to Quash or Modify Subpoena [424]. Plaintiffs' subpoena is modified to require a random sample of 132 files which should come from the cases for which the CCSAO has located files. As offered by the Plaintiffs, they shall pay for the cost of moving, scanning, contract attorneys (if requested), and any other related expenses for the production. Time is of the essence in this case. The Court has already ordered an expert discovery schedule with Plaintiffs' expert disclosures on this matter due by September 30, 2021, as the district judge has set a discovery close date of December 31, 2021. Accordingly, the Courts orders that the CCPD files must be produced no later than August 18, 2021 and the parties shall work cooperatively and expeditiously to ensure timely production of the CCPD files.

**SO ORDERED.**

Dated: August 5, 2021

Sunil R. Harjani
United States Magistrate Judge

---

[6] The Court is limiting production to those CCPD files for which the CCSAO has a corresponding file to ensure that the discovery produced is most likely to be productive in resolving the suppression of evidence based *Monell* claim. If the CCSAO does not have a corresponding file, the Court anticipates the City will raise a challenge to the use of the CCPD file—which could affect the 95% confidence level and ultimately the Court's decision to allow discovery of a statistically sound sample set.