# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| Plaintiff, | ) | 1:18 Civ. 1028 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | Magistrate Sunil R. Harjani |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | | |
| | | |
| GABRIEL SOLACHE, | ) | |
| | ) | |
| Plaintiff, | ) | 1:18 Civ. 2312 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | Magistrate Sunil R. Harjani |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT CITY OF CHICAGO'S
LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant City of Chicago, by its undersigned attorneys, and pursuant to Local Rule 56.1(a)(3), hereby submits this Statement of Material Facts in Support of Its Motion for Summary Judgment.

**PLAINTIFFS' *MONELL* CLAIMS**

1.       Plaintiff Reyes' *Monell* claim includes the following theories: that as a matter of widespread municipal policies and practices, Chicago police officers (1) "systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information," (Ex. 1, Plaintiff Reyes' Second Amended Complaint (Dkt.

396) (hereinafter "Reyes' TAC"), at ¶102); (2) "routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person," (*id.* at ¶109); (3) "operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct," (*id.* at ¶109); (4) "condoned and facilitated a code of silence within the Chicago Police Department," (*id.* at ¶110); (5) failed to "track[] and identify[] police officers who are repeatedly accused of…serious misconduct," (*id.* at ¶111); and (6) "failed…to provide adequate training to Chicago Police Detectives and other officers[.]" (*id.* at ¶113).

2.      Plaintiff Solache's *Monell* claim includes the following theories: that as a matter of widespread municipal policies and practices, Chicago police officers, (1) used "physical[] and psychological[] coercive interrogation tactics in order to elicit statements from suspects in criminal cases," causing false confessions (Ex. 32, Plaintiff Solache's First Amended Complaint (Dkt. 224), at ¶ 65); (2) "systematically suppressed evidence" related to fabricated and coerced confessions (*id.* at ¶ 68); (3) "condoned and facilitated a code of silence within the Chicago Police Department;" (*id.* at ¶ 70); and (4) "fail[ed] to discipline officers accused of this unlawful conduct;" (*id.* at ¶ 71).

3.      Plaintiffs' responded to the City's Interrogatories that asked Plaintiffs' to state the factual basis and evidence upon which they will rely to establish how any of their theories of liability against the City amounted to a "policy" under *Monell v. New York Dept. of Social Services,* 436 U.S. 658 (1978), by identifying only their *Monell* theories based on (i) CPD's supervision and disciplinary system, (ii) CPD's widespread pattern and practice of *Brady* violations, a/k/a their "street file" theory, (iii) a widespread practice of physical abuse of suspects to obtain statements against their will, and (iv) a widespread practice of manipulating eyewitness identification procedures, including by failing to properly document those procedures.  (Ex. 2, Plaintiffs'

Supplemental Responses to Defendant City of Chicago's First Set of Interrogatories, pp. 3-13).

4.     Plaintiffs have only developed evidence related to their theories based upon (i) CPD's supervision and disciplinary system (Ex. 2, Plaintiffs' Supp. Resp. to the City's First ROGs, pp. 3-7), (ii) CPD's widespread pattern and practice of *Brady* violations, a/k/a their "street file" theory (*id.* at pp. 7-12) (iii) a widespread practice of physical abuse of suspects to obtain statements against their will (*id.* at p. 12).   For their *Monell* theory based on a widespread practice of manipulating eyewitness identification procedures, including by failing to properly document those procedures, Plaintiff identify one example: the circumstances surrounding the lineup conducted in the Soto homicide investigation with Norma Salazar.  (*Id.* at pp. 12-13, 27-29).

5.     Plaintiffs' "street files" *Monell* theory is that CPD had a "pattern and practice of *Brady* violations – i.e., related to the repeated failure to disclose exculpatory information to criminal defendants – include express policy theories (*e.g.,* documentation, notetaking and file keeping policies that were plainly inadequate on their face); widespread practice theories (e.g., a widespread practice of failing to document investigative steps, permitting officers to keep street files that were not later disclosed); and failure to train, supervise and discipline theories (e.g., the failure to train detectives on documentation, notetaking and file keeping policies, the failure to conduct audits to ensure such policies were being following (sic), the failure to discipline officers for violating documentation, notetaking and file keeping policies." (Ex. 2, Plaintiffs' Supp. Resp. to the City's First ROGs, p. 7).

6.     Plaintiffs' supervision and discipline theory is that CPD had an "inadequate disciplinary system – *i.e.*, related to the utter failure to adequately investigate and act upon evidence of misconduct by Chicago Police officers, including through civilian and other complaints against officers – include express policy theories (e.g., disciplinary policies that were

obviously inadequate and incomplete), widespread practice theories (e.g., a widespread practice of failing to meaningfully investigate allegations of officer misconduct, depriving investigators of access to officers' disciplinary histories), and failure to train, supervise and discipline theories (e.g., the failure to train internal investigators to meaningfully investigate allegations of office (sic) misconduct, permitting supervisors to conduct disciplinary investigations of their own officers, etc.)." (Ex. 2, Plaintiffs' Supp. Resp. to the City's First ROGs, pp. 3-4).

7. Plaintiffs' coerced confession theory that CPD had "a widespread practice of physical abuse of suspects, including through the use of torture (that is, the physical and psychological abuse of suspects to obtain statements against their will.)" (Ex. 2, Plaintiffs' Supp. Responses to the City's First ROGs, p. 12).

8. Plaintiffs were asked in written discovery to "identify all evidence known to Plaintiffs that establishes why" the City's policies on eyewitness identification, "street files," and supervision and discipline were unconstitutional. (Ex. 2, Plaintiffs' Supp. Resp. to the City's First ROGs, ¶¶ 2-3). Plaintiffs responded regarding the street files theory by incorporating the expert report of their disclosed expert, Thomas Tiderington; the supervision and discipline theory by incorporating the expert report of their disclosed expert, Anthony Finnell; the widespread physical abuse theory by incorporating the expert report of their disclosed expert, Dr. Richard Leo. (*Id.* at pp. 4-5, 7-8, 12).

9. Plaintiffs did not identify any written policies that he maintained were unconstitutional or identify any person with final policymaking authority whose deliberate act caused Plaintiff's alleged constitutional injury. (Ex. 2, Plaintiffs' Supp. Resp. to the City's First ROGs, generally).

4

## THE CITY'S POLICIES AND PRACTICES

### *Policies regarding the creation, maintenance and production of police report*

10.     The "R.D." number is the Records Division number, which is assigned to each case that has been referred to the detective area for investigation.  The number is assigned in a numerical sequence.  (Ex. 3, Deposition of James Hickey, *Kluppelberg v. Burge,* N.D. Ill., 13-CV-03963 (part I dated 7/29/14), at 113:16-24).

11.     The Records Division File ("RD File") would contain the General Offense Case Report, and any and all supplemental reports that are created.  This file is physically maintained in the Records Division.  This file is sometimes referred to as the "Permanent Retention File" as that stamp is affixed to each page of the file by Records Division personnel for records maintained by the Records Division that are required to be kept permanently, such as homicide files or other files that do not have a statute of limitations.  (Ex. 4, Deposition of James Hickey, *Rivera v. Guevara,* N.D. Ill, 12-CV-4428 (part II dated 6/10/14), at 189:21-190:2; 192:2-20; 194:6-7; Ex. 5, Deposition of City's Rule 30(b)(6) witness, Commander Eric Winstrom, in consolidated cases of *Solache v. Guevara,* N.D. Ill., 18-CV-2312, and *DeLeon-Reyes v. Guevara,* N.D. Ill., 18-CV-1028 (hereinafter "Solache/Reyes"), at 176:22-177:8).

12.     The RD File's historical mission was to preserve the original case report and any original supplementary reports generated with that RD number.  It was never intended to include miscellaneous police reports, such as notes (or subsequent to 1982, General Progress Reports ("GPRs")).  (Ex. 4, Hickey Dep in *Rivera* (part II dated 6/10/14), at 192:2-20; Ex. 5, Winstrom Dep in *Solache/Reyes,* at 176:22-177:8).

13.     Prior to 1982, CPD maintained what were commonly referred to as "working files" but also known as "running files" or "street files" which were manila folders which normally

contained photocopies of reports, criminal history statements, photographs, mugshots and memorandums requesting assistance on investigations. (Ex. 3, Hickey Dep in *Kluppelberg* (part I dated 7/29/14), at 106:3-22).

14. Detective Division Notice 82-2 ("DDN 82-2"), was issued on April 20, 1982, and formally identified the "working files, street files, running files" as "Investigative Files" and mandated their preservation. "Investigative Files" were defined as "any document or group of documents the subject of which relates to criminal incidents and which are maintained and stored under Detective Division control within a unit." DDN 82-2 did not cover documents that were not maintained or stored under the control of the Detective Division. (Ex. 6, Detective Division Notice 82-2, AR-L 4430-32, at ¶ II; Ex. 7, Deposition of James Hickey in *Rivera* (part I dated 5/6/14), at 80:19-81:10).

15. Detective Division Special Order 83-1 ("S.O. 83-1"), issued on January 13, 1983, made clear that CPD's policy was to "conduct all criminal investigations in an impartial and objective manner and to maintain the integrity of its investigative files to ensure that the due process rights of the accused [were] not compromised []." (Ex. 8, S.O. 83-1, AR-L 4433-37, at ¶ III).

16. S.O. 83-1 was "designed to institutionalize the control of all [Detective Division] violent crime field investigation documents and files, which previously may have been referred to as working files, running files, or detective's personal files and notes[]" and expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any information and materials that may tend to show his possible innocence or aid in his defense is preserved." (Ex. 8, S.O. 83-1, at ¶ I, II).

17. S.O. 83-1 defined the Investigative File as a "criminal case file pertaining to a

6

violent crime field investigation which contains official Department reports, notes, memoranda and miscellaneous documents generated or received by any detective during the course of such investigation." S.O. 83-1 instructed that the Investigative File "is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney and the assigned Department members with a comprehensive account of the subject criminal case." (Ex. 8, S.O. 83-1, at ¶ VI.A; Ex. 3, Hickey Dep from *Kluppelberg* (part I dated 7/29/14), at 169:20-170:1).

18.     S.O. 83-1 mandated that the Investigative File be maintained in the "Investigative File Case Folder," specifically described as "an 8 ½" x 11" case folder complete with two (2) two-hole metal punch fasteners designed to secure all documents relating to the subject criminal case." The Investigative File is also required to contain an Investigative File Inventory Sheet that lists each document contained within the file. To standardize note taking, CPD created GPRs, which are preprinted forms that detectives use to take notes. Detectives use GPRs to document "handwritten notes and memoranda (the investigative work-product) including: inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigating detectives during the course of a violent crime field investigation." (Ex. 8, SO 83-1, at ¶¶ IV.B, IV.D, IV.E; Ex. 3, Hickey Dep from *Kluppelberg* (part I dated 7/29/14), at 170:7-9).

19.     Detective Division Special Order 83-2 ("S.O. 83-2"), issued May 2, 1983, was issued to improve on the procedures set forth in S.O. 83-1 where possible, and was specifically "designed to institutionalize the control of all violent crimes field investigation documents and files, which previously may have been referred to as Street files, working files, running files, or detectives personal files and notes." The language of S.O. 83-2 reinforced CPD's long standing, though unwritten, policy that everyone has an obligation to pass on information. (Ex. 9, SO 83-2, JR-L

196560-64, at ¶ I; Ex. 3, Hickey Dep from *Kluppelberg* (part I dated 7/29/14), at 233:21-234:3).

20. Detective Division Special Order 86-3 ("S.O. 86-3"), issued May 19, 1986, was issued to further clarify the directions to the Detective Division regarding the creation and maintenance of Investigative Files, mandating "periodic, unscheduled inspections of the subject files be completed to ensure compliance." (Ex. 10, S.O. 86-3, AR-L 4438-40, at ¶ VI).

### *Policies regarding identification procedures*

21. CPD detectives were trained on identification procedures, including photo identifications, show ups, and lineups. (Ex. 11, Detective Division Training Materials from 1988-1996 at bates Foster 30(b)(6) 000039-46; Ex. 12, Deposition of Lt. John Foster, one of the City's Federal Rule of Civil Procedure 30(b)(6) witnesses, from multiple Guevara cases dated June 29, 2022 (hereinafter "Foster Dep"), at 160:17-21; 281:3-20; 282:13-17).

22. On September 23, 1988, CPD issued General Order ("G.O.") 88-18 regarding lineup procedures, effective the next day, September 24, 1988. (Ex. 13, G.O. 88-18 at bates Foster 30(b)(6) 000003-4). Detectives were trained, and G.O. 88-18 mandated, that when a lineup is held, a supplementary report will be completed. (Ex. 13, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ J; Ex. 11, Training Materials at Foster 30(b)(6) 000043). G.O. 88-18 stated: "<u>In no case will a lineup be conducted without a Supplementary Report being completed</u>." (Ex. 13, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ II.J) (emphasis in original). G.O. 88-18 also stated "whenever possible, [lineups] should consist of at least five persons" if there is only one suspect, and all subjects of a lineup "should generally be the same height and weight and should have similar hair and skin color." (*Id.* at Foster 30(b)(6) 000003, ¶ II.G).

23. G.O. 88-18 required that "either an evidence technician or an authorized member of the Detective Division take two photographs of any formal lineup <u>which results in the</u>

identification of a suspect." (Ex. 13, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ II.H) (emphasis in original).

24.     G.O. 88-18 required that when detectives wrote a supplementary report of a lineup, it will include, among other things, "the name, rank and star number of the person photographing the lineup." (Ex. 13, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ II.J.9; Ex. 12, Foster Dep, at 311:12-15).

25.     Under CPD policy, completed line up supplementary reports are included in the Records Division File. (Ex. 5, Winstrom Dep in *Solache/Reyes*, at 176:13-177:22; Ex. 14, CPD General Order 83-5, at Foster 30(b)(6) 000001-2, ¶ II.J).

26.     CPD published Standard Operating Procedures ("SOP") for the detective division in 1988, which incorporated all of the former detective division special orders. (Ex. 15, CPD Detective Division Standard Operating Procedures from 1988, RFC-Solache/Reyes 117553-87; Ex. 5, Winstrom Dep in *Solache/Reyes*, at 46:3-23; 122:6-25). The 1988 SOPs were in effect until 1992, and detectives were trained on the SOPs. (Ex. 5, Winstrom Dep in *Solache/Reyes*, at 124:6-9; 130:12-24).

27.     The procedures required detectives to "preserve and record information and materials obtained, including that which might aid in the defense of the accused." (Ex. 15, 1988 SOPs, at RFC-Solache/Reyes 117582, ¶ 18.1(B); Ex. 5, Winstrom Dep in *Solache/Reyes*, at 126:8-13). Detectives were trained to thoroughly and accurately document their investigation steps in a homicide investigation. (Ex. 5, Winstrom Dep in *Solache/Reyes*, at 74:17-21).

