# Exhibit D

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-01028 |
| | ) | |
| v. | ) | Honorable Steven C. Seeger |
| | ) | District Judge |
| REYNALDO GUEVARA, ET. AL. | ) | |
| | ) | |
| Defendants. | ) | |
| | | |
| GABRIEL SOLACHE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-02312 |
| | ) | |
| v. | ) | Honorable Steven C. Seeger |
| | ) | District Judge |
| CITY OF CHICAGO, ET. AL. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S *DAUBERT* MOTION TO BAR
<u>OPINIONS OF ANTHONY FINNELL</u>**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 1

*DAUBERT* STANDARD ................................................................................................ 4

ARGUMENT ............................................................................................................... 5

    I.   FINNELL LACKS THE QUALIFICATION TO RENDER THE OPINIONS CONTAINED IN HIS REPORT. .......................................................................... 5

        a. Finnell does not have the requisite knowledge, skill and experience necessary and has no training or education that qualifies him to opine on CPD's disciplinary policies and practices. ............................................................................................................... 6

        b. Finnell has no knowledge, skill, experience, training, or education in statistical analysis and therefore is not qualified to render any opinions based on statistical analysis. ............................................................................................................. 10

        c. Finnell has no knowledge, skill, experience, training, or education in qualitative analysis and therefore is not qualified to render any opinions based on qualitative analysis. .............................................................................................................. 11

    II.   FINNELL HAS NO FOUNDATION TO PROVIDE THE OPINIONS CONTAINED WITHIN HIS REPORT ...................................................................................... 12

        a. Finnell has no foundation to opine on the "historical context" of CPD. ................ 12

        b. Finnell has no foundation to opine on CPD's "sustained rate" in comparison to other departments. ......................................................................................................... 15

        c. There is no foundation for the statistical analysis in Finnell's Report, including the Outlier Analysis. ....................................................................................................... 16

    III.   FINNELL LACKS A RELIABLE METHODOLOGY .............................................. 17

        a. There is no reliable evidence to support Finnell's purported sustained rates. ......... 19

        b. There is no reliable evidence to support Finnell's Outlier analysis. ........................ 21

        c. The facts and data contained within Finnell's report are not quantitatively or qualitatively sufficient. ............................................................................................. 24

        d. Finnell's reliance on Knight and Meza means there is no way to determine the methodology used in preparation of the report. .......................................................... 26

    IV.   FINNELL'S OPINIONS ARE NOT RELEVANT OR HELPFUL TO THE JURY .... 27

        CONCLUSION .......................................................................................................... 29

## CASES

*Bogathy v. Union Pac. R.R.*, 2020 No. 17-CV-4290, 2020 WL 419406 (N.D. Ill. Jan. 24, 2020) 19

*Braun Corp. v. Vantage Mobility Int'l, LLC,* 2010 WL 5287484 (N.D. Ind. June 21, 2010) ....... 18

*C.W. ex. rel. Wood v. Textron, Inc.,* 807 F.3d 827 (7th Cir. 2015) .................................................... 4

*Caraker v. Sandoz Pharms. Corp.,* 172 F. Supp. 2d 1046 (S. Dist. Ill. 2001) ............................. 21

*Carroll v. Otis Elevator Co.,* 896 F.3d 210 (7th Cir. 1990)............................................................ 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ........................................... 4

*Dura Auto Sys. Of Ind. V. CTS Corp.,* 285 F.3d 609 (7th Cir. 2002) ....................................... 19, 29

*Fail-Safe, LLC v. A.O. Smith Corp.,* 744 F. Supp. 2d 870 (E.D. Wis. 2010) ............................... 18

*Gayton v. McCoy,* 593 F.3d 610 (7th Cir. 2010) ........................................................................... 12

*Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771 (7th Cir. 2017) ........................... 5, 21, 26, 27

*Gusman v. Unisys Corp.,* 986 F.2d 1146 (7th Cir. 1993) ............................................................... 14

*Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition, LLC.,* 2021 WL 2185699 (Georgia Northern
    District Court 2021) ..................................................................................................... 18, 26

*Hunt v. Dart,* 754 F. Supp. 2d 962 (N.D. Ill. 2010) ...................................................................... 31

*Kirk v. Clark Equip. Co.,* 991 F.3d 865 (7th Cir. 2021) ................................................................ 31

*Lapsley v. Xtek, Inc.,* 689 F.3d 802 (7th Cir. 2012) ......................................................................... 5

*Lewis v. CITGO Petroleum Corp.,* 561 F. 3d 698 (7th Cir. 2009) ............................................. 4, 19

*Loeffel Steel Prods. V. Delta Brands,* 372 F.Supp.2d 1004 (N.D. Ill. 2005).......................... 13, 21

*Myers v. Illinois Cent. R. Co.,* 629 F.3d 644 (7th Cir. 2010)............................................................ 5

*Obrycka v. City of Chicago,* 492 F. Supp. 2d 1013 (N.D. Ill. 2011) ............................................. 15

*Ortega v. United States*, No. 16-cv-8402, 2021 WL 4477896 (N.D. Ill. Sep. 30, 2021)............. 31

*Owens v. Auxilium Pharmaceuticals, Inc.,* 895 F.3d 971 (7th Cir. 2018) ..................................... 30

*Philips Medical Systems Intern. B.V. v. Bruetman,* 8 F.3d 600 (7th Cir, 1993)(Posner, J) ........... 14

*Saad v. Shimano Am. Corp.,* 2000 WL 1036253 (N.D. Ill. 2000)..................................................... 6

*Sommerfield v. City of Chicago,* 254 F.R.D 317 (N.D. Ill. 2008) ........................................... 14, 22

*State Farm Fire & Cas. Co. v. Electrolux Home Prods.,* 980 F. Supp. 2d 1031 (N.D. Ind. 2012) 18

*TK-7 Corp. v. Est. of Barbouti,* 993 F.2d 722 (10th Cir. 1993)..................................................... 29

*United States ex. rel. Barron v. Deloitte & Touche, LLP,* 2008 WL 7136868 (Texas Western Dist. Court 2008) ...................................................................................................................................... 29

## <u>RULES</u>

Fed. R. Evid. 702 .............................................................................................................. 4, 5, 19

## INTRODUCTION

Plaintiffs retained Anthony Finnell to provide opinion testimony about the Chicago Police Department's ("CPD") supervision and disciplinary practices in support of their *Monell* claims. Specifically, "to render an opinion as to the City of Chicago's policies, procedures, and practices as they related to the training, supervision and discipline of officers, and their relationship to the disciplinary histories and conduct of the Defendant Officers, as it relates to the 1998 wrongful conviction of Plaintiffs Reyes and Solache," stemming from their 1998 arrests. Finnell has two global opinions. First, Finnell opines that "[t]he Chicago Police Department and the Defendant City of Chicago engaged in a widespread pattern and practice that condoned unlawful, unreasonable, and improper law enforcement practices." (*See,* Finnell's Report attached hereto as Ex. A at p. 10). Second, Finnell opines that "[t]he Chicago Police Department's and the Defendant City of Chicago's failure to discipline and supervise Defendants created a sense of impunity and facilitated, encouraged, and allowed abuses." (Ex. A at p. 69).