### *Policies regarding the Complaint and Disciplinary Process*

28.     In January 1993, CPD issued G.O. 93-3 regarding "Complaint and Disciplinary Procedures." (Ex. 16, CPD General Order 93-3, at RFC-Solache/Reyes 118501-118594). G.O.

93-3 required all members to comply with Department Rules and Regulations, directives and orders. *Id.* at ¶ I. G.O 93-3 further stated that "Prompt, thorough investigations will be conducted into allegations of misconduct []" and went on to set forth the rights, responsibilities and procedures for conducting investigations relative to disciplinary matters. *Id.* at ¶¶ I, II.

29.     In 1995, when CPD's Office of Professional Standards would receive a complaint about a department member, that complaint would receive a CR number, to allow for CPD to track all complaints. (Ex. 17, Deposition of Lt. Joseph Bird, one of the City's Federal Rule of Civil Procedure 30(b)(6) witnesses dated 12/22/21 (hereinafter "Bird Dep"), at 49:17-50:6). Each complaint would also be given a category code describing the allegation of misconduct. *Id.* (Ex. 18, Complaint Category Tables AR-L 155269-155270).

30.     CPD also implemented the Summary Punishment Action Request system, otherwise known as "SPARS," which was an "effective discipline mechanism that supervisors had, that would allow for immediate correction of less serious transgressions." (Ex. 17, Bird Dep, at 132:8-19). A supervisor would take action immediately and notify the officer that the conduct that occurred was not acceptable. (Ex. 17, Bird Dep, at 132:19-21).

31.     In March 1983, CPD issued G.O. 83-3 titled "Personnel Concerns," which was in place until November 1997 (Ex. 19, CPD General Order 83-3, RFC-Solache/Reyes 118619-118622). This policy established the Personal Concerns Program for Department members, which sought "early identification of members who engage in conduct which is contrary to the goals of the Department." *Id.* at ¶ III.

32.     G.O. 83-3 also created the "Behavioral Alert System" which sought to "identify Department members whose behavior indicates that future disciplinary or performance problems

may result unless correct action [was] taken." (Ex. 19, G.O. 83-3, RFC-Solache/Reyes 118619-118622, ¶ V).

33.     G.O. 83-3 included seven "performance data" that CPD considered to be behavioral alert indicators, including 1) all excessive force complaints; 2) complaint and disciplinary history; 3) repeated incidents of medical roll use; 4) repeated instances of minor transgressions within a twelve month period; 5) a significant reduction in a member's performance; 6) poor Department traffic safety record; and 7) significant deviations from the member's normal behavior.  (Ex. 19, G.O. 83-3, RFC-Solache/Reyes 118619-118622, ¶ V.B).

34.     If an officer refused to comply with the Personnel Concerns program, a supervisor would initiate a CR for violation of a direct order.  (Ex. 17, Bird Dep, at 130:19-25).

35.     In November 1997, CPD issued G.O. 97-10 titled "Behavioral Intervention System" which introduced the Departments Behavioral Intervention System, and expanded the behavioral intervention indicators to include "two or more sustained Complaint Register Investigations within a twelve month period."  (Ex. 20, General Order 97-10, RFC-Solache/Reyes 118623-118630, ¶ V.B.6).

### Policies regarding the Interrogations of Individuals

36.     General order 87-7 is titled "Interrogations: Field and Custodial," was the written policy in place during the 1995-1998 timeframe regarding interrogations.  (Ex. 33, GO 87-7; Ex. 5, Winstrom Dep, p. 210:23-211-12). Section VIII(G) under CUSTODIAL INTERROGATION-ADVISING THE INDIVIDUAL OF HIS RIGHTS, subsection G states, "It is not enough that the person to be questioned is warned and decides nonetheless to answer questions.   Any circumstances of lengthy incommunicado custody, deception, promised or suggestions of benefits, or other forms of psychological pressure will invalidate the acceptability of anything the person

questioned state or writes." Subsection X(C) under WAIVER OF RIGHTS states, "Any indication that the person was tricked, threated or cajoled into a waiver of these rights will establish that the waiver was not voluntary." Subsection XI(D) under "INTERROGATION PROCEDURE" states, "If the person the questioned states or in any manner indicates that he wishes to remain silent, but has a lawyer present, the police officer may state questions. However, no form of physical or psychological pressure may be exerted on the individual." Subsection X (c). (Ex. 33, GO 87-7) (emphasis in original).

37.     With respect to training as to interrogations from the period of 1996 to 1998, the City's Rule 30(b)(6) witness Eric Winstrom testified that detectives received several hours of interview and interrogation training when they were hired, and then received several hours in their pre-service training before being promoted to detective. (Ex. 5, Winstrom Dep, p. 213:17-2, 214:5). Winstrom testified that after being made detective, detectives received on the job training as they took part in custodial interviews. (*Id.*)

38.     Among other things, as part of the preservice training, Winstrom testified that detectives were instructed on *Miranda*, as well as that admissions had to be knowing, intelligent, and voluntary to be admissible. (Ex. 5, Winstrom Dep, p. 214:6-16). Detectives were trained not to physically abuse people during interrogations. (Ex. 5, Winstrom Dep, p. 219:10-25). Detectives were trained regarding false confessions. Detectives were trained to follow the policies and procedures, including not using threats and promises of benefits, to avoid the risk of false confessions. (Ex. 5, Winstrom Dep, p. 230:25-231:17). Detectives were trained that people who were mentally impaired, or intoxicated, may also be more susceptible to false confession. (Ex. 5, Winstrom Dep, p. 258:17-21).

## PLAINTIFFS' *MONELL* EXPERT, THOMAS TIDERINGTON

39.     Plaintiffs retained Thomas Tiderington to provide opinion testimony on Plaintiffs' *Monell* claim as well as the police investigation in this case.  (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 3).

40.     Tiderington has been retained to provide opinion testimony in six cases involving defendant Guevara, *Sierra, Iglesias, Maysonet, Gomez, Johnson* and this case.  (Ex. 29, Tiderington Dep in *Johnson* dated 9/20/23, 218:19-220:4).  His opinions in each of the cases with respect to each Plaintiff's *Monell* claim in each of the cases are nearly identical to his opinions in this case and rely upon the same materials. (*Id.*).

41.     In this case, the first case in which he was retained, Tiderington billed 78 hours in connection with the work he did in preparation of his report, which included both his opinions related to Plaintiffs' *Monell* claims as well as his opinions related to the police investigation in this case.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 362:11-18).  Tiderington estimates that he also had approximately 40 to 50 hours unbilled time in connection with the work he did in preparation of his report that he did not keep track of.  (*Id.* at 362:19-363:4).  Tiderington further estimates that he spent another 15 to 20 hours reviewing materials in preparation for his deposition in this case.  (*Id.* at 363:5-8).

42.     In the second case in which he was retained, *Sierra v. Guevara*, N.D. Ill. 18-CV-3029, Tiderington billed 65.75 hours in connection with the work he did in preparation of that report, which included both his opinions related to Plaintiff's *Monell* claim as well as his opinions related to the police investigation in that case.  (Ex. 23, Tiderington Deposition from *Sierra* dated

12/8/22, at 105:17-20; Ex. 24, Tiderington Invoice from *Sierra* dated 9/18/22, TIDERINGTON 002475-76).

43.　　In the third case in which he was retained, *Iglesias v. Guevara,* N.D. Ill., 19-CV-6508, Tiderington billed 58.15 hours in connection with the work he did in preparation of that report, which included both his opinions related to Plaintiff's *Monell* claim as well as his opinions related to the police investigation in that case. (Ex. 25, Tiderington Deposition from *Iglesias* dated 2/13/23, at 20:23-22:10; Ex. 26, Tiderington Invoice from *Iglesias* dated 11/19/22).

44.　　In the fourth case in which he was retained, *Maysonet v. Guevara*, N.D. Ill., 18-CV-2342, Tiderington billed 87.65 hours in connection with the work he did in preparation of that report, which included both his opinions related to Plaintiff's *Monell* claim as well as his opinions related to the police investigation in that case. (Ex. 27, Tiderington Deposition from *Maysonet* dated 4/28/23, at 89:7-17; Ex. 28, Tiderington Invoice from *Maysonet* dated 1/18/23).

45.　　In the fifth case in which he was retained, *Johnson v. Guevara,* N.D. Ill., 20-CV-4156, Tiderington billed 40.25 hours in connection with the work he did in preparation of that report, which included both his opinions related to Plaintiff's *Monell* claim as well as his opinions related to the police investigation in that case. (Ex. 29, Tiderington Dep from *Johnson* (Part II) dated 9/20/23, at 53:5-17; Ex. 30, Tiderington Invoice from Johnson dated 4/8/23, TIDERINGTON 2479).

46.　　In the sixth cases in which he was retained, *Gomez v. Guevara,* N.D. Ill., 18-CV-3335, Tiderington billed 57.25 hour in connection with the work he did in preparation of that report, which included both his opinions related to Plaintiff's *Monell* claim as well as his opinions related to the police investigation in that case. (Ex. 31, Tiderington Invoice from *Gomez* dated 5/24/23, TIDERINGTON 002582).

*Tiderington's opinions related to Plaintiff's Monell claim*

47.     According to Tiderington, as it relates to Plaintiff's *Monell* claim, "I was asked to assess…whether Chicago Police Department's policies and practices related to documentation and notetaking, including the creation, preservation, and disclosure of investigative materials in homicide cases, are adequate and consistent with practices around the country."  (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 3).

48.     Tiderington's Report does not assess CPD's policies and practices related to photo arrays/lineups.  (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 33-66).

49.     Regarding CPD's policies and practices concerning the documentation and disclosure of documents and information learned during homicide investigations, Tiderington has two global criticisms.  (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 33; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 415:10-416:7).  The first is what he describes as a routine failure to document information. (*Id.*).  The second is a routine failure to disclose the documents and information learned.  (*Id.*).

50.     Tiderington prepared a report in this case which relied on the accuracy of the spreadsheets created and provided to him by Plaintiff's counsel based on information gathered from investigative files and records division files (sometimes referred to as "RD Files" or "permanent retention files") (also collectively referred to as "homicide files") from homicides that were investigated by Area 5 detectives of the Chicago Police Department ("CPD") from 1995-1998.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 388:20-24; Ex. 29,

Tiderington Dep from *Johnson* dated 9/20/23, at 230:9-21; Ex. 23, Tiderington Dep from *Sierra* dated 12/8/2022, at 367:12-368:1).

### Data provided to Tiderington by Plaintiff's counsel

51.     Tiderington was provided a spreadsheet based on information gathered from the homicide files from homicides investigated by CPD Area 5 detectives from 1995-1998.  (Ex. 21, Tiderington Report in *Solache/Reyes*, Attachment F; Ex. 29, Tiderington Dep from *Johnson* dated 9/20/23, at 224:18-225:14; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 399:24-400:15).

52.     Tiderington does not know exactly who or how many people worked on the spreadsheet and was not involved in the decision-making or creation of the spreadsheet.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 389:1-23).

53.     In his report Tiderington states, "For the period from 1995-1998: I found that 277 investigative files, approximately 81% of total investigative files, contained inventory sheets that were incomplete." At his deposition, he testified that he "Certainly [] didn't look at 277 [files], [to determine if the inventory sheets were complete] but that's something that was spot-checked and is reflected in the spreadsheet." Tiderington does not know how the coders determined that the inventory sheets were incomplete. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 503:13-504:1; Ex. 34, Tiderington Report in *Solache/Reyes*, Attachment F, column titled "Are significant documents missing from Investigative File Inventory?")

54.     Tiderington received the spreadsheet in "hard copy large pages," and if he received it electronically, it was only in pdf format.  (Ex. 29, Tiderington Dep from *Johnson* dated 9/20/23, at 234:12-24).

55. The *Solache/Reyes* spreadsheet (for the years 1995-1998) is 53 pages long and contains 349 rows and 28 columns of data for a total of 9772 separate cells of data. (Ex. 34, Tiderington Report in *Solache/Reyes*, Attachment F).

56. There are also eleven columns under the label "Criminal Defense File Comparison". (Ex. 34, Tiderington Report in *Solache/Reyes*, Attachment F). Those eleven columns purport to generally identify "items in the Investigative File Missing from the Criminal Defense Files." (Ex. 34, Tiderington Report in *Solache/Reyes*, Attachment F). The spreadsheet contains no statistical analysis, does not provide percentages or even a tally of the totals for each of the 9,772 separate cells of data for the *Solache/Reyes* spreadsheet. (Ex. 34, Tiderington Report in *Solache/Reyes*, Attachment F).

57. The spreadsheet, and Tiderington's opinions, are based on 344 investigative files and 341 RD Files ranging from 1995-1998. (Ex. 21, Tiderington Report in *Solache/Reyes*, pp. 49-50; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 513:21-514:1; Ex. 29, Tiderington Dep from *Johnson* dated 9/20/23, at 238:16-19, 238:24-239:4).

58. Tiderington was also provided the investigative files and the RD files that the spreadsheet is based on. (Ex. 35, Tiderington Report in *Solache/Reyes*, Attachment B, at ¶¶97 and 99; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 389:24-390:21).

59. Tiderington testified that he began his review by examining the RD files standing alone to assess whether they communicated a complete picture of the investigation but could have just as easily began his review by examining the investigative files and there was no particular reason why he started with the RD files. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 514:12-515:15, 519:1-11).

60.     Tiderington did not review every investigative file he was provided.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 400:16-18).

61.     Of the 344 investigative files he was provided, he "spot-checked several of them" but he does not know if he has an exact number, he "probably looked at every one of the files, but some in greater detail than the others" meaning he "skimmed through each of the files."  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 401:10-402:7).

62.     Tiderington did not utilize "any great methodology" in deciding which files to spend more time with – "if something caught [his] interest, or … if it was something unusual, [he] spent more time on that."  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 403:1-8).

63.     Tiderington's goal in reviewing the investigative files was "to verify the information that was contained in the chart."  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 404:3-8).

64.     There was no "specific reason or rhyme or methodology in determining whether [Tiderington was] going to look at one file in greater detail than the other, but [his] goal was not to become familiar with each of the 300 files."  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 404:14-19).

65.     He doesn't "think it would have been humanly possible" to become familiar with each of the investigations that underlie the 344 files he reviewed because each of the files contained "many, many pages," sometimes hundreds of pages.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 404:20-405:7).

66. Tiderington believes anything in an investigative file can be exculpatory but did not do any analysis of the information in the file that led him to conclude the information was exculpatory.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 527:21-528:9).

67. The 344 investigative files that provide the basis for the spreadsheet in this case (1995 to 1998) are 55,474 pages in total.  (Ex. 35, Tiderington Report in *Solache/Reyes*, Attachment B at ¶ 97).

68. The 341 RD files that provide the basis for the spreadsheet in this case are 24,422 pages in total.  (Ex. 35, Tiderington Report in *Solache/Reyes*, Attachment B at ¶ 99).