Finnell's opinions should be barred entirely as 1) he is not qualified to provide them; 2) they are nothing more than inferences that lack a foundation, and when tested, do not withstand scrutiny; 3) are not based on a reliable methodology, or any methodology for that matter, and instead are based upon assumptions as well as data and information curated and provided to him by Plaintiffs' counsel and cannot be replicated; and 4) are not relevant.

## BACKGROUND

Finnell was first hired to provide *Monell* opinions regarding the City of Chicago and the Chicago Police Department, ("CPD") by one of Plaintiffs' law firms in September 2021, in the matter of *Velez v. City of Chicago* (a case that does not involve Defendant Guevara). (*See,* Finnell's September 22, 2022, Deposition attached as Ex. B at 86:8-13). Subsequently, he has provided

nearly identical opinions regarding the City's policies and practices, relying upon two separate datasets, in five separate cases involving Defendant Guevara, *Sierra, Iglesias, Rodriguez, Gomez[1],* and the underlying case.

Finnell's report, and the opinions contained therein, rest nearly entirely upon the "spreadsheet" created by Plaintiffs' counsel and provided to Finnell based upon information gathered from hundreds of Complaint Register files, ("CR Files" or "CRs") that included allegations made against detectives assigned to Area 5 during the period of 1995-1998. (Ex. A at 9). Plaintiffs' legal team distilled the data from the hundreds of CR Files into the spreadsheet that constitutes the dataset. (*See,* Ex. B at 178:19-179:2). Finnell does not know who prepared the dataset, how many people were involved in the preparation of the dataset, or the background or credentials of those involved in the preparation of the dataset. (Ex. B at 179:5-180:4)

At Plaintiffs' request to support his *Monell* claim in this case, the City produced 349 CRs that included complaints against detectives assigned to Area Five during the 1995-1998 time period that were initiated between 1995-1998. (Ex. B at 176:16-19). In addition, the City produced the career CR files for each of the Defendants Officers. (Ex. A at 9). Finnell was also provided the 349 CR files produced by the City. (Ex. A at 9). In preparing his report, Finnell enlisted the assistance of Timothy Knight and Miroslava Meza. (Ex. A at pp. 4-5). Finnell relied on the quantitative[2] statistical analysis and tables generated by Meza to support his opinions. (Ex. A at p. 9; Ex. B at 186:12-17). Finnell relied on Knight for the "qualitative analysis of the historical

---

[1] Notably, despite disclosing Finnell in *Gomez v. Guevara,* after Finnell was deposed for the third time, plaintiff Gomez opted to withdraw his opinions entirely the day before his previously confirmed deposition.
[2] Finnell defines "quantitative analysis" as taking the data that is within the CR files or within the excel spreadsheet and looking for various components or outcomes. (*See* Finnell's January 13, 2023 Deposition in *Sierra v. Guevara, et. al*, attached hereto as Ex. C at 57:5-16)

2

context, and cases relevant to this inquiry in support of [his] views." (*Id.*) Knight and Meza did not sign the report and were not disclosed as experts by Plaintiffs. (Ex. A at p. 80).

The statistical analysis and tables generated by Meza that are included in Finnell's report includes the "analysis of dataset[3] provided by Plaintiff's legal team" which Finnell attached to his report as Appendix A. (Ex. A at p 9; Ex. B at 186:12-17). There are 20 tables and several figures which purport to distill and analyze the information contained within the spreadsheet. Each of these tables and/or figures are used to support certain statistical conclusions, which Finnell then used to support a multitude of sub-opinions, and ultimately serve as the basis for Finnell's two global opinions. Yet, Finnell does not know what type of statistical software Meza used or even how Meza created the tables and graphs that are contained within his report. (Ex. B at 121:2-122:5). Moreover, Finnell relied entirely on Meza's determination that the sample size was statistically significant in order to render an opinion, but he does not know how she made that determination. (Ex. B at 193:4-194:1; 199:14-200:16; 319:15-20).

Under the heading "Defendants Escaped Accountability" at page 78 of his report, Finnell opines that Defendants Guevara and Halvorsen escaped accountability throughout their careers because of the lack of supervisory oversight, inadequate investigations, and inadequate discipline, and this lack of accountability "continued" through and after the criminal investigation that led to Plaintiff's arrest. (Ex. A at 78). However, this opinion appears to be based entirely on Knight's qualitative analysis of the historical information and analysis. (*See generally,* Ex. A; Ex. D). Finnell describes qualitative analysis as the review of documents to identify "themes, patterns and phrases" that allow officer misconduct and "are relevant to Plaintiffs' claims." (Ex. B at 228:17-229:1). Against this backdrop, Finnell states that the CRs that Guevara and Halvorsen received "contained

---

[3] Throughout Finnell's report and testimony, he refers to the spreadsheet provided to him as the "dataset."

similarly themed allegations and patterns throughout their career" and that they were "sued many times based on similarly themed allegations and patterns." (Ex. A; Ex. B at 228:17-229:11). Yet, no where in his report does Finnell describe what methodology, if any, Knight used to conduct this research, or identify the results of this research. (Ex. A, generally). Additionally, Finnell does not have any training in conducting qualitative analysis. (Ex. D).

### *DAUBERT* STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *Lewis v. CITGO Petroleum Corp.,* 561 F. 3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert,* 509 U.S. at 589; *see also C.W. ex. rel. Wood v. Textron, Inc.,* 807 F.3d 827, 934 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. As recently emphasized by the Advisory Committee Notes to the 2023 Amendments to Rule 702, "[j]udicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments. The Court should "scrutinize proposed expert witness testimony to determine if it

has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012) (internal quotations omitted).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Myers v. Illinois Cent. R. Co.,* 629 F.3d, 644 (7th Cir. 2010) (internal quotations omitted); *see also Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 779 (7th Cir. 2017). The proponent of the expert bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Gopalratnam,* 877 F.3d at 782; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

**ARGUMENT**

## I. FINNELL LACKS THE QUALIFICATION TO RENDER THE OPINIONS CONTAINED IN HIS REPORT.

Finnell is not qualified to opine about the disciplinary policies and practices of CPD. In analyzing the reliability prong of the *Daubert* analysis, "the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert used in reaching his conclusions. *Saad v. Shimano Am. Corp.,* 2000 WL 1036253 (N.D. Ill. 2000). While an expert may be qualified by "knowledge, skill, experience, training, or education[]" Finnell has none of the qualifications necessary to opine on CPDs disciplinary policies and practices of during the 1995-1998 time period. Fed. R. Evid. 702. Specifically, Finnell is not qualified to opine about whether CPD engaged in a "widespread pattern or practice that condoned

unlawful, unreasonable and improper law enforcement practices" or that the "Chicago Police Department" had a "failure to discipline and supervise Defendants" which "created a sense of impunity and facilitated, encouraged, and allowed abuses" during the 1995-1998 time period.