69. Tiderington skimmed through the 341 RD files he was provided in this case and took a closer look at 15 to 20 of them.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 514:2-11).

70. There are no GPRs in RD files by design.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 515:12-23).

71. In addition, Tiderington based his opinion on whether CPD had a pattern and practice of not disclosing material exculpatory evidence to criminal defendants on 64 criminal defense files from the Cook County Public Defender's Office (hereinafter "CCPDO files") associated with the 1995-1998 investigative files and RD Files.  (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 53; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 596:9-599:21; Ex. 29, Tiderington Dep from *Johnson* dated 9/20/23, at 239:8-22).

72. Tiderington thinks he went through each of the CCPDO files but did not review in detail every document that was contained in the files. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 406:11-18).

73.     Tiderington never reviewed any files from the Cook County State's Attorney's Office (hereinafter "CCSAO files") that corresponded with any of the investigative files and RD Files from 1991-1998 to determine if any of the materials that Tiderington claims were not in the CCPDO files were contained within the CCSAO files, even though the CCSAO files were produced in this case. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 658:7-660:6; Ex. 29, Tiderington Dep from *Johnson* dated 9/20/23, at 225:10-226:7; 239:8-22).

74.     Tiderington learned the corresponding CCSAO files had been previously produced to Plaintiff the first day he was deposed in this case. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 659:12-660:6).

75.     After learning that the CCSAO files were produced in this case, and although Tiderington was disclosed subsequently in five other cases, he still never reviewed the CCSAO files or incorporated them into any of his *Monell* analysis in any of those reports, including never supplementing his report and opinions in this case. (Ex. 29, Tiderington Dep from *Johnson* dated 9/20/23, at 225:10-226:7; 239:17-22).

### *Failure to document*

76.     At his deposition, Tiderington identified *Jones v. City of Chicago, No. 87 C 2536 (N.D. Ill.)*, a civil rights lawsuit about a 1981 CPD investigation, as an example of a failure by CPD officers to document information. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 420:3-17; 422:23-423:2). Specifically, that there was "false or misleading documentation of a photo lineup --- well, I'm sorry, of information that was used to convict a young man that was contrary to the reports that were found in a street file at some point later." (*Id.*). Tiderington further testified that "Officer Laverty documented his portion of the investigation in which he concluded that Jones could not have possibly been the suspect. There was a separate

street file that failed to document how they concluded that Jones was a suspect adequately to document how they concluded that Jones committed the crime." (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 421:18-422:6).

77. In his report, Tiderington includes a reference to *Jones* in the section titled: **"Street Files": the George Jones Case and the *Palmer* class action**. (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 36). Tiderington's report states that detective Laverty interviewed the victim's brother, Purvy, who told detective Laverty that there were two assailants and both were wearing masks. (*Id*. at 37). Tiderington's report further states that "Laverty documented this and other evidence that Jones was not the perpetrator and that Jones could have used to help defend himself. However, this information was placed 'not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files." (*Id*.)

78. Tiderington testified that he found other examples of CPD officers' alleged failure to document information while "spot-checking" the information in the spreadsheet. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 423:3-424:1).

79. He determined that CPD officers were not documenting information from spot-checking data in the spreadsheet for cases "where the police report would attribute statements to a witness, but then there were no notes." (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 424:2-20).

80. Tiderington testified that he did not specifically list the examples of cases in his report in which CPD officers were not documenting information. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 424:22-425:1).

81.     Tiderington also testified that he did list the RD numbers of cases that were examples at page 50 of his report. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 426:18-23).

82.     The 5 RD numbers of cases listed at page 50 of Tiderington's report are in the section titled **Missing or Incomplete Inventory Sheets**.    (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 49-50).   In the report, those 5 RD numbers are cited as examples of why inventory sheets were "not useful for their intended purpose of serving as a cross-reference: there are examples where dates are illegible, where dates do not appear at all, where the person who entered the document is not listed, and where the entries are too vague to be able to tell what document it is referring to (e.g., "GPRs," without identifying how many or which dates, etc.)." (*Id.* at p. 50).

83.     Tiderington also testified that the spreadsheet he was provided by Plaintiff's counsel confirms this opinion.   (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 428:12-21).

84.     There is no column in the spreadsheet that indicates there is failure to document found in a particular case, but according to Tiderington, there is a column that lists the numbers of cases that do not have GPRs. (Ex. 34, Tiderington Report from *Solache/Reyes*, Attachment F; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 428:22-429:5).

85.     According to Tiderington, if an investigative file does not have a GPR it may support his conclusion of a failure to document.   (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 429:6-12).

86.     The police department where Tiderington was chief did not require the use of GPRs. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 489:7-8).

87.     Tiderington identified the columns that say, "Are there handwritten notes in that file that are not GPRs"; "Are there significant documents missing from the investigative file inventory? List report, type and dates."; "Are they any handwritten notes?" as the columns he reviewed to determine whether the investigative file contained a GPR.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 430:23-431:5; 431:23-432:8; 434:21-435:4).

88.     Tiderington identified files that did not contain any handwritten notes while he was spot-checking the files but did not tabulate how many of those files existed. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 437:10-438:15).

89.     No other data contained within his report supports his conclusion that there was a routine failure to document.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 438:16-20).

90.     His opinion that "All relevant information in unofficial documents is not transcribed in official reports" is based on his inference that "unofficial documents" must exist because there are no notes in files he believes should contain notes.  (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 50; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 509:23-513:1).

91.     Tiderington defines "unofficial documents" as "perhaps the street files [referring to the *Jones* case] or documents that officers believe are personal information versus [sic] and information that perhaps they keep in their desk and not in either the investigative file or permanent file." (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 511:3-11).

92.     In his review, he has never seen those files or "unofficial documents."  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 513:7-20).

93.    In Tiderington's opinion, handwritten notes that are not written on GPRs that are included in the investigative file does not constitute a violation of a criminal defendant's constitutional rights. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 491:2-17).

94.    Tiderington's criticism of the use of handwritten notes not on GPRs is limited to whether CPDs policies were being followed.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 491:17-20).

95.    The evidence upon which Tiderington relies in support of his opinion that police officers were treating notes as their personal property is the fact that "there were no notes on investigations that you would reasonably expect to see notes and that many files were void of notes as well." (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 494:10-24).

96.    Tiderington's Report does not identify data that establishes a routine failure to document.  (Ex. 21, Tiderington Report in *Solache/Reyes,* pp. 33-66).

***Street files***

97.    Tiderington opines that the City's policies were inadequate to address the street files problem. (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 49).

98.    Tiderington's understanding of the phrase "street file" are files that were used that were not considered a formal file that would have to be turned over to prosecuting attorneys or criminal defendants.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 438:21-439:6).

99.    Investigative files are considered formal files that are to be turned over by the CPD to prosecuting attorneys or criminal defendants.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 439:7-441:2).

100.    Tiderington's opinion that CPDs policies were inadequate to address the street files problem is based on his review of 344 separate Area 5 homicide investigations for the period 1995-1998 that are documented in the investigative files and RD files produced.  (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 49).

101.    He concluded that the street files problem still existed because he concluded CPDs policies were not being complied with.  (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 49-52).

102.    He also concluded in his Report that based on his "review of the criminal defense files provided to [him], as compared to the investigative files" that the criminal defense files show that "important investigative materials" are regularly withheld. (Ex. 21, Tiderington Report in *Solache/Reyes*, pp. 52-53).

103.    Tiderington's Report does not identify any investigative files that did not have at least some of its documents in the corresponding criminal defense file from CCPDO (other than from criminal defense files that he eliminated from his analysis because they were incomplete). (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 441:6-22, 442:7-14, 598:1-599:13).

**Failure to disclose**

104.    There are redacted documents contained in the CCPDO files, including redactions of full pages, and Tiderington's report assumes that the redacted documents are not police documents, but he also agrees that information relevant to his analysis could have been redacted. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 599:22-601:10; 607:14-613:6; Ex. 29, Tiderington Dep from *Johnson* dated 9/20/23, at 251:13-254:9).  Tiderington testified that he can conclude that there are documents missing from every criminal defense file even though a majority, if not all, of the criminal defense files contain redacted pages because "you can only go

on the information that was provided." (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 605:5-13).

105. Tiderington was told by Plaintiff's counsel that police reports were not redacted from the CCPDO files. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 607:14-608:1).

106. Tiderington eliminated some of the files from his analysis because they contained no police documents or so few that he treated the files as being incomplete, and agreed that some of the files may be incomplete because they were likely transferred to private criminal defense attorneys. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 441:6-22; 598:1-599:13).

107. Tiderington agrees "that if the materials or the majority of materials that [he has] identified as being withheld because [he] didn't find them in the [CCPDO] files, if they, in fact, are there and redacted for some reason, then, obviously, that would change [his] opinions[.]" (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 612:22-613:6).

108. Tiderington has no understanding of where or how the CCPDO maintained their 1995-1998 files. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 613:7-16).

109. Tiderington states "My comparison of the investigative files to corresponding defense files revealed that every one of the criminal defense files are missing documents that were contained in the corresponding police investigative files." (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 55; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 601:11-18). Tiderington did no analysis to determine if the missing information was exculpatory. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 528:1-9).

110.    There were 64 CCPDO files that had corresponding CPD investigative files ("companion files").  Tiderington did not personally compare page by page the 64 CCPDO files to the companion files; he "spot-checked several cases, and it was consistent with what the analysis was." (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 601:19-602:7).

111.    Tiderington personally compared under 10 of the 64 sets of companion files.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 603:4-8).

112.    If Tiderington had reviewed the CCSAO files that corresponded with the investigative files, RD files, and CCPDO files, and "found out that the materials [he] identified in [his] report as being withheld [were] actually contained in the Cook County State's Attorney's files" he agrees that it "would have been proper and reasonable conduct on the part of the [CPD] investigators." (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 660:7-18).

113.    Tiderington provides eight cases that he claims are "[e]xamples of relevant information in police files that was withheld from criminal defendants but should have been disclosed," which he also describes as "examples from the comparison of the defense attorney files and the corresponding police investigative files that demonstrate that the information withheld from criminal defendants included investigative material that should have been disclosed." (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 56-60).

114.    Tiderington identified some of the examples of CCPDO files which were missing documents from the investigative files on his own and some were pointed out to him by Plaintiff's counsel but he cannot identify which cases were pointed out by Plaintiff's counsel for closer review.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 663:1-24).

115.    Tiderington testified that when he says "withheld," he means generally speaking that criminal defendants didn't receive them. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 592:24-593:10).

116.    In one example in his report, the Kim Mathis case, Tiderington alleges that Terry Mathis, the criminal defendant's sister, being a potential witness to the crime was not disclosed, yet Tiderington conceded at his deposition that the public defender's file shows that "the defense attorney was in contact with the criminal defendant's sister." (Ex. 21, Tiderington Report in *Solache/Reyes*, pp. 57-58; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 591:7-13; 591:24-592:9). Defendants' *Monell* expert, Bernard "Bernie" Murray, agrees that the public defender's file contains an extensive diary of the public defender's interviews with Terry Mathis. (Ex. XX, Bernie Murray's Expert Report in *Solache/Reyes*, pp. 12, 17).

117.    In another example in Tiderington's report, the Ardell Clemons case, Tiderington alleges that "[t]he investigative file includes several documents that could have been relevant to the defense but were not in the public defender's file," and more specifically that there were documents of potential alternative suspects that were not in the CCPDO file, yet concedes that he did not review the CCSAO file to determine if those documents were contained in it and ignored other documents from the file that the criminal defendant had called CPD and admitted to the crime and also subsequently confessed to the officers in Key West, Florida. (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 58; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 660:7-18; 660:23-662:8). Defendants' expert Murray found the documents Tiderington alleged were missing in the CCSAO file. (Ex. 36, Bernie Murray's Expert Report in *Solache/Reyes*, pp. 17-18).

118.    In yet another example in his report, the Oscar Soto case, Tiderington alleges that GPRs from the investigative file are not in the CCPDO file and that arrest reports of two alternative

suspects that were also suspects in another case, but were not identified in the lineup in the Soto case, were in the investigative file but not the CCPDO file, yet agrees that the CCPDO file contains two supplementary reports related to those two suspects and he does not know what is contained in the redacted pages of documents in the CCPDO file. (Ex. 21, Tiderington Report in *Solache/Reyes*, pp. 58-59; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 669:24-670:20; 671:3-11). Murray states that the public defender's file for the Soto case is incomplete because the CPD files were 158 pages, and the produced public defender's file contains only 112 pages, 47 of which are redacted, 28 of which are photographs, 2 are blank, 2 are copies of envelops, and 33 pages are subpoenas. (Ex. 36, Bernie Murray's Expert Report in *Solache/Reyes*, pp. 18-19).

119.     In another example in his report, the Guy Rainey case, Tiderington alleges detectives did not disclose all of the names and mugshots they obtained of potential suspects when detectives requested numerous photographs of individuals with the documented nickname "Little", but Tiderington admits that he only assumed that the alleged mugshots of individuals nicknamed "Little" were compiled to conduct photo arrays. In the same file, Tiderington alleges that detectives did not disclose a handwritten note in the investigative file with Donnie Morris' name on it that says "Kevin Haas pull file to see if he is still wanted" because alternative suspects should be disclosed, yet Tiderington agrees that Kevin Haas was a detective at Area 5 in charge of record keeping investigative files and was not a suspect, and that Donnie Morris was not a suspect as documents in the file show that it was disclosed that Donnie Morris was with his nephew Cedric Morris when Cedric Morris was shot. (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 59; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 672:11-23; 673:2-674:17; 674:22-677:4).

29

*Training*

120.    Tiderington's Report states that there was inadequate training and monitoring/auditing to ensure compliance with the special orders, referencing Special Order 83-1. (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 48; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 482:1-10).

121.    Tiderington's report does not address any training that was done after CPD issued the 1986 directive or the 1988 SOP.  (Ex. 21, Tiderington Report in *Solache/Reyes*, p. 48; Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 482:11-485:10).

122.    The only information Tiderington has about training that was done on the 1986 directive or the 1988 SOP is based on his memory on the testimony of James Hickey and Eric Winstrom, two of the City's Rule 30(b)(6) witnesses. (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 482:11-485:10).

123.    Hickey testified that detectives, youth officers, sergeants, lieutenants, and exempt commanding officers in the Bureau of Investigative Services were provided training on the 1982, 1983 and 1986 police orders establishing investigative files.  (Ex. 7, Hickey Dep in *Rivera* dated 5/6/14, at 54:12-55:7, 56:1-7).

124.    Winstrom testified that detectives were trained on the SOPs, and more specifically that they were required to report all substantive or relevant information learned in an investigation, and testified that from 1986-1998 detectives were trained on notetaking.  (Ex. 5, Winstrom Dep, at 130:12-131:18; 145:13-21).  Detectives also received role call training when 86-3 became effective for 5 or 7 straight days, which advised them of the order and its contents.  (Ex. 5, Winstrom Dep, at 152:1-24)  New detectives received training on the 86-3 police and SOPs in pre-detective training, including the purpose of notes, the circumstances in which they needed to

take notes, that notetaking was a useful tool that could help them write accurate reports, that they should never destroy their notes, the information to include in supplementary reports for violent crimes cases, including homicides. (Ex. 5, Winstrom Dep, at 152:25-154:14; 166:7-168:18).