Finnell was a sworn member of the Indianapolis Metropolitan Police Department ("IPD") for the majority of his professional career. (*See,* Finnell's CV attached hereto as Ex. D). He started his career in 1989 as a patrol officer and retired in 2013. (Ex. E). He held no police oversight positions while at IPD. (Ex. D; Ex. B at 30:3-7). After he retired from IPD he joined the Independent Police Review Authority ("IPRA")[4] where he investigated and recommended officer discipline. He left IPRA a short time later and took an oversight position in Oakland (from which he was fired) and then another in Seattle where he left in 2022 under a cloud after an outside investigation determined that there were "troubling patterns" in his certification procedures. Despite the years Finnell spent employed at police oversight agencies after retiring from IPD, Finnell lacks the "knowledge, skill, experience, training, or education" that qualifies him to opine in the field of police oversight during the relevant time frame in this case. Moreover, Finnell concedes he has none of the requisite "knowledge, skill, experience, training, or education" that would qualify him to render opinions in the areas of qualitative or quantitative analysis, which provide the purported foundations for the opinions set forth in his report and none of the requisite expertise to opine on any statistical comparisons between the sustained rates within CPD and any other similarly sized police department in the United States. (Ex. D).

     **a. Finnell does not have the requisite knowledge, skill and experience necessary and has no training or education that qualifies him to opine on CPD's disciplinary policies and practices.**

---

[4] IPRA was the name of the City of Chicago's police oversight agency at the time Finnell was employed by the City of Chicago.

Finnell retired from the IPD in April 2013, as a Sergeant within the Community Affairs Branch of the department. (Ex. D). Prior to his retirement, he held several different positions within the department, including as a patrol officer, a homicide and robbery investigator, and a neighborhood resource officer. (Ex. D). However, none of these various positions within the department involved police oversight, investigating police misconduct or implementing officer discipline. (Ex. D; Ex. B at 30:3-7). Rather, his first position working with police oversight was when he was hired by the IPRA in Chicago in April 2013. (Ex. D). There, he worked as a Supervising Investigator for approximately fourteen months, where he was tasked with supervising five individual investigators of various levels. (Ex. B at 36:8-16). This fourteen-month stint at IPRA is Finnell's only direct experience with officer misconduct and discipline.

In July 2014, Finnell left IPRA and was hired by the Citizen's Review Board in Oakland, California, which was later re-named to the Community Police Review Agency. (Ex. D; Ex. B at 28:15-29:2). A simple review of his CV shows that none of his duties involved investigating police misconduct or implementing officer discipline. (Ex. D). In November 2018, Finnell was terminated after the police commission voted to remove him from the position. (Ex. B at 49:7-16). According to Finnell, the termination resulted from a dispute between Finnell and the police commission regarding the release of police misconduct investigative files. (Ex. B at 49:17-50:9). In April 2019, Finnell was hired by the Office of the Inspector General for Public Safety ("OIG") in Seattle, Washington, where he worked as an auditor and then a Strategic Initiatives Lead for approximately three years before he resigned while under investigation for his failure to thoroughly review findings issued by the Office of Police Accountability ("OPA") before issuing full certifications. (*See,* OIR Group Report, attached hereto as Ex. E).

Specifically, as an auditor for the OIG, Finnell was responsible for reviewing investigations conducted by the OPA into allegations of officer misconduct, including complaints of unnecessary use of force, and certifying and/or approving the findings. (Ex. D; *See,* South Seattle Emerald, "OIG Auditor Certified Cases Without Reviewing Evidence, Investigation Reveals, November 8, 2021, attached hereto as Ex. F). However, in August 2020, less than a year after he began his employment with the OIG, concerns were raised about the quality of Finnell's work, which resulted in him being given a different assignment within the OIG. (Ex. F). Subsequently, it was discovered that Finnell failed to review body-worn video in cases that had been certified, which resulted in a systematic audit of case review logs and the discovery of a widespread problem with Finnell's work product. (Ex. F). As a result, the OIG engaged an outside agency, the OIR Group, to conduct an "examination of the concerns about the work performance of current and former individuals who had been assigned to the investigative auditing function of the office." (Ex. F).

The OIR Group found that Finnell's work on 34 specific cases that the OIR Group reviewed was not "sufficiently rigorous to be able to fairly make certification decisions." (Ex. F at 14). Specifically, their investigation found that in the 34 cases Finnell reviewed officers' body-worn cameras were not viewed, and only a small handful of documents were accessed, and cases with "sizeable quantities of evidence" were certified in as few as "10-15 min after [Finnell] first accessed the case." (Ex. E at p. 14). When interviewed by the OIR, Finnell acknowledged that reviewing body-worn video would have been proper, but that he possessed "a level of experience to make it possible to review cases [] succinctly and still fairly judge thoroughness and objectivity." (Ex. E at p. 14). The OIR Group specifically disagreed, finding that there were no circumstances where a complaint about an officer's use of force, or any misconduct allegation, could be resolved with such "limited review." (Ex. E at p. 14).

Finnell resigned three days after Seattle's OIG received the final report of investigation from the OIR Group, which found that Finnell had "troubling patterns of very quick certifications following review of few documents or other pieces of evidence." (Ex. E at p. 13). This "include[ed] complaints about unnecessary use of force, complex cases with substantial amounts of evidence, allegations made about supervisory conduct, and a high-profile case that generated significant media coverage." (Ex. E at p. 13). In short, the OIR Group's investigation determined that Finnell failed to conduct even the most basic of reviews into high profile cases at a time when there was immense public scrutiny on police and police oversight. Instead, he deemed himself to have a level of experience that made such a review unnecessary.

Since his resignation from the Seattle's OIG, Finnell's only employment and source of income has been his consulting business, which he formed in early 2020. (Ex. B at 9:8-13). Since that time, he has provided expert opinions and testimony almost entirely for the law firm of Loevy & Loevy, as well as some other consulting work that has not resulted in written reports and oral testimony. (Ex. B at 13:15-20; 15:16-23).

Finnell's "experience" demonstrates that Finnell lacks the knowledge, skill, experience, training or education to opine on the disciplinary policies that were in place within CPD from 1995-1998. The first position Finnell held in the area of police oversight was in 2013, fifteen years after the relevant time period that he was purportedly "analyzing" in this case. He has no formal training in the field of police oversight. (Ex. D). And while he purports to have reviewed CPDs "policies, procedures and practices as they related to the training, supervision, and discipline of officers," he could not articulate or identify what policies or training materials those were. (Ex. B at 154:7-24). Finnell has not conducted any research into the area of police oversight and discipline, and he has no publications that pertain to these issues. (Ex. D). And while he spent a

little over a year working at IPRA, Finnell admits that his purported "historical understanding of CPD's disciplinary systems" came from general conversations with other employees. (Ex. B at 136:7-138:13). This "general knowledge" does not provide the requisite qualification to opine on the policies and practices of the entire department from the 1995-1998 period. Moreover, despite securing employment in two different oversight agencies after the one year he spent at IPRA, he seemingly gained no relevant experience from either job, since he was fired from one and essentially forced to leave from the other because his work product and investigative tactics were called into question.