### *Tiderington's understanding of the process in Cook County criminal cases*

125.    Tiderington does not have any understanding of what a motion for discovery is in the context of criminal case in Chicago.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 622:10-14).

126.    Tiderington does not know the distinction between a "00MC1" court number and a "00CR" number.  (Ex. 22, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 625:12-23).


## PLAINTIFF'S MONELL EXPERT, ANTHONY FINNELL

127.    Plaintiff retained Anthony Finnell to provide opinion testimony about CPD's supervision and disciplinary practices in support of Plaintiff's *Monell* claim, specifically "to render an opinion as to the City of Chicago's policies, procedures, and practices as they related to the training, supervision and discipline of officers, and their relationship to the disciplinary histories and conduct of the Defendant Officers, as it relates to the 1998 wrongful convictions of Plaintiffs Reyes and Solache."  (Ex. 37, Finnell Report in *Solache/Reyes*, p. 7).

128.    Finnell has been retained to provide opinion testimony in four other cases involving defendant Guevara, *Sierra*, *Iglesias, Rodriguez* and one case against the City of Chicago that does not involve defendant Guevara, *Velez*.  (Ex. 38, Finnell Dep from *Iglesias*, at 31:23-32:11).  His opinions in each of the cases with respect to each plaintiff's *Monell* claim are nearly identical to the opinions set forth in the report in this case and rely upon the nearly the same materials. (*Id*.).

129.    In preparing his report, Finnell enlisted the assistance of Timothy Knight and

Miroslava Meza. (Ex. 37, Finnell Report in *Solache/Reyes*, pp. 4-6). Knight and Meza did not sign the report and were not disclosed as experts by Plaintiffs. (Ex. 37, Finnell Report in *Solache/Reyes*, p. 80).

130. Knight reviewed CRs and other documentation and provided a different perspective on different parts of the material that Finnell had not considered. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, 144:2-15). Knight also assisted Finnell in drafting the report by reviewing Finnell's work, making sure he correctly captured all of the documentation reviewed, and he would more or less edit and review certain portions, particularly in the historical context section. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 146:12-147:1).

131. Meza conducted the statistical analysis and generated the tables that are included in Finnell's report. (Ex. 37, Finnell Report in *Solache/Reyes*, p. 9).

132. Finnell knows that Meza used statistical software to conduct her analysis, but he does not know the methodology she used to create the tables and graphs for his report. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, 121:21-122:5).

133. Finnell was a sworn member of the Indianapolis Metropolitan Police Department from October 1989 until June 2014. (Ex. 40, Finnell Report in *Solache/Reyes*, Attachment C, p. 2). He was a homicide and robbery investigator for ten of those years. (*Id*.)

### Finnell's opinions related to Plaintiff's Monell claim

134. Finnell has two global opinions. First, Finnell opines that "[t]he Chicago Police Department and Defendant City of Chicago engaged in a widespread pattern and practice the condoned unlawful, unreasonable, and improper law enforcement practices." (Ex. 37, Finnell Report in *Solache/Reyes*, p. 10). Second, Finnell opines that "[t]he Chicago Police Department's and the Defendant City of Chicago's failure to discipline and supervise Defendants created a sense

of impunity and facilitated, encouraged, and allowed abuses." (*Id.* at p. 69).

**Data provided to Finnell by Plaintiff's counsel**

135.    Finnell was first provided a spreadsheet from Plaintiff's counsel that was based on information gathered from the Complaint Register Files ("CRs" or "CR files") investigating allegations of misconduct that included Area 4 detectives and gang specialists from March 1996 to March 2001 in the *Velez* case.  (Ex. 37, Finnell Report in *Solache/Reyes*, p. 7).  He was then provided with a spreadsheet from Plaintiff's counsel that was based on information gathered from the CRs investigating allegations of misconduct that included Area 5 detectives from 1995-1998 in this case.  (*Id.*).

136.    With respect to the *Velez* spreadsheet, Finnell does not know a) the identities of, b) the number of, or 3) the expertise of, the individuals who prepared the spreadsheet. Finnell and his team relied on the *Velez* spreadsheet in support of his opinions.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 101:2-102:15).  Finnell does not know the expertise, education or training of the individuals that were extracting the information from the CRs to create the *Velez* spreadsheet or if they had any familiarity with the subject matter.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 102:16-103:3).

137.    With respect to the *Solache/Reyes* spreadsheet, Finnell does not know who prepared the spreadsheet, how many people prepared the spreadsheet, the backgrounds or credentials of any of the individuals who prepared the spreadsheet and he did not have any input into the preparation of the spreadsheet.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 179:13-180:4).

138.    Finnell was also provided with the CR files that support the spreadsheets in this case and *Velez*.  (Ex. 37, Finnell Report in *Solache/Reyes*, p. 7).

139.    The spreadsheet in this case includes columns such as complainant, accused

officers' name, allegation, date of incident, date CR was initiated, date investigation completed, finding and a host of other data points, many of which (*see e.g.*, columns N-R, U, X, AA-AZ, BA-BN) are not mentioned in Finnell's report.  (Ex. 41, Finnell Report in *Solache/Reyes,* Appendix B).

140.    In *Velez*, Meza analyzed the data in the spreadsheet provided in that case and reviewed CR files to spot check various points in the spreadsheet but Finnell does not know which CRs she reviewed.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 98:22-99:22).

141.    Meza also analyzed the data in the *Velez* spreadsheet and reviewed CR files to spot-check various points in the spreadsheet.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 98:22-100:1).

142.    Finnell also spot-checked the CRs in *Velez* by pulling a CR and seeing if the information from the CR matched the spreadsheet but he does not know how many CRs he spot checked, "probably twenty."  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 105:7-21).

143.    Finnell tried to look at every CR file that was produced in this case, at least through the Complaint page that identifies the complaint and the Summary Report that shows the steps the investigator took.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 131:5-12).

144.    Finnell spent 10 to 60 minutes to conduct his review depending on the length of the CR file.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 131:21-132:5).

145.    Finnell was also provided with the CR files for Defendant Officers.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 184:10-185:5).

146.    Finnell produced reports in *Velez* and this case that included charts and graphs created by Meza. He does not know what methodology Meza used to create the tables and graphs

that are used in any of those reports.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 121:2-122:5).

### *Outlier Analysis*

147.     Finnell relied on Meza to use consistent methodology in all her analysis, including her outlier analysis.  (Ex. 42, Finnell Dep from *Sierra* dated 1/13/23, at 226:12-18).  The "statistical outlier classification are officers who, once Ms. Meza determined what constituted an outlier, those officers would fall into that classification, meaning statistically they are the outlier from the group based on the number of allegations that they had during that time period."  (Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 432:5-19).

148.     The purpose of the outlier analysis was to determine whether any Defendant Officers would be considered an outlier compared to other Area 5 detectives.  (Ex. 42, Finnell Dep from *Sierra* dated 1/13/23, at 258:2-15).  Finnell concluded in his original report that Defendant Officers Guevara, Halvorsen, Rutherford, Harvey, Mingey, and Biebel were outliers.  (Ex. 37, Finnell Report in *Solache/Reyes,* p. 70).

149.     Finnell expected Meza to use sound methodology in the cases where she conducted her outlier analysis which included *Solache/Reyes* (and later cases where he was retained) but Finnell is not a statistician so he relies on Meza to do what she deems appropriate and best in analyzing the data and providing that information to him.  (Ex. 42, Finnell Dep from *Sierra* dated 1/13/23, at 226:20-227:6).  Finnell has "no idea" if there are other methodologies that are better.  (Ex. 42, Finnell Dep from *Sierra* dated 1/13/23, at 227:8-20).  Because Finnell is not a statistician, he is unable to critically review Meza's calculations.  (Ex. 42, Finnell Dep from *Sierra* dated 1/13/23, at 229:2-7).

150.     There is no standard in the field of police oversight about the appropriate period of

time to conduct an outlier analysis. (Ex. 42, Finnell Dep from *Sierra* dated 1/13/23, 250:8-16). Finnell does not know if any police departments were conducting outlier analyses in 1995 and cannot identify any police department that has ever used an outlier analysis similar to the one Meza conducted for the purpose of discipline and oversight. (Ex. 42, Finnell Dep from *Sierra* dated 1/13/23, at 250:17-21, 254:14-23).

151.     Finnell has no statistical background and cannot evaluate or answer questions about the statistical analysis Meza conducted that is included in his report. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 186:12-188:10).

152.     Finnell conceded in his rebuttal report in this case that his "outlier analysis" from his report was wrong, and that none of the Defendant Officers are outliers when compared to the 1995 to 1998 time period. (Ex. 44, Finnell Rebuttal Report in *Solache/Reyes,* p. 33).

### The City's CR production

153.     For purposes of Plaintiffs' *Monell* claim in this case, the City produced 349 CRs that included complaints against Area Five detectives from the 1995-1998 time period. (Ex. 37, Finnell Report in *Solache/Reyes*, p. 9).

154.     For purposes of Plaintiff's *Monell* claim, the City produced 416 CRs in the *Velez* case from the March 1996 – March 2001 time period. (Ex. 37, Finnell Report in *Solache/Reyes,* p. 7; Ex. 45, Finnell Report in *Velez*, p. 10).

155.     The City also produced the career CR files for Defendant Officers. (Ex. XX, Finnell Report in *Solache/Reyes*, p. 9; Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, 283:21-284:24; 287:18-288:4).

156.     Finnell's report in this case identifies Defendant Guevara and Halvorsen's CRs by incident date not initiation date. (Ex. 37, Finnell Report in *Solache/Reyes*, pp. 71-76). A CR

36

initiation date is the date a CR is actually filed as distinct from the date of the incident. (Ex. 42, Finnell Dep from *Sierra* dated 1/13/23, at 63:10-24).

### *Defendant Officers CR Files that pre-date Plaintiffs' 1998 arrests*

157.    By the time of Plaintiffs' arrests in April 1998, Defendant Guevara had thirteen CRs initiated against him; Defendant Biebel had three CRs; Defendant Cappitelli had no CRs; Defendant Halvorsen had three CRs; Defendant Mingey had three CR; and Defendant Dickinson had one CR; Defendant Rutherford had eight CRs, Defendant Trevino had no CRs. (Ex. 46, Defendant Officers' complaint histories).

158.    A CR can result in one of four outcomes: (1) unfounded (the allegation was found to have not occurred); (2) exonerated (the conduct occurred but was lawful); (3) not sustained (the allegation is unable to be proved or disproved); and (4) sustained (the allegation occurred). (Ex. 37, Finnell Report in *Solache/Reyes,* pp. 53-54).

159.    In 1986, three allegations in CR No. 152902 against Defendant Guevara were sustained for failing to make a proper notification that he was the victim of a battery, releasing a prisoner without proper authorization, and making a false statement, resulting in a two-day suspension without pay. The allegations that Guevara failed to make the proper notification that he was the victim of a battery and that he released a prisoner without proper authorization were made by a supervisor. (Ex. 37, Finnell Report in *Solache/Reyes*, at p. 72; Ex. 47, CR File 152902, at RFC-Solache/Reyes 31538-40)

160.    In 1986, two allegations in CR No. 150473 against Defendant Guevara for excessive force and verbal abuse were sustained, resulting in the City's Office of Professional Standards (OPS) recommending a 5-day suspension. Although the Chief Administrator for OPS did not uphold the sustained CR for excessive force, he did for verbal abuse, and Defendant

Guevara was reprimanded. (Ex. 48, CR No. 150473, CCSAO *Reyes/Solache* PC Documents 10032, 10040).

161.    In 1996, in a CR initiated against 150 Chicago police officers after CPD was notified by the Illinois Secretary of State that those officers had suspended driver's licenses for not having paid parking tickets or traffic infractions, one allegation in that CR (CR No. 220046) against Defendant Guevara for allegedly having a suspended driver's license because he had failed to pay a parking ticket was sustained. (Ex. 49, CR No. 220046, RFC-Reyes 27968, 27975, 27986; Ex. 46, Defendant Officers' complaint histories, at RFC-Solache/Reyes 789).

162.    In March 1998, one allegation in CR No. 223928 against Defendant Guevara for "[e]ngaging in any unjustified verbal or physical altercation with any person while on or off duty" was sustained, and Defendant Guevara was suspended for one day. (Ex. 50, CR No. 223928, RFC-Reyes 28399, 28403).

163.    In 1992, one allegation in CR. No. 191722 against Defendant Rutherford for "Inattention to Duty" for a prisoner escaping police custody was sustained, and Defendant Rutherford was suspended for 1 day. (Ex. 51, CR No. 191722, RFC-Solache/Reyes 2710, 2713).

164.    Before Plaintiffs' arrests in 1998, Defendant Biebel had three CRs initiated against him, none of which were sustained, which include (i) CR No. 156137, one allegation for damaging a door while executing a search warrant was exonerated, one allegation for damaging personal property while executing a search warrant was not sustained, and one allegation for searching without a warrant was unfounded; (ii) CR No. 153256, three allegations for striking, knocking down, and kicking a complainant were not sustained; and (iii) CR No. 194728, one allegation for verbal abuse was not sustained. (Ex. 52, CR File 156137, at RFC-Solache/Reyes 2301-02; Ex. 53,

CR File 153256, at RFC-Solache/Reyes 2247-48; Ex. 54, CR File 194728, at RFC-Solache/Reyes 116271-72).

165.    Before Plaintiffs' arrests in 1998, Defendant Frank Cappitelli did not have any CRs initiated against him.  (Ex. 46, Defendant Officers' complaint histories, at RFC-Solache/Reyes 884).

166.    Before Plaintiffs' arrests in 1998, Defendant Mingey had three CRs initiated against him, and none of which were sustained, which include (i) CR No. 123850, three allegations for forcibly entry and search, assault, and threats were unfounded; (ii) CR No. 233861, one allegation for using profanity was not sustained; and (iii) CR No. 240708, two allegations for warrantless entry and pointing a weapon at the complainant were not sustained.  (Ex. 46, Defendant Officers' complaint histories, at RFC-Solache/Reyes 867; Ex. 55, CR File 123850, at RFC-Solache/Reyes 31449; Ex. 56, CR File 233861, at RFC-Solache/Reyes 31947-49; Ex. 57, CR File 240708, at RFC-Solache/Reyes 32010-13).