> **b. Finnell has no knowledge, skill, experience, training, or education in statistical analysis and therefore is not qualified to render any opinions based on statistical analysis.**

Likewise, Finnell is not a statistician, and by his own admission, does not have any statistical background to allow him to explain or defend the statistical analysis and conclusions set forth in his report. (Ex. B at 186:18-19; 433:14.) Finnell readily admits that large portions of his report pertaining to the statistical methods used were provided to him by Meza, and that he played no role in the analysis. (Ex. B at 465:9-22; 466:2-6). In fact, Finnell admits that the analysis of the "dataset" was done entirely by Meza, and that she used that analysis to generate the tables and graphs within the report. (Ex. A p. 8). As outlined *supra* at pg. 3, Finnell's report includes 20 separate tables, each of which claims to distill certain subsets of information from the dataset. (Ex. A at pp. 31-34, 39-46, 48-49, 60, 61-63, 66, 70-78, 81-83). Finnell relies on Meza's tables to support his various sub-opinions which form the building blocks of his two global opinions.

Yet Finnell is unable to validate any of the data contained within any of the tables, graphs or figures which serve as the basis of his ultimate conclusions. In fact, when asked about basic elements of the tabulations, such as "how many CR files" were included in the "unknown"

category of Table 1 (at p. 30), the basis for concluding that the annual reports referenced individual investigations[5], or how his "outlier analysis", discussed more fully *infra* at p. 16, 22-23, was conducted, he could not answer.  (Ex. B at, 204:9-205:20; 346:20-347:8).  Rather, he indicated that he would need to discuss those questions with Meza.  (Ex. B at 205:15-20).  Plaintiff did not disclose Meza as an expert and it is clear that Finnell is not qualified to provide any opinions based upon the statistical analysis contained within his report thus the opinions must be barred.

### c. Finnell has no knowledge, skill, experience, training, or education in qualitative analysis and therefore is not qualified to render any opinions based on qualitative analysis.

Finally, Finnell has no background in qualitative analysis that would allow him to explain or defend any of his opinions based upon the qualitative analysis of the purported historical information or cases analyzed in his report.  (Ex. D).  Finnell concedes that he relied on Knight for the "qualitative analysis of the historical context, and cases relevant to this inquiry in support [his] views." (Ex. A at p. 9).  Finnell's report does not describe how he employed this qualitative assessment or analysis, nor does it include the results of Knight's research.  When asked during his deposition what "qualitative analysis" he was referring to, he stated it was the "review" and "coding" of documents such as "new articles, reports, and other written material[,]" to identify "themes, patterns, phrases, that allow officer misconduct and are relevant to Plaintiffs' claims." (Ex. B at 228:17-229:1).  Finnell relies on this "analysis" and "themes" in support of his ultimate finding that the defendants in this case "escaped accountability" and "benefited from a legacy of abusive *de facto* polices within the department.  (Ex. A at 78).  Plaintiff did not disclose Knight as

---

[5] This is particularly telling given Finnell's admission that the CPD annual reports documented the "primary allegation" and that the CR counts do not include "additional allegations" that may have been associated with each CR.  (Ex. A at. 321:2-14).

an expert and it is clear that Finnell is not qualified to provide any opinions based upon the qualitative analysis contained within his report thus the opinions must be barred.

## II.    FINNELL HAS NO FOUNDATION TO PROVIDE THE OPINIONS CONTAINED WITHIN HIS REPORT

In performing its gatekeeping function, the Court must ascertain not just whether "an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question. *Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir. 2010), *quoting Carroll v. Otis Elevator Co.,* 896 F.3d 210, 212 (7th Cir. 1990).  And when an expert bases his opinion on information supplied by another, the Court must focus on the reliability of the expert's foundation. *See Loeffel Steel Prods. V. Delta Brands,* 372 F.Supp.2d 1004, 1119 (N.D. Ill. 2005)*.*  Contrary to *Daubert's* requirement that expert testimony "rest[] on a reliable foundation," Finnell's opinions are entirely based upon data and information supplied to him by others, including Plaintiffs' counsel.

### a.  Finnell has no foundation to opine on the "historical context" of CPD.

Finnell opines that CPD engaged in a "widespread pattern and practice that condoned unlawful, unreasonable, and improper law enforcement practices" based upon his purported review and analysis of the "historical context" of policing in the City of Chicago.  (Ex. A at 11).  However, Finnell did not conduct any of his own academic research on policing in general, and his knowledge about CPD is primarily based upon his fourteen months working at IPRA, and certain anecdotal information provided to him by others.  Rather, Finnell admits that he asked Knight to "conduct an analysis of the literature and [] the reports" and was not aware of how that process or analysis worked.  (Ex. C at 195:15-18).

Finnell dedicates 17 pages of his report recounting what he deems the "historical context" of allegations of abuse in the form of "fabrication of evidence" which he opines lead to "wrongful

arrests and convictions." (Ex. A at 11). Each of these specific examples purport to support his ultimate opinion that that the CPD engaged in a "widespread pattern and practice that condoned unlawful, unreasonable, and improper law enforcement practices." (Ex. A at 10). Yet, for the majority of these purported historical examples, Finnell has no independent knowledge or understanding of the underlying facts or the resources and references cited within his own report.

By way of example, Finnell begins this section by discussing what he deems the "Pre-Guevara: The Jon Burge Era, 1972-1991" which relies heavily on a law review article written by G. Flint Taylor. (Ex. A at 12 fn. 7). G. Flint Taylor is the founding partner of The People's Law Office, a plaintiff's law firm who represented several men in their civil lawsuits against Jon Burge, including Andrew Wilson. (*See,* People's Law Office Website Bio, attached hereto as Ex. G). What's more, the People's Law Office represents Plaintiff Solache in this matter, in which Finnell provided his expert report. (Ex. B at 234:1-5). Not only was he unaware of *who* he was citing, but he testified that it is *not inappropriate* to rely on such material, (Ex. B at 324:11-17), even though it is "assumed that counsel is supposed to give evidence a partisan slant." *Philips Medical Systems Intern. B.V. v. Bruetman,* 8 F.3d 600, 606 (7th Cir, 1993)(Posner, J), (Ex. B at 234:1-235:18). Relying on a law review article written by an attorney who not only represents one of the Plaintiffs in the case wherein you have been retained, but also the attorney who represented the plaintiffs whose cases you seek to summarize is "incompatible with the neutrality and evenhandedness" necessary to have the reliability that *Daubert* demands. *Sommerfield v. City of Chicago,* 254 F.R.D 317, 322 (N.D. Ill. 2008). "The roles of attorney and witness usually are incompatible, a witness is supposed to present the facts without a slant, while an attorney's job is to advocate a partisan view of the significance of the facts. One person trying to do both things is

apt to be a poor witness, a poor advocate, or both." *Gusman v. Unisys Corp.,* 986 F.2d 1146, 1148 (7th Cir. 1993).