167.    By the time of Plaintiffs' arrests in 1998, Defendant Rutherford's non-sustained CRs include (i) CR No. 144706, four allegations for excessive force were not sustained; (ii) CR No. 157986, one allegation for failure to render medical assistance was unfounded; (iii) CR No. 180432, one allegation for excessive force was not sustained; (iv) CR No. 181452, one allegation for damaging personal property was not sustained; (v) CR No. 183770, two allegations for warrantless search and false arrest were not sustained and one allegation for failure to appear in court was unfounded; (vi) CR No. 187732, one allegation for damaging personal property while executing a search warrant was not sustained; (vii) CR No. 188980, one allegation for warrantless search was exonerated and one allegation for theft during the search was not sustained.  (Ex. 58, CR No. 144706, at RFC-Solache/Reyes 2053-54; Ex. 59, CR No. 157986, at RFC-Solache/Reyes

2344-45; Ex. 60, CR No. 180432, at RFC-Solache/Reyes 2487-88; Ex. 61, CR No. 181452, at RFC-Solache/Reyes 2530-31; Ex. 62, CR No. 183770, at RFC-Solache/Reyes 2569; Ex. 63, CR No. 187732, at RFC-Solache/Reyes 2635-36; Ex. 64, CR No. 188980, at RFC-Solache/Reyes 2686-87)

168.    Before Plaintiffs' arrests in 1998, Defendant Halvorsen had three CRs initiated against him, and none of which were sustained, which include (i) CR No. 157627, one allegation for excessive force was not sustained; (ii) CR No. 240708, two allegations for warrantless entry and pointing a weapon at the complainant were not sustained; and (iii) CR No. 177115, three allegations for excessive force were unfounded.  (Ex. 37, Finnell Report in Solache/Reyes, at p. 73; Ex. 46, Defendant Officers' complaint histories, at RFC-Solache/Reyes 799; Ex. 65, CR File 157627, at RFC-Solache/Reyes 31594-95; Ex. 66, CR File 240708, at RFC-Solache/Reyes 32010-13).

169.    Before Plaintiffs' arrests in 1998, Defendant Dickinson had one CR initiated against him that was not sustained, which includes CR No. 192379, two allegations for physical abuse and attempting to make a warrantless search were not sustained.  (Ex. 46, Defendant Officers' complaint histories, at RFC-Solache/Reyes 808; Ex. 67, CR File 192379, at RFC-Solache/Reyes 2743-47).

170.    Before Plaintiffs' arrests in 1998, Defendant Guevara's non-sustained CRs include (i) CR No. 124631, fourteen allegations for excessive force and verbal abuse were not sustained (12 allegations) and exonerated (2 allegations) (ii) CR No. 142612, two allegations for excessive force and threatening to shoot a dog were not sustained; (iii) CR No. 143475, allegations for a warrantless search and damaging property were not sustained; (iv) CR No. 168160, one allegation for a warrantless search was exonerated and one allegation for failure to identify as an officer not

sustained; (v) CR No. 182519, one allegation for verbal abuse was not sustained; (vi) CR No. 195857 one allegation for forcing two individuals to pose for pictures was exonerated; (vii) CR No. 205257, five allegations for erratic driving, verbal abuse, excessive force (2 allegations), and driving while intoxicated were not sustained, and one allegation for excessive force was exonerated; (viii) CR No. 217624, one allegation for beating and threatening an individual was not sustained; (ix) CR No. 236739, one allegation for failing to provide medical treatment was not sustained. (Ex. 37, Finnell's Report in *Solache/Reyes*, at pp. 71-76; Ex. 46, Defendant Officers' complaint histories, at RFC-Solache/Reyes 789; Ex. 68, CR File 124631, at NPSL 9127-32; Ex. 69, CR File 142612, at RFC-Solache/Reyes 33536-38, 33571; Ex. 70, CR File 143475, at NPSL 18864-66; Ex. 71, CR File 168160, at RFC-Solache/Reyes 33574, 33579; Ex. 72, CR File 182519, at RFC-Solache/Reyes 31618-20; Ex. 73, CR File 195857, at RFC-Solache/Reyes 31630-31; Ex. 74, CR File 205257, at RFC-Solache/Reyes 31644, 31651; Ex. 75, CR File 217624, at RFC-Solache/Reyes 31761; Ex. 76, CR File 236739, at RFC-Solache/Reyes 31963, 31966).

### *Training and Supervision*

171.    Finnell does not identify any training materials in his report. (Ex. 41, Finnell Report in *Solache/Reyes*, attachment B.) Finnell does not recall receiving any training guides, training manuals or training histories. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 153:3-6).

172.    Finnell's Report does not analyze or opine on any CPD's training policies or practices. (Ex. 37, Finnell Report in *Solache/Reyes*, generally).

173.    While Finnell mentions supervisors and supervision throughout his report his criticism is limited to CPD's systems. (Ex. 37, Finnell Report in *Solache/Reyes,* generally).

41

### *Finnell's conclusions about Defendant Officers' conduct*

174.    Finnell concluded that, "the practice of rehearsing false confessions, the practice of fabricating evidence or false statements or forcing people to give statements, provide statements that they know aren't true. You know, threatening witnesses, you know, or holding back information when you know that the information might prove that the Defendant wasn't there and it might point to another Defendant.  So, those are the practices that the detectives did in this case and in many other cases" that were permitted and overlooked by CPD.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 157:9-19, 160:21-161:9).

175.    Finnell testified that it was his "opinion that the officers committed constitutional rights violations on the plaintiffs as well as part of their pattern of work throughout their careers as a result of the multiple complaints, multiple investigations and reviews of not only them but the entire system over the years."  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 415:14-416:4).

176.    Finnell's conclusions regarding the practices of the City of Chicago are based on his conclusions that the Defendant Officers in this case coerced false confessions, fabricated evidence, false statements, threatened witnesses, and held back information that might prove the Defendants innocent as well as the Defendant Officers' history of their CRs, and other allegations against them and other investigations that have been conducted or information that had come forward that was never acted upon by the CPD administration.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 161:4-20).

### *CPD Annual Reports*

177.    Finnell testified that the CPD Annual Reports list only the primary allegation in the CR and that within those CR files there could be additional allegations.  (Ex. 39, Finnell Dep from

*Solache/Reyes* dated 9/22/22, at 313:21-315:24, 316:11-15).

178.   In its Annual Reports for the 1995-1998 timeframe, CPD calculates the number of disciplinary complaints made against Chicago police officers by CRs but Finnell calculated by "investigations and allegation counts." (Ex. 37, Finnell Report in *Solache/Reyes,* p. 48-49, 81-83 (*see also* Annual Reports from 1995-1998 cited by Finnell at fn. 84-87, https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/); Ex. 39, Finnell Dep in *Solache/Reyes* dated 9/22/22, 181:3-11; Ex. 43, Finnell Dep in *Solache/Reyes* dated 9/23/22, 294:3-295:1).

179.   Table 17 of Finnell's Report shows:

TABLE 17: Sample size, based on CPD complaints documented in its annual report (19951998).

| Year of incident | Sample available Individual Investigations | CPD Annual report, complaint received count | Sample size % Of total complaints registered by CPD |
|---|---|---|---|
| 1995 | 643 | 9525[134] | 6.8% |
| 1996 | 556 | 7420[135] | 7.5% |
| 1997 | 448 | 7240[136] | 6.2% |
| 1998 | 336 | 5981[137] | 5.6% |
| *Total* | 1983 | 20641 | 9.6% |

(Ex. 37, Finnell Report in *Solache/Reyes,* p. 81-82).

180.   Table 17 was prepared by Ms. Meza.  (Ex. 39, Finnell Dep in *Solache/Reyes* dated 9/22/22, 193:8-194:1).

181.   At his deposition, Finnell testified that the numbers in the Column labeled "CPD Annual Report, complaint received count" for the year 1995-1998 as well as the total and the

percentages were incorrect and that they "are numbers that should have been in another … report that [he] was working on." (Ex. 39, Finnell Dep in *Solache/Reyes* dated 9/22/22, 196:15-197:4).

182.    He figured out there was an error two days before his deposition. (Ex. 39, Finnell Dep in *Solache/Reyes* dated 9/22/22, 197:13-15).

183.    Finnell testified that despite the error, according to Ms. Meza, the difference does not change the opinion or the outcome because it was statistically insignificant, meaning, "when [he] conferred with Miss Meza, she assured [him] that statistically that it does not matter … from a statistical perspective, it does not change the opinion or the outcome.". (Ex. 39, Finnell Dep in *Solache/Reyes* dated 9/22/22, 198:4-199:18).

184.    Finnell could not provide the basis of Ms. Meza's opinion that the changes in the numbers were statistically insignificant and he has no way to evaluate that opinion himself. (Ex. 39, Finnell Dep in *Solache/Reyes* dated 9/22/22, 199:19-200:16).

185.    Finnell testified that the correct numbers that should have been in Table 17 are: 6406 for 1995, 7151 for 1996, 6940 for 1997, 5778 for 1998. (Ex. 39, Finnell Dep in *Solache/Reyes* dated 9/22/22, 200:17-201:4).

186.    Finnell testified that Ms. Meza concluded that the numbers reflected in the CPD Annual Reports represent individual investigations or CR numbers. (Ex. 39, Finnell Dep in *Solache/Reyes* dated 9/22/22, 205:15-20).

187.    Finnell testified that he personally does not know if the numbers reflected in the CPD Annual Reports for the years 1995-1998 represent individual investigations or CR numbers. (Ex. 39, Finnell Dep in *Solache/Reyes* dated 9/22/22, 205:21-206:1).

188.    Finnell testified that a statistically significant sample is a sample large enough from the population that being analyzed in order to render an opinion applicable to the entire population

so that the entire population does not have to be analyzed. (Ex. 42, Finnell Dep from *Sierra* dated 1/13/23, at 102:18-103:8).

189.    Finnell's report does not state that the sample size he was provided is a statistically significant sample size for purposes of his analysis. (Ex. 37, Finnell Report in *Solache/Reyes,* generally).

190.    Finnell's report does not specify the minimum number of files required to have a statistically significant sample. (Ex. 37, Finnell Report in *Solache/Reyes,* generally).

### *Sustained Rate*

191.    In support of his opinion that the City had a pattern and practice of fabricating evidence, Finnell relies in part on a federal survey that he states "found that 8 percent of use of force complaints received by large state and local law enforcement agencies in 2002 were sustained." (Ex. 37, Finnell Report in *Solache/Reyes*, p. 30).

192.    Finnell testified that he relied on a news article about the federal survey conducted in 2002 but is not sure he read the federal survey itself. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 335:12-24).

193.    Finnell reviewed the federal survey and acknowledged that Table 3 of the survey breaks down sustained rates based on the size of the agency and that law enforcement agencies with 1,000 or more full-time sworn officers have a sustained rate 6% for excessive force complaints. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 313:21-315:24, 316:11-15; Ex. 77, Bureau of Justice Statistics Special Report; Citizen Complaints about Police Use of Force, p. 3). Finnell testified that in his report he compared CPD's rates to the overall rate identified in the survey, 8%, not the rate for large law enforcement agencies with more than 1,000 sworn officers. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 340:20-341:2; Ex. 77,

45

Bureau of Justice Statistics Special Report; Citizen Complaints about Police Use of Force, p. 3).

194.    Finnell further testified that he agreed with the statement at page 4 of the Federal Survey, in the section titled "Limitations of complaints data," which says, "Citizen complaints data must be interpreted with caution. Differences in how agencies receive, process, and record complaints can account for differences in the volume and rate of complaints across agencies. Likewise, the citizen's decision whether to file a complaint may be influenced by both citizen and agency characteristics, and other factors." (Ex. 37, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 336:20-338:4; Ex. 77, Bureau of Justice Statistics Special Report; Citizen Complaints about Police Use of Force, p. 4). Finnell further testified that he agreed with the statement in the same section that says, "Finally, the meaning of a complaint rate is not entirely clear: a low force complaint rate could mean that police are performing well or that the complaint process is inaccessible; likewise, a high force complaint rate could mean that officers use force often or that the complaint process is more accessible." (Ex. 37, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 338:6-339:2; Ex. 77, Bureau of Justice Statistics Special Report; Citizen Complaints about Police Use of Force, p. 4).

195.    Finnell also relied on a 2020 Washington Post article for the proposition that "about 7 percent of complaints of officer misconduct for unionized police agencies were sustained." (Ex. 37, Finnell Report in *Solache/Reyes*,, p. 30).

196.    Finnell's report acknowledges that "[t]here is no standardization of data collection for agencies and units tasked with investigating officer misconduct across the country." (Ex. 37, Finnell Report in *Solache/Reyes*, p. 30).

197.    Finnell's report states that by comparison, the 1995-1998 spreadsheet data from this case shows that the sustained rate for all types of allegations was 8% after investigation and 3%

after full review, and the sustained rate for excessive force was 4.7% and, 9% after full review. (Ex. 37, Finnell Report in *Solache/Reyes,* p. 30). The force statistics are based upon individual investigations and allegations (not CRs). (Ex. 37, Finnell Report in *Solache/Reyes*, Tables 2 and 3, pp. 32-32). "After full review" means after a CR "goes through the command channel review process and whatever other external processes are available to police officers once a complaint is sustained." (Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 357:3-10).

198.    Finnell does not know how the data collected in the 2002 federal survey or the data reported in the 2020 Washington Post article counted complaints. (Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 339:7-24; 340:15-343:8; Ex. 37, Finnell Report in *Solache/Reyes,* p. 30).

199.    Finnell's report states that of the 349 CRs analyzed, 39 were sustained, equating to an 11% sustained rate. (Ex. 37, Finnell Report in *Solache/Reyes*, Appendix A, Table 2.1, p. 81; Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 468:12-469:10).

200.    Finnell's report states that of those 349 CRs, there were 1,983 individual investigations of the officers analyzed, 167 of those individual investigations were sustained for an 8% sustained rate. (Ex. 37, Finnell Report in *Solache/Reyes*, Appendix A, Table 2.1, p. 81; Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 306:9-307:8; 468:12-19; 469:11-20).

201.    Finnell's report states that there were 2,150 allegations contained in those 349 CRs, and 171 allegations were sustained for an 8% sustained rate. (Ex. 37, Finnell Report in *Solache/Reyes*, Appendix A, Table 2.1, p. 81; Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 279:12-280:4; 468:12-19; 469:21-470:1).

202.    Finnell did not try to find data from other law enforcement agencies around the country for their sustained rates for the time period. (Ex. 37, Finnell Dep from *Solache/Reyes*

dated 9/22/22, 343:3-8, Ex. 41, Finnell Report in *Solache/Reyes*, Attachment B – Report of Materials Reviewed).

203.    Finnell testified that Meza's analysis shows that the sustained rate for external allegations from the 1995-1998 spreadsheet data from this case was 1%. He believes the appropriate sustained rate should have been significantly higher, but he could not place a number on it because "it would take other factors and other considerations to provide a number." (Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 373:15-374:1).

204.    Finnell's report states that CPD's sustained rate in the sample CR files from the 1995 to 1998 dataset is "far below available national averages from that time period," (Ex. 37, Finnell Report in *Solache/Reyes*, p. 38), but admitted at his deposition that his report does not cite to the "national averages from the time period" and he could not recall any specifics regarding what the national average was at the time. (Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 373:15-375:8; 376: 6-15).