Finnell continues this pattern of reliance on inherently biased material through his discussion of the civil case of *Wilson v. City of Chicago,* which again, was handled by the People's Law Office. While Finnell cites to a Seventh Circuit opinion rather than the law review article, he lacked even the most basic understanding of the opinion from which he quotes, and admits that he did not fully review the opinion or the CR which served as the basis for Andrew Wilson's allegations. (Ex. B at 238:6-18; 139:16-20; 241:8-20).

Finally, Finnell testified that despite opining in his report that "the City's Practice of False Statements Was Further Revealed in FBI 302s" related to the FBIs and CPDs investigation into former Chicago police officer Joe Miedzianowski, he conceded that he had no knowledge of the scope of the FBI and CPD's investigation into Miedzianowski. (Ex. B at. 171:23-172:5). He did not request, nor was he provided, any materials, including the FBI materials related to the FBI 302 that he referenced in his report. (Ex. B at 172:6-11).

Finnell failed to even familiarize himself with purported supporting material. Rather, Finnell seems to have uncritically relied solely on the information provided to him by Plaintiffs' counsel and distilled by Knight. This "historical context" is simply a roadmap of Plaintiffs' cases and evidence that their counsel has identified as support for their claims, which does not provide a reliable foundation upon which Finnell can state his opinions. Therefore, any opinions derived from the "historical context" section must be barred. *See e.g., Obrycka v. City of Chicago,* 492 F. Supp. 2d 1013, 1025 (N.D. Ill. 2011)

### b. Finnell has no foundation to opine on CPD's "sustained rate" in comparison to other departments.

Finnell opines that CPD's sustained rates for all complaints fell "well below" the national average, indicating that CPD had a "deeply flawed system of investigating and disciplining serious police misconduct." (Ex. A at p. 30). Finnell bases his opinion, in part, on a federal survey to establish the proposition that "8 percent of the use of force complaints received by large state and local law enforcement agencies in 2002 were sustained." (Ex. A at 30). However, Finnell has no foundation to espouse this opinion given his admission that he did not examine any national averages from the time period of this case, and that there is "no standardization of data collection for agencies and units tasked with investigating officer misconduct across the country." (Ex. A at p. 30; Ex. B at 373:15-375:8; 376: 6-15).

In fact, Finnell admits that when comparing CPD's purported "sustained rate" (which, as explained below, is problematic in and of itself), to the survey, he chose to compare CPD to the 8% rate identified in the survey, not the appropriate 6% rate for large law enforcement agencies, as he should have. (Ex. B at 340:20-341:2; *See,* Bureau of Justice Statistics Special Report; Citizen Complaints about Police Use of Force, attached as Ex. H at 3). He further testified that he agreed citizen complaints data must be interpreted with caution due to the differences in how agencies receive, process and record complaints, as well as the various influences on the citizen's decision whether to file a complaint. (Ex. B at 336:20-338:4; Ex. H at p. 4). Finally, Finnell agreed that even the meaning of "complaint rate" is not entirely clear because a low force complaint rate could mean that police are performing well or that the complaint process is inaccessible; likewise, a high force complaint rate could mean that officers use force often or that the complaint process is more accessible. (Ex. B at 338:6-339:2; Ex. H at p. 4).

The above concessions by Finnell are enough to establish that he lacked even the basic foundation to make such a comparison. Yet even if they were not, the author of the federal survey upon which Finnell relied in forming his opinion made the point quite clear when he published a follow up study, in which the author found that the Bureau of Justice Statistics Special Report data did "not provide a valid and reliable basis for this kind of comparative analysis." (*See,* National Data on Citizen Complaints About Police Use of Force: Data Quality Concerns and the Potential (Mis)Use of Statistical Evidence to Address Police Agency Conduct, attached hereto as Ex. I; Ex. C at 130:21-132:12)

### c. There is no foundation for the statistical analysis in Finnell's Report, including the Outlier Analysis.

It is without question that Finnell did not conduct *any* of the statistical analysis contained in his report. Rather, Finnell testified that Meza conducted the analysis of data distilled from the 349 CR Files in the spreadsheet. (Ex. B at 186:13-20). Finnell has no understanding of how the information contained within the spreadsheet was complied. (Ex. B at 178:24-179:15). He does not know who prepared the spreadsheet, how many people were involved, or the background or credentials of those involved in the preparation of either spreadsheet. (Ex. B at 179:16-180:4). Finnell and his "associates," including Meza, spot-checked the spreadsheet by looking at random CRs to make sure the information in the spreadsheet matched the information in the CR, but he could not say how many he actually compared, or exactly which files Meza looked at. (Ex. B at 99:9-20).

This renders his statistical analysis unreliable and justifies excluding his opinions that rely on this information. *See, State Farm Fire & Cas. Co. v. Electrolux Home Prods.,* 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2012). *See also, Fail-Safe, LLC v. A.O. Smith Corp.,* 744 F. Supp. 2d 870, 887 (E.D. Wis. 2010)(stating that the defendant's expert's reliance on the defendant's own data,

which he did not independently verify, rendered his opinion unreliable); *Braun Corp. v. Vantage Mobility Int'l, LLC,* 2010 WL 5287484, at *7 (N.D. Ind. June 21, 2010)(recommending exclusion of the portions of the defendant's expert's opinion replying on a histogram prepared by the defendant where the expert used it without verifying or reviewing the underlying information), *report & recommendation adopted,* 2010 WL 5279974 (N.D. Ind. Dec. 17, 2010).

Moreover, Finnell lacks the most basic understanding of the statistical methods used in his report. He admitted that he had no idea how to do the calculations required in order to calculate the outlier analysis. (Ex. B at 434:1-10). While an expert may rely on the work of assistants when formulating an expert opinion, they cannot simply parrot the work actually done by another expert, who is not offered for testimony and cross-examination. *See generally Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition, LLC.,* 2021 WL 2185699 (Georgia Northern District Court 2021). It is clear here that Meza was more than a "gopher or data gatherer" and instead exercised her own professional judgment that was beyond Finnell's abilities. *Dura Auto Sys. Of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 612 (7th Cir. 2002).

## III.    FINNELL LACKS A RELIABLE METHODOLOGY

Even if Finnell was qualified to provide the opinions within his report, and if they were supported by proper foundation, he lacks any reliable methodology. The Court must ensure that a proposed expert's methodology is "scientifically valid" and that his conclusions are 'based on sufficient facts or data." *Bogathy v. Union Pac. R.R.*, 2020 No. 17-CV-4290, 2020 WL 419406, at *4 (N.D. Ill. Jan. 24, 2020). The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).