205.    Finnell testified that one cannot look at a police department's sustained rate alone and use it to determine that it was deliberately indifferent to police misconduct. (Ex. 78, Finnell Dep from *Velez*, at 272:20-274:14).

### *Defendant Officers' CRs*

206.    Finnell conceded that there is no analysis in his report to support his conclusion that the investigations into Defendant Officers' CRs in this case (listed at pages 71-76 of his report) was not rigorous and that the investigators did not properly credit the allegations of the complainants and the complainant's witnesses. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 451:7-17, 452:9- 16).

207.    Finnell testified regarding his conclusion in this case that the investigations were

not rigorous and that the investigators did not properly credit the allegations was based on his "review[][of] the CRs, discuss[ing] the CRs with [his] team and look[ing] at the CRs and what the investigators at the time had done and not done, and he was able to determine that there was still work that could have been done on these CRs, [but they] weren't necessarily trying to judge the investigator's work, more trying to show how – by not identifying witnesses and proactively going out to get testimony from witnesses or having officers do in-person interviews versus submitting to/froms, how that would result in CRs being closed as not sustained or otherwise not being able to gather evidence or support the allegations that were made against the officers" but he did not include any of that analysis in his report in that case. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 451:17-452:16).

### *Finnell's lack of analysis of CRs themselves*

208.     Finnell's report in this case states, "My analysis and report avoid determining the credibility of the various parties and witnesses, or choosing between disputed accounts, as that is outside the purview of my work and remains within the province of the factfinder," (Ex. 37, Finnell Report in *Solache/Reyes,* p. 9), and there is no analysis in his report discussing his determination that misconduct occurred in any of the CR files he reviewed.   (Ex. 37, Finnell Report from *Solache/Reyes*, generally).

209.     In his report in this case, Finnell offers criticisms about the quality of the investigations in nine CR files from the sample 349 CR files from 1995 to 1998 produced plus the CR files of Defendant Officers. (Ex. 37, Finnell Report from *Solache/Reyes*, pp. 35-36, 56-58). He criticizes three more investigations where he claims that although the complaint was sustained, the discipline imposed was insufficient. (*Id.* at p. 47).

210.     Finnell offers no criticisms of any of the quality of CR investigations he reviewed

in the *Velez* case.  (Ex. 45, Finnell Report in *Velez*; Ex. 78, Finnell Dep from *Velez* dated 2/15/22, at 76:18-77:12).

### Defendant Officers' lawsuits

211.    Finnell testified that there were only two lawsuits identified in his report that were filed against Defendant Officers before Solache's and Reyes' arrest in 1998.  (Ex. 37, Finnell Report in *Solache/Reyes*, p. 77-78; Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 452:18-453:4).  Finnell opines that the civil lawsuits filed against CPD officers provided additional notice to policymakers of their alleged misconduct.  (Ex. 37, Finnell Report in *Solache/Reyes*, p. 77).

212.    Finnell testified that the majority of the lawsuits identified in his report were filed after 2005.  (Ex. 37, Finnell Report in *Solache/Reyes*, p. 77; Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 455:1-4).  Of the 16 lawsuits listed in Finnell's report, only three of them were filed before Plaintiffs' arrests in 1998.  (Ex. 37, Finnell Report in *Solache/Reyes*, p. 77-78).

213.    Finnell does not know when any of the Defendant Police Officers retired.  (Ex. 43, Finnell Dep from *Solache/Reyes* dated 9/23/22, at 455:5-17).

214.    Finnell did not conduct an independent assessment of the claims in the lawsuits, nor did he have actual knowledge of the posture of the litigation. (Ex. 37, Finnell Report in *Solache/Reyes*, p. 77).

### "Historical Context"

215.    Finnell's report in this case refers to something he labels "historical context" in support of his opinion that the City had a policy of failing to discipline its officers in 1998 and seeks to introduce evidence starting from the "Burge Era" to show that City's police accountability

system had allegedly been broken for decades. (Ex. 37, Finnell Report in *Solache/Reyes*, pp. 11-29).

216.    This section of his report discusses events from 1972-1991 that do not relate to any allegations in this case or any Defendant Officers in this case, such as the allegations against Jon Burge, who was suspended in 1991 and terminated in 1993, and prior civil rights litigation alleging unrelated claims. (Ex. 37, Finnell Report in *Solache/Reyes*, pp. 11-29).

217.    Finnell also relies on the 2017 U.S. Department of Justice Report to support his opinions.  (Ex. 37, Finnell Report in *Solache/Reyes,*, p. 29).

### *Notetaking at the Indianapolis Police Department*

218.    As a detective in the Indianapolis Police Department ("IPD"), Finnell was not trained to take notes of witness interviews a certain way.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 67:16-68:5).

219.    As a detective in the IPD, with respect to interviews of suspects, particularly in homicide cases, Finnell was trained to always have two people conducting the interview, with the primary doing all the questioning and the second detective normally taking notes.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 68:9-68:19).  The interview could also be recorded. (*Id*.)

220.    In IPD, patrol officers were required to carry a pocket or field notebook.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 69:6-16).  The major case investigators oftentimes would also carry a full-sized pad of paper.  (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 69:17-21).

221.    As an IPD detective, Finnell carried a flip pad type steno pad of a notebook where he would write notes and make quick notations as he worked his cases called a "daily notepad."

(Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 69:22-24, 71:21-72:2).

222. Finnell would use his notes to type the information into his case file because oftentimes the notes would have "coffee or blood or whatever" on them so they were not presented in court because they were "nasty looking." (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 70:1-13).

223. Finnell also created a "case steno pad" where he would keep specific notes for the day. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 71:1-4).

224. Finnell would record information on the daily notepad and at the end of the day he would transfer information from the notepad to the case steno pad and then would also transfer the information into a typed report that would go into the case file. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, 72:3-15). IPD's case management system was electronic so there was an electronic copy of typed reports that Finnell would print to put into the "official office case file." (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 72:3-15).

225. The IPD required that the daily notepads were kept in a drawer in a file cabinet in their office and had the start and end date of the notes recorded on the front. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 72:16-73:3).

226. Finnell destroyed his daily notepads upon his retirement in 2013 which was not precluded by the rules, regulations, or directives of the IPD. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 73:11-74:8).

227. Finnell expects that the case steno pad is maintained in the IPD's master case file. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 74:9-17).

228. Once charges were filed through the prosecutor's office, it was the responsibility of all IPD detectives and investigators during the 1994-2004 time period to prepare a prosecutor's

file, which was a duplicate of the master case file, to be provided to the prosecutor's office for the prosecuting attorney to work from as they built their case. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 74:18-76:11).

229. Finnell knows generally that the Illinois statute that requires an affidavit in order for an administrative investigation against police officers to proceed absent certain circumstances was passed sometime in the 2000s. (Ex. 39, Finnell Dep from *Solache/Reyes* dated 9/22/22, at 45:5-46:4, 48:9-17).

### PLAINTIFFS' *MONELL* EXPERT DR. RICHARD LEO

230. Plaintiffs' retained Richard Leo, Ph.D., J.D., to provide opinions related to Plaintiffs' disputed confessions as well as Plaintiff's *Monell* claim as it relates to the City's alleged policies and practices of allowing coerced confessions against African American and Latino suspects. (Ex. 79, Dr. Leo's Report in *Solache/Reyes,* pp. 12-15, and generally; Ex. 80, Dr. Leo's Curriculum Vitae, pp. 1-2).

231. Dr. Leo has a Ph.D. in Jurisprudence and Social Policy, with a specialization in Criminology and Social Psychology, as well as a Juris Doctor, and is the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly an Associate Professor of Psychology and Associate Professor of Criminology at the University of California, Irvine. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 1; Ex. 80, Dr. Leo's Curriculum Vitae, pp. 1-2; Ex. 81, Dr. Leo's Dep in *Solache/Reyes* dated 9/28/22, 9:9-17).

232. Dr. Leo's area of research, training, and specialization includes social psychology, criminology, sociology, and the law on policy interrogation practices, the psychology of interrogation and confessions, and erroneous convictions. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 1; Ex. 81, Dr. Leo's Dep in *Solache/Reyes* dated 9/28/22, 83:16-84:8).

233.    At pages 12 to 29 of his single-spaced Report, Dr. Leo provides an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confessions, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability.  (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 12-29).  Within that section of his report, Dr. Leo cites several published articles and resources as support.  (*Id.*).

234.    According to Dr. Leo, because "false confessions are difficult for researchers to discover because neither law enforcement nor any private organization keep a comprehensive database of the interrogations that have produced them, [and] even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of establishing the confessor's factual innocence to an absolute certainty," he and Dr. Richard Ofshe coined the term "*proven* false confession" in 1998.  (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 16) (emphasis in original).

235.    According to Dr. Leo, "there are four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

    a.  When it can be objectively established that the suspect confessed to a crime that did not happen;

    b.  When it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;

    c.  When the true perpetrator is identified and his guilt is objectively established; and/or

    d.  When scientific evidence dispositively establishes the confessor's innocence."

(Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 16) (emphasis in original, footnote removed).

236.    At pages 29 to 65 of his single-spaced Report, Dr. Leo then discusses this assessment of the relevant social science "as [it] relate[s] to the investigation, interrogations, and

54

confession statements" of Solache and Reyes in the Soto murder investigation, which he concludes are "proven false confessions." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 12-29).

237. In his analysis of Plaintiff Reyes' confession statement (referring to Plaintiff Reyes' April 5, 1998 handwritten statement), Dr. Leo acknowledges that Reyes' and Defendants' accounts (referring to Defendants Guevara, Rutherford, Dickinson, Trevino and ASA O'Malley) of the circumstances of their confession statements "present[] a classic swearing contest" because they are "dramatically different." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 30; Ex. 82, Plaintiff Reyes' 4/5/98 Handwritten Statement, RFC-Solache/Reyes 294-304).

238. Dr. Leo also acknowledges that, "Factually, [Reyes' and Defendants' accounts] cannot be reconciled." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 30).

239. Accordingly, Dr. Leo states in his Report that he "will apply the findings of this empirical social science literature to both set of accounts [Reyes' and Defendants'] of Arturo DeLeon-Reyes' custodial interrogations... and discuss the implications and concerns that social science research raises for each set of accounts." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 30).

240. In his analysis of Plaintiff Solache's confession statement (referring to Plaintiff Solache's April 5, 1998 handwritten statement), Dr. Leo acknowledges that Solache's and Defendants' accounts (referring to Defendant Guevara and ASA Brualdi) of the circumstances of their confession statements "present[] a classic swearing contest" because they are "dramatically different." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 53; Ex. 83, Plaintiff Solache's 4/5/98 Handwritten Statement, RFC-Solache/Reyes 305-313).

241. Dr. Leo also acknowledges that, "Factually, [Solache's and Defendants' accounts] cannot be reconciled." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 53).

242. Accordingly, Dr. Leo states in his Report that he "will apply the findings of this empirical social science literature to both set of accounts [Solache's and Defendants'] of Gabriel Solache's custodial interrogations… and discuss the implications and concerns that social science research raises for each set of accounts." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 53).

243. At pages 17- 22 of his single-spaced Report, Dr. Leo discusses what he terms, "The Social Psychology of Police Interrogation." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 17-22).

244. In this section of his report, Dr. Leo states that researchers in his field have classified the types of inducements investigators use during the interrogation process into three categories: "*low-end* inducements, *systemic* inducements, and *high-end* inducements." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 20-22) (emphasis in original).

245. Dr. Leo's Report states: "*Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 20) (emphasis in original).

246. Dr. Leo's Report states: "*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 20) (emphasis in original).

247. Dr. Leo's Report states that "*high-end* inducements refer to appeals that directly communicate the message that the suspect will received less punishment , a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater

punishment if he does not comply with the interrogator's demand that he confess. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 21) (emphasis in original).

248.     According to Dr. Leo, all high-end inducements are coercive, and some systemic inducements are coercive ("depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates"). (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 21-22).

249.     Dr. Leo's Report also states that there are three types of false confessions:

[A] *voluntary* false confession or statement (*i.e.,* a false confession knowingly given in response to little or no police pressure); a *coerced-* or *stress-compliant* false confession or statement (*i.e.,* a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession or statement (*i.e.,* a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime, despite no actual memory of having done so).

(Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 22-23) (emphasis in original).

250.     Dr. Leo's Report states that "[t]here are three important decision points in the interrogation process that known to be linked to false confessions or statements…, the first decision point is the police decision to classify someone as a suspect…[, t]he second decision point in the process occurs when the police interrogate a suspect…[, and t]he third decision point in the interrogation process occurs after the police have elicited an admission – an 'I did it' statement – from the suspect." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 23-24).

251.     Dr. Leo's Report states that in his field of study, scientific researchers also analyze the patterns, characteristics and indicia of reliability in true and false confession cases. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 25).

252.     Dr. Leo's Report states that "[t]o evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze

the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.,* location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.)." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 25).

253.    Dr. Leo uses the "fit standard to evaluate the validity of a confession statement[.]" (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 25).

254.    The "fit standard" is:

> The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's postadmission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that contains factual errors and is disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence. Indeed, absent contamination (*i.e.,* the leaking and disclosing of non-public crime facts that cannot easily be guessed by chance), the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

(Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 25).

255.    Dr. Leo uses "situational risk factors" to determine if a confession meets the criteria of a false confession, which includes: lengthy interrogation, sleep deprivation, premature rush to judgment and guilt-presumptive interrogation, false evidence ploys, explicit and implicit threats, explicit and implicit promises, and physical and psychological coercion.  (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 13 (¶5), p. 14 (¶12), p. 16).

***Leo's opinions related to Plaintiff's Monell claim***

256.    At pages 65 to 94 his single-spaced report, Dr. Leo opines that the Chicago Police Department had a "Widespread and Systemic Pattern and Practice of Physically and Psychologically Coercive Interrogations (Especially of African-American and Latino men) from 1972 to at least 2000." (Ex. 84, Leo's Dep in *Solache/Reyes* dated 9/29/22, 359:3-360:1; Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 65-66).

257.    Dr. Leo states that in this section of his Report, he "will review the evidence establishing the basis for these opinions, as well as briefly summarize many of the cases that illustrate the substantial empirical basis for these opinions." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 66).

258.    In this section of his Report, Dr. Leo does not apply any of the analysis set forth at pages 12-29 of his Report, specifically the overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confessions, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability, that he utilized and applied to analyze Plaintiffs' confession statements, in arriving at his opinion that the Chicago Police Department had a widespread and systemic pattern and practice of physically and psychologically coercive interrogations, especially of African-American and Latino men, from 1972 to at least 2000. (Ex. 79, Leo's Report in *Solache/Reyes*, pp. 65-94).