Relying on Meza's statistical analysis of the spreadsheet, Finnell's report renders multiple sub-opinions, including that the City of Chicago had a "pattern and practice of fabricating evidence," (Ex. A at 29), CPD routinely failed to "thoroughly investigate, supervise and discipline officers in a timely manner," (Ex. A at 37), "CPD's accountability system had no mechanism to detect and respond to officers with a high number of complaints," (Ex. A at 59), "the structure of CPD's review system unduly delayed accountability," (Ex. A at 60), "CPD's accountability system routinely failed to detect or discipline fabrication of eyewitness identifications and misconduct during eyewitness identification procedures," (Ex. A at 66), and CPD's "failure to address Rule 14 allegations, the CPD and the City of Chicago condoned a code of silence." (Ex. A at 68). Each of these sub-opinions provide the basis for Finnell's global opinion that the City of Chicago's "failure to discipline and supervise Defendants created a sense of impunity and facilitated encouraged and allowed abuse." (Ex. A at 69). However, as discussed at length *supra,* Finnell did not conduct any of the statistical analysis contained within the report. Rather, he consistently testified throughout his deposition that Meza conducted the analysis and generated the tables and graphs that are contained therein. (*see e.g.* Ex. B at 186:12-17).

Despite his complete reliance on her work product, Finnell does not know what methodology Meza used to create the tables and graphs that are used in his report. (Ex. B at 121:2-122:5). And when asked questions about the methodology, e.g. how she decided to count data points, he repeatedly testified that he would have to consult with Meza to answer the question. (Ex. C at p. 105:12-20). And while he expected her to use "sound" methodology in conducting her analysis, particularly her outlier analysis, he testified that he had "no idea" if there were other methodologies that that would have been better. (Ex. C at 226:20:227-6; 229:2-7).

**a. There is no reliable evidence to support Finnell's purported sustained rates.**

Much of Finnell's opinion rests on his comparison of CPD's "sustained rates" to what he purports to be a national average. (Ex. A at 30). Specifically, Finnell's report opines that CPD had a sustained rate of 8% for all types of complaints; and a sustained rate of 4.7% for excessive force complaints. (Ex. A at 30). From there, Finnell opines that each of these sustained rates are *below* national average, and therefore CPD had a "deeply flawed system" of discipline. (Ex. A at 30). Finnell's opinions are not admissible unless Plaintiffs can demonstrate by a preponderance that they are based on sufficient facts and data and that he applied reliable principles and methodology. Fed. R. Evid. 702; *Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 780 (7th Cir. 2017). Even where an expert is well-qualified by experience, "an expert cannot reply on data of unknown reliability." *See Loeffel Steel Prod., Inc. v. Delta Brands, Inc*., 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005). All Finnell's sub-opinions that rely on the City's purported "sustained rate" depend entirely on the assumption that the facts and data supporting the City's purported sustained rates are accurate, reliable, and trustworthy, such that the sustained rates are what he reported them to be. Because that assumption is unsupported, and, in fact, as explained below, demonstrably false, the methodology is flawed and does not bear the indicia of reliability worthy of admission. *Gopalratnam*, 877 F.3d at 786 (excluding expert testimony based on faulty premise underlying expert's opinion).

Finnell relied on Plaintiffs' legal team to provide him with the data to determine the purported sustained rate. If the coding procedure was trustworthy, then, at a minimum, the data should not need to be altered for the analysis to be conducted. Here, in advance of statistically analyzing the data, Finnell explained that Meza had to "remove duplicate entries within the dataset" which resulted in different number of allegation counts. (Ex. B at 188:11-189:9). The

mere fact that Meza had to review the spreadsheet, and "identify and remove" duplicates, shows that the data is not reliable. But even if Meza's strategy is methodologically sound, the work she did to remove entries from the spreadsheet is not capable of replication. *Caraker v. Sandoz Pharms. Corp.,* 172 F. Supp. 2d 1046, 1047 (S. Dist. Ill. 2001)("The hallmark of this reliability prong is the scientific method, *i.e.,* the generation of testable hypotheses that are subjected to the real word crucible of experimentation, falsification/validation and replication.) *Finnell* is unable to identify which entries were duplicates and removed, explain what else Meza did to the data or to describe the process Meza implemented to remove duplicates and otherwise cleaned up the data. (Ex. B at 191:17-192:20). He could not even explain what she did to the spreadsheet, or confirm whether he was provided with a spreadsheet *after* she removed "duplicates." (Ex. B at 269:16-270:23). In fact, Finnell testified that the only person who could possibly answer questions about what exactly was done to alter the spreadsheet, was Meza, and he wasn't even sure if she could replicate her work. (Ex. B at 192:3-20).

Because Finnell does not know what Meza did, cannot identify any of the changes she made to the spreadsheet, cannot replicate the work himself and does not believe that Meza can replicate the work, all of sub-opinions that rely on the spreadsheet that underlies any opinions Finnell purports to proffer rely on unsound methodology and must be barred. Plaintiff has provided no other source of proof to establish the purported "sustained rates" within CPD for various complaints of misconduct. Where there is no affirmative proof of the facts underlying an expert's opinion, the testimony is excluded. *Sommerfield v. City of Chi.,* 254 F.R.D. 317, 324-326 (N.D. Ill. 2008).

**b. Finnell's report and tables contain significant errors.**

During his deposition, Finnell admitted that his report contained significant errors. Specifically, Finnell testified on the first day of his deposition that while preparing for his deposition, he noticed errors in Table 17. (Ex. B at 193:8-195:24). Rather than including the correct data from the CPD Annual reports, Finnell testified that he included numbers from "another report" that he was working on (that he could not identify), and that the numbers in column three ("CPD Annual Report, Complaint, Received Count) did not belong in this report at all. (Ex. B at 195:18-24); Ex. A at 81-82). Finnell testified that the error was innocuous and did not alter his ultimate conclusions. (Ex. B at 198:23-200:3). However, this was not his only error, and ultimately showed a consistent lack of understanding of the concepts for which he was testifying.

Finnell's report purports to compare the data he received from the 349 CR Files produced to the City to the CPD Annual Report data from the years 1995-1998, and claims that the sample is "at least 9.6% of all Complaint Register files" for the time period. (Ex. A at 9). However, this opinion is based upon Finnell's conflation of "CR files, individual investigations and allegation counts." Specifically, Finnell's report breaks down the 349 CR files into 1,983 "individual investigations," which he defines as "the number of officers total that are accused within the 349 CRS," and 2,150 "allegations," which he defines as the total number of allegations that are found within the 349 CRs." (Ex. B at 180:13-16; 181:3-11). Finnell then used the "investigations and allegation counts" as his datapoints to compare to the CPD Annual Reports. (Ex. B at 204:21-23).