259.    Of all the cases cited in Dr. Leo's Report as support for his opinions, Dr. Leo does not mention the race of any of the alleged victims of abusive or coercive interrogations. (Ex. 79, Leo's Report in *Solache/Reyes,* pp. 77-82 (Area 3 cases numbered 1-30), pp. 83-88 (Area 4 cases numbered 1-19), pp. 88-92 (Area 5 cases numbered 1-13), pp. 92-93 (Area 5 cases numbered 1-5), pp. 93-94 (Area 5 cases numbered 1-2).

260.    In this section of his Report, Dr. Leo also states, without citation, that "at least as early as February of 1982 and continuing through the 1990s" the City of Chicago "received continuing notice of this systemic practice of torture, physical abuse and coercion of (primarily Black and Latino) suspects resulting in coerced and fabricated confessions[.]" (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 65-66).

261.    Dr. Leo opines that the evidence that supports his opinion that the City of Chicago was on notice of these practices are from:

> [T]he repeated documented allegations that accumulated against supervisors and detectives, first at Area 2 detective Division, and later at Areas 3, 4 and 5; from the testimony of numerous criminal defendants at motion to suppress hearings and trials; from in-court admissions of city lawyers; from the findings in numerous Office of Professional Standards reports; from federal and state court decisions; from media articles, reports and editorials; from innocence pardons by the Governor of Illinois; from numerous civil lawsuits alleging physical abuse and coercion to extract and fabricate confessions; from the findings of the United Nation's Committee against Torture and from Amnesty International; and from the admissions of City officials.

(Ex. 79, Dr. Leo's Report in Solache/Reyes, p. 66). There are no citations at page 66 of the report to support these conclusions. (*Id.*).

### *Burge/Area 2*

262.    As support for his pattern and practice opinion, Dr. Leo opines that there was systemic and widespread torture, physical abuse and coercive interrogations at CPD's Detective Division Areas 2 and 3 under John Burge from 1972 to 1991. (Ex. 84, Leo's Dep in *Solache/Reyes* dated 9/29/22, 359:3-360:1; Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 66). Leo's report states that Burge was fired in 1993. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 71).

263.    To reach his conclusion, and for support of his statement that Jon Burge and those under his command at Area 2 and Area 3 tortured 125 suspects from 1972-1991, Dr. Leo relied on a "Torture Victims Chart" that was created by the law firm that represents Plaintiff Solache. (Ex.

79, Dr. Leo's Report in *Solache/Reyes*, p. 66; Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 367:17-368:6; 368:20-369:12; Ex. 85, Torture Victims Chart, PTP-NOTICE-000829-842).

264.    For purposes of his opinions in this case, Dr. Leo did not determine that any of the cases he analyzed to evaluate the practices at Area 2 met the criteria for a proven false confession. (Ex. 79, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 408:19-409:3:411:13-15 ("I did not go through and do an analysis of whether any of these cases met a proven false confession.").

265.    Dr. Leo relies on numerous materials from *after* Plaintiffs' arrests in 1998 to support his conclusions related to Burge, including a 1999 judicial opinion in *U.S. ex. rel. Maxwell v. Gilmore,* 37 F.Supp.2d 1078 (N.D. Ill. 1999), the fact that retired judge Edward Egan served as a special prosecutor to investigate allegations against Burge from 2002 to 2006, Governor Ryan's 2003 pardons of some Burge victims, a 2005 judicial opinion in *Hinton v. Uchtman,* 395 F.3d 810 (7th Cir. 2005), a 2006 statement from Cook County Criminal Court Chief Judge Paul Biebel, a 2006 statement of Mayor Richard Daley regarding a Special Prosecutor's Report on Burge, the 2009 enactment of the Illinois Torture and Inquiry Commission, a 2009 judicial opinion in *People v. Cortez Brown*, a 2010 judicial opinion in *People v. Wrice,* 940 N.E.2d 102 (1st Dist. 2010), the 2010 federal jury conviction of Jon Burge, the 2013 judicial opinion confirming Burge's conviction, the 2015 City reparations ordinance, the 2015 statement of Mayor Rahm Emmanuel apologizing to Burge victims, a 2018 judicial opinion in *People v. Jackie Wilson,* and a 2018 statement by Lori Lightfoot before she became mayor following Burge's death. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 390:24-392:12; 393:13-397:4; 398:3-15; Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 71-76).

266.    All of the materials for the specific cases Dr. Leo relied on for his opinions about systemic and widespread misconduct at Area 2 under Jon Burge are cited in his report, unless there was a mistake or he inadvertently did not include them.  (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 363:22-364:8).

267.    Dr. Leo found no evidence that any of the Defendant Officers knew, worked for, or worked with Jon Burge, or that any of the Defendant Officers worked at Area 2 at any point in their career, nor does Dr. Leo know if Jon Burge worked at Area 5, and he does not know where Area 2 is located relative to Area 5.  (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 400:16-405:10).

### Opinions related to Areas 3, 4 and 5

268.    In the "widespread and systemic pattern and practice" section of his Report, Dr. Leo relies on certain, often one sentence, (numbered) case summaries from Areas 3, 4 and 5 to support his opinion that the City had a pattern and practice of systemic physically and psychologically abusive and coercive interrogations resulting in coerced, false and/or fabricated, and/or unreliable inculpatory evidence.  (Ex. 79, Leo's Report in *Solache/Reyes,* pp. 77-82 (Area 3 case summaries numbered 1-30), pp. 83-88 (Area 4 case summaries numbered 1-19), pp. 88-92 (Area 5 case summaries numbered 1-13), pp. 92-93 (Area 5 case summaries numbered 1-5), pp. 93-94 (Area 5 cases numbered 1-2).  Dr. Leo does not apply any of the empirical research he discusses in the overview section of his report (pp. 16-29) and does not conclude that any of the numbered case summaries meet criteria for a proven false confession.  (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 65-94).

### Area 3

269.     Dr. Leo opines, "The physical abuse and coercion of custodial suspects to obtain confessions was also systemic and widespread at Area 3, and repeatedly involved Detectives Kill, Boudreau, Halloran and several other Chicago Police detectives who routinely used physical coercion and abuse to extract incriminating statements and fabricate false confessions from criminal suspects during lengthy incommunicado and unlawful interrogations." (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 411:20-412:2; Ex. 79, Dr. Leo Report in *Solache/Reyes*, at p. 77).

270.     This section of his report includes 30 "case summaries" for criminal defendants who Leo states alleged physical abuse and coercive interrogation at Area 3. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 77-82). Dr. Leo states the 30 "case summaries" pertain to allegations against "Detective Kill, Boudreau, Halloran, and Others." Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 77-82. Out of the 30 "case summaries" for Area 3, 15 are one sentence long in Leo's report. (*Id.*)

271.     Dr. Leo is not opining, however, that Detectives Kill, Boudreau, Halloran, and others, did in fact, physically abuse suspects because he is not the finder of fact. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 412:3-19).

272.     According to Dr. Leo, the evidence to support Dr. Leo's opinion about the alleged widespread practice at Area 3 "come from the repeated documented allegations that accumulated against Detectives Kill, Boudreau, Halloran, and other Area 3 Chicago Police Detectives; from the testimony of numerous criminal defendants at motion to suppress hearings and trial in Area 3 cases; from federal and state court decisions in Area 3 cases; and from media articles, reports and editorials, among other sources." (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 414:7-19; Ex. 79, Dr. Leo Report in *Solache/Reyes*, at p. 77).

273. As an example, Dr. Leo cites the following: "Frank Bounds (1987): Detective [Kelly] hit Bounds on the head, tried to kick him in the groin, and threatened to bring Bounds' girlfriend into the case if he did not confess causing Bounds to falsely confess to a murder. *People v. Bounds*, 171 Ill.2d 1, 29-30 (1995). (PTP-F BOUNDS-000001-000030)." (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 424:21-425:9; Ex. 79, Dr. Leo Report in *Solache/Reyes*, at p. 77; Ex. 86, *People v. Bounds* (bates number PTP-F BOUNDS-000001-30)).

274. The *Bounds* opinion cited by Dr. Leo is an Illinois Supreme Court opinion affirming Bounds' conviction and death penalty sentence for murder, aggravated criminal sexual assault, and aggravated kidnapping, ordering "The clerk of this court is directed to enter an order setting Wednesday, March 13, 1996, as the date on which the sentence of death entered in the circuit court of Cook County is be carried out," and Dr. Leo's pin cite to the *Bounds* opinion refers to allegations made by Bounds. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 414:20-416:6; Ex. 79, Dr. Leo Report in *Solache/Reyes*, at p. 77; Ex. 86, *People v. Bounds* (bates number PTP-F BOUNDS-000001-30), specifically *Bounds,* 171 Ill.2d at *16, *29-30, *73).

275. Dr. Leo agrees that he is not concluding that Bounds falsely confessed to a murder, but that "[h]e alleged that he falsely confessed." (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 425:10-426:19).

276. Dr. Leo agrees that of the 30 cases he listed, it is possible that there is other evidence that could undermine the allegations of misconduct other than a police officers' denial, and agrees the cases are disputed. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 431:4-15).

277. As another example, Dr. Leo cites the following: "Alnoraindus Burton (1989): Detective Kill kicked Burton in the groin, slammed his head against the wall, slapped him across the face, and told him he could kill him causing Burton to falsely confess. (Ex. 87, PTP-NOTICE-

64

000829-000842; Ex. 88, PTP-A BURTON-000001-000009)." (Ex. 79, Dr. Leo Report in *Solache/Reyes*, at p. 77).

278. Dr. Leo is not making a determination that Burton falsely confessed and agrees that the paragraph on Burton is based on assertions made by Burton; to support his paragraph on Burton, Dr. Leo cites the "Torture Chart" created by Plaintiff Solache's counsel and a *pro se* civil Complaint. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 433:6-434:16; Ex. 79, Dr. Leo Report in *Solache/Reyes*, at p. 77; Ex. 87, Torture Chart (PTP-NOTICE-000829-000842), specifically referencing PTP-NOTICE-000840; Ex. 88, Burton *pro se* Complaint, PTP-A BURTON-000001-9).

279. Dr. Leo also opines that the City of Chicago was "on continuing notice since at least as early as 1986 that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 3 detectives, particularly from (but not limited to) Detectives Kill, Boudreau and Halloran." (Ex. 79, Dr. Leo Report in *Solache/Reyes,* p. 82). Dr. Leo's report does not explain why he states the City was on notice of this alleged pattern in 1986. (Ex. 79, Leo's Report in *Solache/Reyes*, pp. 77-82).

*Area 4*

280. Dr. Leo's report also includes 19 "case summaries" for criminal defendants who Dr. Leo states alleged physical abuse and coercive interrogation at Area 4. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 82-88). Dr. Leo states the 19 "case summaries" pertain to allegations against "Detective Kato, Detective John Summerville, Detective Clarence Lewis, Detective John Roberts, Detective Same Cirone, and Others." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 82-88). Out of the 19 "case summaries," four are one sentence long and four are two sentences long. (Ex. 79, Leo's Report in *Solache/Reyes*, pp. 82-88).

281.    According to Dr. Leo, these 19 summaries support his opinion, and  "represent a portion of the cases in which Detective Kriston Kato has been accused of physically abusive and coercive interrogations with the result of coercing and/or fabricating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence[.]"  ((Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 488:19-489:14; Ex. 79, Dr. Leo Report in *Solache/Reyes*, at pp. 83-88).

282.    As to the 19 cases cited in his report's summaries, Dr. Leo is not offering an opinion as to whether the confessions are true or false, or coerced or not coerced.  (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 489:17-490:4).

283.     Dr. Leo opines that the City of Chicago was "on continuing notice since as early as 1987 that there was a pattern and practice of police interrogation torture and coercion to extract confessions among Area 4 detectives, particularly from (but not limited to) Detective Kriston Kato and the Area 4 detectives with whom he worked cases."  (Ex. 79, Leo Report in *Solache/Reyes*, at p. 83). Dr. Leo's report does not explain why he states the City was on notice of this alleged pattern in 1987.  (Ex. 79, Leo's Report in *Solache/Reyes*, pp. 82-88).

***Area 5***

284.    Dr. Leo's report also includes 13 "case summaries" for criminal defendants who he states alleged physical abuse and coercive interrogation at Area 5.  (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 88-92), Dr. Leo states that the 13 "case summaries" pertain to allegations involving Detective Guevara, Detective Halvorsen, and Others."  (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 88-92).  Out of the 13 "case summaries," six are one sentence long and three are two sentences long. *Id.*

285.     Dr. Leo also opines that the City of Chicago was "on continuing notice since as early as 1987 that there was a pattern and practice of police interrogation torture and coercion to extract confessions in Area 5 involving Detective Guevara, Detective Halvorson (sic) and other Area 5 Chicago police detectives. (Ex. 79, Leo Report in *Solache/Reyes*, at p. 88). Dr. Leo's report does not explain why he states the City was on notice of this alleged pattern in 1987. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 88-95).

286.     The "case summaries" include citations to records produced by Plaintiffs. (Ex. 89, Plaintiffs' correspondence regarding PTP production). Plaintiffs did not rely on the homicide investigative files to support their *Monell* claim based on a theory of a widespread practice of coercion. (Ex. 90, Transcript of Proceedings from March 7, 2022, pp. 27:16-28:16).

287.     Dr. Leo is not making a factual determination that any of the individuals in the *Monell* section of his report were subjected to physical and psychological coercive interrogations. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 360:2-361:17; 412:3-19; 426:6-19; 433:6-18; 433:19-434:3; 434:17-435:20; 442:9-17; 443:2-445:24; 449:23-451:10; 452:24:454:13; 454:18-456:19; 456:20-457:19; 462:19-463:13.46-5:22-466:12; 471:2-15; 475::2-476:11; 477:16-478:2; 480:3-22; 481:6-482:15; 483:6-20; 484:21-485:10; 486:1-487:6; 489:15-490:12; 497:9-499:22).

288.     Dr. Leo states that "eighteen individuals have had their convictions overturned in cases investigated by Detective Guevara. Those men are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jost Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Areil Gomez, Xavier Arcos, Ricard rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, and Demetrius Johnson." (Ex. 79, Leo Report in *Solache/Reyes*, at p. 88).

289.     Dr. Leo does not have any materials listed in his "Materials Reviewed" section of his report related to Jacques Rivera, Juan Johnson, Roberto Almodovar, William Negron, Angel Rodriguez, Henry Johnson, Xavier Arcos, Ricardo Rodriguez, Geraldo Iglesias, and Demetrius Johnson, however, Dr. Leo states that if he would have gotten the information related to these individuals from among the voluminous documents that he reviewed. (Ex. 84, Leo's Dep in *Solache/Reyes* dated 9/29/22, 492:21-493:14; 494:17-497:8).

290.     With respect to the 13 cases referring to Detective Guevara, Dr. Leo is not offering any opinions about what did or did not occur in those 13 cases. (Ex. 84, Leo's Dep in *Solache/Reyes* dated 9/29/22, 497:9-23).