However, Finnell admitted during his deposition that he in fact had no basis to conclude that the numbers in the annual reports represent individual investigations, rather than individual CRs. (Ex. A at 204:15-20). Rather, he was relying exclusively on Meza's conclusion that the data provided was referring to individual investigations, despite his own acknowledgement and

understanding that CPD classified this data by the primary allegation/and each data point was one individual CR. (Ex. A at 205:21-206:16; 316:11-15). Accordingly, the sample size reviewed by Finnell fell far below 9.6% as stated in his report, and was actually closer to .9%, making it far from statistically significant.

Finnell also testified that the data related to Defendant Officers' CRs was wrong in his report. Specifically, Finnell's report states that his analysis considered a "subset of 158 CRs for defendant officers from Area 5." (Ex. A at 9). However, during his deposition, he conceded that this was inaccurate, and that it should have been 158 *allegations* against defendant officers from Area 5. (Ex. A at 444:2-9). Moreover, Finnell admitted that these 158 allegations against the defendant officers were from CRs that spanned their entire careers, not just the 1995-1998 time frame of dataset of CRs. (Ex. at 444:18-445:2). This error directly impacts Finnell's calculations pertaining to his "outlier analysis," as he was comparing allegations against non-defendant officers for a span of four years to allegations against defendant officers for their entire career which, as explained more fully below, when done correctly shows that *none* of the defendant officers fell into his "outlier" category."

Finally, Finnell relies upon the fact that the City required a signed affidavit from each complainant in order to support his opinion "the City failed to investigate anonymous complaints." (Ex. A at 55). However, in 1998, there was no such requirement that each complaint include a signed affidavit. Rather, the Uniform Peace Officers' Disciplinary Act was not amended to include an affidavit requirement until 2003. *See* 50 ILCS 725/3.8(b). During his deposition, Finnell conceded that his entire opinion related to the requirement of a signed affidavits for each complaint was included in his report in error and admitted that the entire paragraph should be stricken from his report. (Ex. B at 424:8-425:11). Finnell testified that the inclusion of this paragraph was an

"inadvertent inclusion from another report" though he could not identify which report it came from. (Ex. B 424:14-18).

### c. There is no reliable evidence to support Finnell's Outlier analysis.

Finnell opines that CPD's "failure to discipline and supervise" Defendant Officers created a sense of impunity and facilitated, encouraged and allowed abuses. (Ex. A at 69). In support of this opinion, Finnell relies on Meza's calculations to determine that several Defendants Officers fall into the category of "statistical outlier" which Finnell defines as statistically, an officer was an "outlier from the group based on the number of allegations that they had" during a certain time period. (Ex. B at 432:5-19). Finnell's report claims that if an officer received nine or more *allegations* arising out of a CR initiated between 1995-1998, then they would be statistical outliers. (Ex. A at 447:1-7). However, in response to Defendants' expert report, Plaintiffs produced Finnell's rebuttal report. In that rebuttal report, Finnell conceded that the outlier analysis set forth in his original report was done incorrectly, and further conceded that once done properly, *none* of the Defendant Officers were outliers in the 1995-1998 timeframe. (*See* Finnell Rebuttal Report, attached as Ex. K, at 33). Accordingly, Finnell's outlier analysis entirely has no relevance to any of his opinions.

If that was not enough, by conceding that the analysis was conducted improperly, Finnell cannot demonstrate by a preponderance that this opinion is based on sufficient facts and data *or* that he applied reliable principles and methodology, as required under Fed. R. Evid. 702.

Moreover, Finnell testified that Meza used the "interquartile rule" to determine whether a Defendant Officer fell into the statistical outlier category. (Ex. B at 432:20-24). However, he does not know why she used this method or even if there was another method that could have been used to conduct this analysis. (Ex. B at 433:4-11; Ex. C at 227:8-20). In fact, when asked directly,

Finnell testified that he had no idea how Meza reached the conclusion that "officers with nine of more allegations" fell into a statistical outlier category. (Ex. B at 433:17-434:10). Finnell's outliner analysis opinions depend entirely on the assumption that the facts and data supporting the calculations are accurate, reliable, and trustworthy. Now that he has conceded that the analysis was inaccurate, unreliable and not trustworthy because the calculations included allegations against Defendant Officers from their entire career, rather than just those initiated between 1995-1998, (Ex. A at 444:18-444:2), the analysis and the opinions that stem from them can be disregarded. More importantly however, this error, which Finnell did not catch until after he tendered his original report, after he was deposed and after he was provided with Defendants' expert report illustrates the peril of allowing an expert to simply parrot the work actually done by another expert, who is not offered for testimony and cross-examination. *See generally Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition, LLC.,* 2021 WL 2185699 (Georgia Northern District Court 2021). All of Finnell's opinions suffer from this same flaw and must be barred.

### d. The facts and data contained within Finnell's report are not quantitatively or qualitatively sufficient.

Even if the data were trustworthy and reliable – which they are not – Finnell's testimony is inadmissible because Plaintiffs cannot demonstrate that the facts and data that he relied upon were quantitatively or qualitatively sufficient. *Gopalratnam*, 877 F.3d at 781. In the quantitative sense, to satisfy *Daubert*, the facts and data must be sufficient for the expert to employ the methodology. *Id*. For instance, the Seventh Circuit has provided the example that if an economic expert provided an opinion about an average gross sales price, the opinion "could not be reliably supported by evidence relating to sales to only one customer 'because a single observation does not provide a sufficient basis for calculating an average.'" *Id.*

Here, Finnell considered only the data that Plaintiffs provided to him and analyzed it as if it was representative of CPD as a whole by conflating the number of "investigations" and "allegations" contained within a CR with the number of individual CR files opened against members of CPD from 1995-1998. The spreadsheet provided by Plaintiffs' counsel purports to be based on the information distilled from 349 CR files produced by the City, that included allegations against Area 5 Detectives[6]. (Ex. B at 178:7-14). Pursuant to his report, these 349 CR files contain 1,983 individual investigations. (*Id*). By conflating the number of "investigations" with the number of CR files opened, Finnell's report purports to have analyzed 9.6% of the CRs opened against members of CPD from 1995-1998. However, Finnell admits that CPD Annual reports reflect the number of individual CR files opened from 1995-1998, not allegation counts. (Ex. A at 205:21-206:16; 316:11-15). When reviewing the CPD Annual Reports, the total amount of CRs for the time frame was 38,504 CRs. (*See,* CPD Annual Reports from 1991-1995, https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/; Ex. B at 290:1- ; 311:9-14; 314:22-315:2). Accordingly, the dataset of CRs reviewed by Plaintiff's counsel and distilled into the spreadsheet, accounts for .91 percent of the total CRs investigated by CPD during the 1995-1998 period.