291.     Also in support for his opinion about Area 5, Dr. Leo provides five cases (Annie and Bernad Turner, Leshurn Hunt, Rafeal Garcia, Melvin Warren, Juanita Martinez) where individuals made complaints to the Chicago Police Department about Detective Guevara that range in time from 1982 to 1995. (Ex. 84, Leo's Dep in *Solache/Reyes* dated 9/29/22, 503:1-504:8; Ex. 79, Leo Report in *Solache/Reyes*, at pp. 92-93).

292.     Dr. Leo does not know how many complaints other police officers at the Chicago Police Department average during a similar time frame. (Ex. 84, Leo's Dep in *Solache/Reyes* dated 9/29/22, 504:9-17).

293.     Dr. Leo agrees that if the police misconduct allegations are false or made up then they do not support his pattern and practice opinion. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes*, 458:22-461:2).

### *No methodology set forth in the case summary discussions*

294.     For the Fred Ewing and Darnell Stokes case (Area 3, no. 8), the Report cites the first fifteen pages of a CR regarding Ewing and Stokes' allegations and a 2001 Chicago Tribune

article. For the Alfonzia Neal case (Area 3, no. 19), the Report cites the same 2001 Chicago Tribune article only. For the Michael Cage case (Area 4, no. 2) and for the Keith Washington case (Area 4, no. 16), the Report cites a 1991 Chicago Reader article. For the Harold Lucas case (Area 4, no. 8) and the Angelo Rogers case (Area 4, no, 12), Leo's report cites a 1991 Chicago Tribune article. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 78 (Ewing and Stokes case), 80 (Neal case), 83 (Cage case), 85 (Lucas case), 86 (Rogers case), 87 (Washington case).

295.    For the James Coston case (Area 3, no. 5), Leo's report cites ten pages of a deposition transcript, labeled pages 93 to 102. The transcript is not dated and does not include the name of the person testifying. Regarding Coston, the transcript reflects the witness was asked, "Did you, in fact, strike in him in the jaw?" The witness answered, "No." The transcript reflects the witness was asked "Did you him at all?" The witness answered, "No, never laid a hand on him. Went in, talking to him, that was it." (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 78; Ex. 91, PTP-J COSTON-000001-000003).

296.    For the Tyrone Hood and Wayne Washington case (Area 3, no. 13), Leo's report cites the first 39 pages of the plaintiffs' response to the defendants' Rule 56.1 statement in Hood and Washington's 2016 lawsuit. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 79; Ex. 92, PTP-T HOOD & W WASHINGTON-000001-00039).

297.    For the Emmett White case (Area 3, no. 27), Leo's report cites PTP-E WHITE-000001-000007, which is a partial transcript from a proceeding in Milwaukee County, Wisconsin. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 82; Ex. 93, PTP-E WHITE-000001-000007). Dr. Leo's report states "Detective Boudreau and Detective O'Brien arrested Mr. White, and Detective O'Brien subsequently beat him in the head and face, threw him to the ground and dragged his head

69

across the floor of the interrogation room." The names Boudreau or O'Brien do not appear in the transcript cited. (Ex. 93, PTP-E WHITE-000001-000007).

298. In addition to Frank Bounds (Area 3, no.1), for the cases of Anthony Lash (Area 3, no. 18), Johnny Plummer (Area 3, no. 20), Anthony Robinson (Area 3, no. 22), Anthony Williams (Area 3, no. 29), Kevin Murray (Area 4, no. 10), Gregory Shelton (Area 4, no. 14), and Ronald West (Area 4, no. 18), Dr. Leo's report cites to court opinions affirming the defendant's conviction. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 77, 80-82, 85-87; Ex. 94., PTP-A LASH-000001-000011; Ex. 95, PTP-J PLUMMER-000001-000010; Ex. 96, PTP-A ROBINSON 000001-000006; Ex. 97, PTP-A WILLIAMS-000001-000008; Ex. 98, PTP-K MURRAY 000001-000013; Ex. 99, PTP-G SHELTON-00001-000006; Ex. 100, PTP-R WEST-000001-000008). For the Derrick Harvey case (Area 4, no.5), Leo's report cites an appellate court opinion concluding Harvey's appeal was barred by procedural default. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, pp. 84; Ex. 101, PTP-D HARVEY-000001-000023).

299. For the cases of Derrick Flewellen (Area 3, no. 9), Oscar Gomez, Abel Quinones, and Abel Gomez (Area 3, no. 11), Jason Gray and Manuel Bobe (Area 3, no.12), Tyrone Hood and Wayne Washington (Area 3, no. 13), Joseph Jackson (Area 3, no. 15), Ronald Kitchen, Marvin Reeves, and Eric Wilson (Area 3, no. 17), Johnny Plummer (Area 3, no. 20), Tyrone Reyna, Nicholas Escamilla and Miguel Morales (Area 3, no. 21), Clayborn Smith (Area 3, no. 23), Kilroy Wakins (Area 3, no. 25), Demond Weston (Area 3, no. 26), Anthony Williams (Area 3, no. 29), Carl Chatman (Area 4, no. 3), Jeremiah Wright and Elijah Threatt (Area 4, no. 19), Gloria Ortiz Bordoy (Area 5, no. 1), Edwin Davila (Area 5, no. 3), Voytek Dembski (Area 5, no. 4), Adrian Duta (Area 5, no. 5), Aldolfo Frias (Area 5, no. 6), Ariel Gomez (Area 5, no. 7), David Rivera (Area 5, no. 11), Daniel Rodriguez and David Velasquez (Area 5, no. 12), Dr. Leo's report cites

documents dated after 1998. (Ex. 102, PTP-D-FLEWELLEN-0000001-000015; Ex. 103, PTP-O Gomez & A QUINONES-00000-00043; Ex. 92, PTP-T HOOD & W WASHINGTON-000001-00039; Ex. 104, R-KITCHEN-000001-000208; Ex. 95, PTP-J PLUMMER-000001-000010; Ex. 105, PTP-T REYNA-000001-000010; Ex. 106, PTP-C SMITH-000001-000010; Ex. 107, PTP-K WATKINS-000001-000015; Ex. 97, PTP-A WILIAMS-000001-000008; Ex. 108, PTP-C CHATMAN-000001-0000082; Ex. 109, PTP-JERMIAH WRIGHT & ELIJAH THREATT-000001-000007; Ex. 110, AR-L 148767-148860; Ex. 111, AR-L 154814-155027; Ex. 112, AR-L 155056-155058; Ex. 113, AR-L 154806-154809; Ex. 114, Bluhm 10887-10888, Ex. 115, JR-L 300501-300555; Ex. 116, AR-L 155028-155029, Ex. 117, AR-L 155310-15363).

300. Dr. Leo's report cites eight CR files in his summaries for the following cases: Mark Craighead, Fred Ewing, Tony Bey, Sean Hardy, Miller Holston, Xavier Johnson, Keith Mitchell, and Andrew Wallace, (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 78, 83-86). Dr. Leo's report cites CR # 166416 for allegations pertaining to Mark Craighead. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 78). Dr. Leo's citation for his Craighead summary is the four-page summary digest and does not include the underlying investigative material. (Ex. 118, PTP-M CRAIGHEAD 000001-000004). Dr. Leo's report cites CR# 184112 with respect to allegations by Miller Holston. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 84). The file for CR# 184112 reflects that the complainant "refused to give a statement or cooperate with the investigation" of the complaint. (Ex. 119, PTP-M HOLSTON 000001-000073, pp. 2-3). Dr. Leo's report cites CR # 235098 for allegations pertaining to Keith Mitchell. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 85). The file for CR # 235098 reflects that the complainant refused to cooperate in the investigation of the complaint. (Ex. 120, PTP-K MITCHELL 000001-000034). Dr. Leo's report cites CR # 240931 for allegations pertaining to Xavier Johnson. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. 85).

71

PTP-X JOHNSON 00001-000013 is the appellate court ruling affirming Xavier Johnson's conviction and states that the trial court found that Xavier Johnson presented false witness testimony from James Harlan that was inconsistent with the evidence collected at the scene and that Mr. Harlen previously testified that he confessed to the murder because Xavier Johnson threatened to kill him if he did not. (Ex. 121, PTP-X JOHNSON 00001-000013).

301.    Dr. Leo testified that he created 91 pages of notes for 38 of the 62 case summaries to aid his memory during the deposition. Dr. Leo read from the notes at the deposition. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, pp. 267:20-269:13; 451:11-542:23; 463:19-464:15; 467:17-468:4). The 91 pages of notes include headings labeled "Evidence of Coercion and Abuse," "Evidence of Notice to the City of Chicago," and "Evidence of innocence." (Ex. 122, Leo notes, LEO 2268-2358). The citations to documents in the portion of his report pertaining to Jon Burge and the "case summaries" in his report do not include those headings. (Ex. 79, Dr. Leo's Report in *Solache/Reyes*, p. pp. 65-94). Dr. Leo's notes also include a section labeled "summary in Leo report" for the cases referenced. (Ex. 122, Leo notes, LEO 2268-2358).

302.    Dr. Leo did not produce the notes with his report, nor before his first deposition in this case. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, 268:5-270:3; 381:22-390:15; 392:13-393:12; 427:15-21; 466:21-469:24; 476:21-477:6; Ex. 123, Dr. Leo's Dep in *Solache/Reyes* dated 4/24/23, 6:16-7:2; 10:11-19). When Defendants learned of the notes during Dr. Leo's depositions, Defendants requested the notes, but Plaintiffs refused. (*Id*.). Plaintiffs eventually produced the notes on November 7, 2022, which total 91 pages. (Ex. 122, Leo notes, LEO 2268-2358; Ex. 124, Plaintiffs' Nov. 7, 2022 email correspondence; *Reyes* Dkt. 607, Parties' Joint Status Report, p. 2). Dr. Leo was re-deposed about the notes on April 24, 2023, at which time Plaintiffs asserted a work product privilege objection to follow-up questions about the notes'

creation, including how Dr. Leo created the notes. (Ex. 123, Dr. Leo's Dep in *Solache/Reyes* dated 4/24/23, 125:17-126:2; 127:9-128:6; 132:14-18; 136:9-13; 139:16-20; 142:24-143:3).

303.    Dr. Leo's notes do not reference the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confessions, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability set forth at pages 12-29 of his report. (Ex. 122, Leo notes, LEO 2268-2358).

304.    Dr. Leo's notes do not describe any methodology he used in creating the notes or how he developed the information contained in the bullet point for each heading in the notes. (Ex. 123, Dr. Leo's Dep in *Solache/Reyes* dated 4/24/23, 139:16-20; Ex. 122, Leo notes, LEO 2268-2358).

305.    Dr. Leo does not know how often in the time period of 1987 to 2000 criminal defendants brought motions to suppress statements based on allegations of physical abuse. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, p. 522:3-14). Dr. Leo does not know how many criminal defendants brought motions to suppress their incriminating statements that included allegations of physical abuse involving police offices employed by the City of Chicago in the 1995 to 1998 time frame. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, pp. 523:16-524:1).

306.    When asked questions about whether the 62 cases in the "case summaries" in the report, were substantiated in any way, Dr. Leo answered that he did not recall and would have to review the materials provided to him. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22, pp. 463:19-464:15; 465:16-21; 495:3-6; 484: 7-16; 501:23-502:1; 505:17-507).

307.    Dr. Leo testified that he did not include all the citations that are in his notes in his original report because there was an overwhelming amount of material, and that it is not

uncommon to include some citations but not all in academic work, so he did not feel a need to include every single document. (Ex. 84, Dr. Leo's Dep in *Solache/Reyes* dated 9/29/22., pp. 468:20-469:17). Plaintiff's counsel instructed Dr. Leo not to answer why he felt a need to include additional citations in his notes or why he included additional citations in his notes. (*Id.* at 467:5-468:24). After Plaintiffs produced Dr. Leo's notes, Dr. Leo testified at his deposition on April 24, 2023, and Plaintiffs asserted a work product objection as to what Dr. Leo did to create the notes, and if he created the notes on the same computer as his report, and why he used the heading "summary in Leo report". *Id.* 132:8-22; 134:4-10; 138:3-6.

308. When asked what methodology Dr. Leo utilized to create the bullet points under the "Evidence of Coercion and Abuse" section of his notes related to the Derrick Flewellen summary, Plaintiffs' counsel also asserted privilege and instructed Dr. Leo not to answer. (Ex. 123, Dr. Leo's Dep in *Solache/Reyes* dated 4/24/23, p.139:16-20).

### *Dr. Leo's hours worked and materials reviewed*

309. From October 11, 2018 through February 2019, Dr. Leo billed 50.4 hours in connection with the work he did in this case, and the descriptions of the work he performed are redacted. (Ex. 84, Dr. Leo's Dep in Solache/Reyes dated 9/29/22, 517:9-16; Ex. 125, Dr. Leo's Invoice (bates stamped LEO 000976-978)).

310. From July 24, 2019 through January 15, 2022, Dr. Leo billed 175.7 hours in connection with the work he did in this case for emailing with Plaintiffs' counsels, consulting with Plaintiffs' counsels, reviewing, analyzing, and synthesizing case materials, and preparing and revising his report. (Ex. 84, Dr. Leo's Dep in Solache/Reyes dated 9/29/22, 512:4-12; Ex. 126, Dr. Leo's Invoice (bates stamped LEO 000007-9)).

311.    From March 18, 2022 to March 16, 2023, Dr. Leo billed 47.2 hours in connection with the work he did in this case for communicating with Plaintiffs' counsel, downloading and printing case materials, reviewing and analyzing case materials, and preparing and revising his sixteen-page rebuttal report, which includes his time for reviewing and preparing 91 pages of more detailed notes to utilize at his deposition, which occurred in September of 2022.  (Ex. 84, Dr. Leo's Dep in Solache/Reyes dated 9/29/22, 387:8-16; 390:9-15; Ex. 127, Dr. Leo's Invoice (bates stamped LEO 002425-27); Ex. 122, Dr. Leo's Notes (bates stamped LEO 002268-2358)).

312.    Dr. Leo's Report lists 283 distinct entries for the materials he reviewed for his report.  (Ex. 79, Dr. Leo's Report in Solache/Reyes, pp. 2-12 ("Materials Reviewed")).

313.    According to his report, in total, Dr. Leo reviewed just over 18,000 pages of documents in arriving at all of his opinions.  (Ex. 79, Dr. Leo's Report in Solache/Reyes, pp. 2-12 ("Materials Reviewed")).

Dated: April 8, 2024                          Respectfully Submitted,

                                              by: /s/ *Eileen E. Rosen*
                                              Eileen E. Rosen
                                              Special Assistant Corporation Counsel
                                              *One of the Attorneys for City of Chicago*

                                              Eileen E. Rosen
                                              Theresa Berousek Carney
                                              Catherine M. Barber
                                              Austin G. Rahe
                                              Lauren M. Ferrise
                                              Rock Fusco & Connelly, LLC
                                              333 W. Wacker, 19th Floor
                                              Chicago, Illinois 60606
                                              (312) 494-1000
                                              erosen@rfclaw.com