As to whether the facts and data are qualitatively sufficient, the question is whether Finnell relied on the kinds of facts on which experts in her field would reasonably rely. *Gopalratnam*, 877 F.3d at 781. Finnell testified that a statistically significant sample is a sample that is large enough from the population that you are analyzing to render an opinion applicable to the entire population so that you do not have to analyze the entire population. Though Finnell believes that 349 CR files

---

[6] Notably, on the second day of his deposition, Finnell changed course, and stated that the data set represented 556 officers of the Chicago Police Department, rather than Area 5 Detectives. (Ex. A at 431:2-6).

is a statistically significant sample, this is based solely on Meza's determination which Finnell cannot articulate. (Ex. B at 309:10-23). Moreover, despite acknowledging that the tables on which these opinions rely on contained significant errors, Finnell maintained that the ultimate opinions did not change based on Meza's say so. (Ex. A at 198:4-199:200:8). Finnell offers no scientific or statistical explanation as to how or why such a limited set of data could be sufficient for him to opine on the City's sustained rates or any other disciplinary policy.

   e. **Finnell's reliance on Knight and Meza means there is no way to determine the methodology used in preparation of the report.**

Finnell readily admits that he relied heavily on the work of Knight and Meza when forming his opinions and drafting his report, so much so, that he felt it necessary to include their credentials within the body of his report. (Ex. B at 143:16-22; 150:8-21). In fact, while neither Knight or Meza are disclosed as an expert or author in this case, Knight testified in a subsequent Guevara related case that him, Meza and Finnell worked from a "shared document" while drafting the original report, that was ultimately produced in this litigation, and others. (*See,* Deposition of Knight in *Iglesias v. Guevara,* attached hereto as Ex. J, at 152:15-22; 155:8-14). Yet, when questioned about what specific portions of the report were written or prepared by Knight, Finnell was instructed not to answer. (Ex. B at 146:5-11). As for the portions of the report that were drafted by Meza, Finnell testified that she prepared the charts and graphs that are contained within the report, and that she provided him the "steps or process" that she used to reach her determinations, however, none of that is included within the report. (Ex. B at 187:5-10).

At best, it appears that the three co-authored the report, having all substantially participated in his preparation. This sort of "joint collaboration" by experts violates the purpose of Fed. R. Civ. P. 26, which requires that an expert report contain the basis and reasons for the expert's opinions, as well as the data or other information considered by the witness. *United States ex. rel. Barron v.*

26

*Deloitte & Touche, LLP,* 2008 WL 7136868, \*5 (Texas Western Dist. Court 2008). Given the testimony of Finnell, there is simply no way to determine the methodologies utilized, tests conducted, opinions rendered (with a basis and reasons therefore), and sections in the expert report prepared by Finnell himself as compared to those prepared by Knight and/or Meza. And, as illustrated by the errors in the outlier analysis, Finnell has no ability to catch errors in their work.

While an expert is permitted to use assistants in formulating his expert opinion, issues tend to arise when those assistants "aren't merely gofers or data gatherers but exercise professional judgment that is beyond the expert's ken". *Dura Auto Sys. Of Ind. V. CTS Corp.,* 285 F.3d 609, 612-613 (7th Cir. 2002). Here, Finnell lacks the basic understanding of the methods and reasons underlying the data and information supplied by Meza and Knight, and as such, was "virtually precluded" from being able to give an assessment of the validity of the data through cross-examination." *TK-7 Corp. v. Est. of Barbouti,* 993 F.2d 722, 732 (10th Cir. 1993). Accordingly, his testimony should be barred in its entirety.

## IV. FINNELL'S OPINIONS ARE NOT RELEVANT OR HELPFUL TO THE JURY

Expert testimony that is not helpful to the jury is excluded. Fed. R. Evid. 702. And Rule 403 excludes testimony where the potential prejudice of the evidence outweighs the probative value. In large part, Finnell's report is a one-sided proclamation on the history of the disciplinary process within the CPD, that is completely lacking in any evidentiary support.

In this case, Plaintiffs' claim is that the City failed to discipline its police officers for misconduct, thereby encouraging and even allowing the alleged abuses affecting Plaintiffs, and they offer Finnell as support. Yet, Finnell did not opine that a single CR should have been sustained that was not, nor does he make any affirmative determination that misconduct occurred in any CR file that he reviewed. His opinions, therefore, are wholly disconnected from the claim at issue in

the case. *See Owens v. Auxilium Pharmaceuticals, Inc.,* 895 F.3d 971, 973 (7th Cir. 2018) (expert opinion testimony does not help the jury understand the evidence or decide an issue in the case when it does not fit the facts of the case).

Presumably, Plaintiffs intend to argue that CPD's "low" sustained rate (which he lacks reliable evidence to support) is reason enough to speculate that some nefarious conduct on the part of the detectives. Yet Finnell concedes that he did not conduct any comparison between CPD's sustained rates during the period of 1995-1998 and other documented sustained rates during the same time frame for similarly situated departments. Accordingly, no such comparison is relevant to the jury.

Finally, Plaintiffs' reliance on Finnell's outlier analysis to support the notion that the City should have had notice that its policies were unconstitutional is inherently irrelevant. Not only does Finnell concede that the analysis was done incorrectly, he concedes that he was not aware of the outlier analysis, as conducted within his report, being used by any police departments in the 1995-1998 time frame, and he cannot point to any department that has used or currently uses the analysis in the way Meza did in order to support his opinions in this case. (Ex. C at 250:17-21, 254:14-23).

If the jury must decide whether CPD's polices caused Plaintiffs to suffer constitutional violations, then, each of Finnell's speculative theories add no value. *See Kirk v. Clark Equip. Co*., 991 F.3d 865, 876 (7th Cir. 2021) (finding ample reason to question the soundness and care which expert arrived at his conclusions where opinions were supported by expert's mere speculation); *Hunt v. Dart,* 754 F. Supp. 2d 962, 971-72 (N.D. Ill. 2010) (expert opinions based on nothing more than speculation will not help the jury); *Ortega v. United States*, No. 16-cv-8402, 2021 WL 4477896, *9 (N.D. Ill. Sep. 30, 2021) (excluding expert testimony where expert could merely

testify that the defendants' actions can or could have caused injury were "too speculative to pass muster under *Daubert*")

Finnell's opinions are also inadmissible pursuant to Rule 403 because of their potential to confuse the jury. Rather than establish any culpability on the part of the City for its disciplinary practices, which is the purpose they should serve, Finnell's opinions fault the City for failing to meet the best practices as defined by the standards of today. Finnell does not cite to any evidence, research paper, or policy standard from 1995-1998 in support of his opinions.

## CONCLUSION

For the foregoing reasons, Defendant, City of Chicago, requests that Anthony W. Finnell's expert opinions be barred in their entirety.

WHEREFORE, Defendant, City of Chicago, Respectfully Request This Honorable Court Grant Its *Daubert* Motion To Bar Opinions Of Anthony W. Finnell in its entirety, and for any other relief as this Court deems just and reasonable.

Dated: April 8, 2024

Respectfully Submitted,

by: /s/ *Eileen E. Rosen*
Eileen E. Rosen
Special Assistant Corporation Counsel
*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Theresa Berousek Carney
Catherine M. Barber
Austin G. Rahe
Lauren M. Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker, 19th Floor
Chicago, Illinois 60606
(312) 494-1000
erosen@rfclaw.com