```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   ARTURO DeLEON-REYES,              )
                                       )
 4                    Plaintiff,       )
                                       )
 5   -vs-                              )  Case No. 18 CV 1028
                                       )
 6   REYNALDO GUEVARA, et al.,         )
                                       )
 7                    Defendants.      )  Chicago, Illinois
     _____ )  May 24, 2024
 8                                     )  9:24 a.m.
     GABRIEL SOLACHE,                  )
 9                                     )
                      Plaintiff,       )
10                                     )
     -vs-                              )  Case No. 18 CV 2312
11                                     )
     CITY OF CHICAGO, et al.,          )
12                                     )
                      Defendants.      )
13
                TRANSCRIPT OF PROCEEDINGS - Status
14            BEFORE THE HONORABLE STEVEN C. SEEGER

15   APPEARANCES:

16   For Plaintiff          LOEVY & LOEVY
     DeLeon-Reyes:          BY:  MR. JONATHAN I. LOEVY
17                               MS. RACHEL ELAINE BRADY
                            311 North Aberdeen Street
18                          Chicago, IL  60607

19   For Plaintiff          PEOPLE'S LAW OFFICES
     Solache:              BY:  MS. JANIS M. SUSLER
20                          1180 North Milwaukee Avenue
                            Chicago, IL  60642
21

22   Court Reporter:        AMY M. KLEYNHANS, CSR, RPR, CRR
                            Federal Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 2318A
24                          Chicago, IL  60604
                            Telephone:  (312) 818-6531
25                          amyofficialtranscripts@gmail.com
```

```
 1   APPEARANCES (CONT'D):

 2   For Defendant          LAW OFFICES OF GABRIELLE R. SANSONETTI
     Guevara:               BY:  MS. GABRIELLE R. SANSONETTI
 3                          120 North LaSalle Street
                           Suite 2000
 4                          Chicago, IL  60602

 5   For Defendants         THE SOTOS LAW FIRM, P.C.
     Halvorsen, Dickinson,  BY:  MR. JOSH M. ENGQUIST
 6   Rutherford, Trevino,   141 West Jackson Boulevard
     Mingey, Biebel, and    Suite 1240A
 7   Cappitelli:            Chicago, IL  60604

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings heard in open court:)

2              THE CLERK:  18 CV 2312, DeLeon-Reyes versus Guevara,

3    *et al.*, and 18 CV 2312, Solache versus City of Chicago, *et al.*

4              MR. LOEVY:  Good morning, Your Honor.

5              Jonathan Loevy for Plaintiff Reyes.

6              MS. BRADY:  Good morning, Your Honor.

7              THE COURT:  Good morning.

8              MS. BRADY:  Rachel Brady, also on behalf of Plaintiff

9    Reyes.

10             THE COURT:  Good morning.

11             MS. SUSLER:  Good morning, Judge Seeger.

12             Jan Susler on behalf of Gabriel Solache.

13             THE COURT:  Good morning.

14             You're all on the plaintiffs' side.

15             Good morning.

16             Defense team.

17             MR. ENGQUIST:  Josh Engquist on behalf of all of the

18   individual officers except for Ray Guevara --

19             THE COURT:  All right.

20             MR. ENGQUIST:  -- in both cases.

21             THE COURT:  Good morning.

22             MS. ROSEN:  Good morning, Your Honor.

23             Eileen Rosen on behalf of Defendant City of Chicago

24   in both cases.

25             THE COURT:  Good morning.

1          MS. SANSONETTI:  Good morning, Your Honor.

2          Gabrielle Sansonetti on behalf of Officer Guevara.

3          THE COURT:  Good morning.

4          Thank you for coming in today.

5          I've been actively reading the docket.  I've seen

6     some activity.  It's a beehive of activity.

7          I will say this:  I've put a lot of thought into how

8     I should start the hearing.  The parties have filed, I think,

9     four summary judgment motions, give or take, give or take,

10    plus a couple *Daubert* motions.  And the parties can't seem to

11    agree on the number of pages that I should allow, the number

12    of paragraphs I should allow for summary judgment.

13         So, you know, I did a little counting.  So far, so

14    far -- and you haven't even done the responses yet -- you

15    folks, it looks to me, have filed 6,838 pages before we get to

16    the response.  And that got me thinking, how many pages are in

17    *Moby Dick*?

18         By the way, on a personal note, I read a Peggy Noonan

19    article a couple of weeks ago talking about an article by

20    William F. Buckley a couple of years ago, saying he couldn't

21    believe he almost went through his whole life without reading

22    *War and Peace*.  He would have missed something.  She said the

23    same thing about *Moby Dick*.  She says don't go through life

24    without reading *Moby Dick*.  But I digress.

25         There are I think a couple thousand pages.

1        That doesn't begin to scratch the surface of what

2    we've got.  So I thought I would illustrate the amount of

3    pages that you've put in front of me.  As a demonstrative

4    here, I have a stack of briefs -- excuse me -- a stack of

5    books.

6        John Rawls -- we're going to add it up as we go.

7        John Rawls' *A Theory of Justice* is 525 pages.

8        Richard Posner's *Reflections on Judging* is 379 pages.

9        *The Law of Judicial Precedent* is 908 pages.

10       *The Essential Scalia* is 334 pages.

11       *The Words That Made Us* is 806 pages.

12       *Federalist Papers*.  My copy is all marked up.  597

13   pages.

14       And last but not least, Sun Tzu's *The Art of War*.  It

15   is 561 pages.

16       What's the grand total?

17       THE LAW CLERK:  4,110.

18       THE COURT:  We're only at 4,110.  We're a few

19   thousand pages short.

20       One idea I had is I could order you guys to read all

21   of these books before completing summary judgment.

22       I hope the transcript reflects that I'm joking when I

23   say that.

24       I got to thinking about the 6,838 pages, and I

25   started thinking about the Dirksen Federal Building.  How many

1    windows are on the Dirksen Federal Building?  In jest, I

2    thought about ordering you to count it up to give you some

3    perspective the number of pages you've dumped on me.  I

4    decided not to do that.  But we've got, what, 28 floors, 29

5    floors, something like that.  I actually counted.  I think

6    it's probably 80 across.  I did a little math.  I literally

7    almost went outside yesterday to add it up.  Maybe you folks

8    have done it.  I thought it was a vocative exercise.

9         Parenthetically, there are way more windows on the

10   Dirksen Federal Building than I ever could have imaged, if you

11   actually count it up.

12        What I'm trying to tell you is this as a starting

13   point, you've put a lot on my plate so far and counting.

14   We're just at the beginning stage of summary judgment.

15        Let me also tell you this on a personal note.  Let me

16   just tell you about my week.

17        On Tuesday, I finished a week and a half jury trial.

18   A cocaine conspiracy case.  I put everything I had into the

19   case.  Got a jury verdict Tuesday afternoon.

20        Wednesday, I was on the bench all day handling

21   criminal stuff.  I had a 67-year-old gentleman that I

22   sentenced.  He had cancer and a spine lesion, a hip

23   replacement, a knee replacement.  I spent really a ton of time

24   thinking about him because I cared about him, candidly.

25        Thursday, I had another sentencing.  I did other

1    criminal stuff all day.  And I sent somebody else to federal

2    prison.  He got 75 months for a cocaine conspiracy.

3           And then I have you all here who can't agree on the

4    number of pages for summary judgment.  And it gives me a

5    little pause.  In jest, I think, "I wish Learned Hand were

6    here.  He could probably figure this out, but I can't."

7           I also want to give you a little bit of perspective

8    as follows:  How many civil cases do you think I have?  Honest

9    to goodness, how many civil cases do you think I have?

10          Everybody get your answer in your head, and then

11   we're going to go down the line.  Okay.

12          How many civil cases do you think I have?

13          Everybody got your number?

14          My joke was going to be, whoever gets the closest was

15   going to get five extra pages.  That's a joke.

16          Let's just go down the line.

17          How many cases do you think I have?

18          Everybody ready?

19          All right.  So we're going to go from left to right.

20          Ms. Sansonetti.

21          Everybody say your name and give me your guess.

22          MS. SANSONETTI:  Gabrielle Sansonetti.

23          A hundred.

24          THE COURT:  Okay.

25          MS. ROSEN:  Eileen Rosen.

1          400.

2          THE COURT:  Okay.

3          MR. ENGQUIST:  Josh Engquist.

4          250.

5          MR. LOEVY:  251.  The price is right.

6          THE COURT:  The price is right, yeah.

7          MS. BRADY:  I'm with John, 251, Your Honor.

8          MR. LOEVY:  You could have beat me with 252.

9          MS. SUSLER:  Jan Susler.

10         275.

11         THE COURT:  275.

12         My answer, Ms. Ramos, is . . . ?

13         THE CLERK:  319.

14         THE COURT:  319.  319 cases.

15         As of the beginning of week, I had gotten 28 new

16    cases this month.  28 new cases.

17         That's civil-land.  There's also criminal-land.  I

18    have a lot of criminal cases.  Untolled dozens of criminal

19    cases.  And I put a lot of energy into the criminal cases

20    because I care about the people and I try to do the right

21    thing.  I really do.

22         So whenever I have a sentencing, I devote as much

23    time as I need to.  It's the most important thing I do,

24    probably.

25         Let me ask you, for my 319 cases -- let's do a little

1 math -- how much time do you think I can spend on each

2 individual civil case in a year?  What do you think?

3          Mind you that I get probably 30 new cases a month.

4 So, you know, how much time do you think I can spend on each

5 case on average?  Let's do a little math.  What do you think?

6 What do you think?

7          Say your name.

8          MR. LOEVY:  I'm Jonathan Loevy.

9          If you do the math, you've got 300 cases, that's not

10 even a day a case if you only work on the weekdays, which I

11 suspect you don't.

12          THE COURT:  I work every day.

13          Go ahead.

14          MR. LOEVY:  Yeah.  So, I mean, by pure math, you

15 average less than a day a case, and that's for all the

16 proceedings and everything.

17          THE COURT:  Yeah.  And that assumes I do nothing on

18 criminal cases, right?

19          What do you think?  What's the math work out to?

20          MR. ENGQUIST:  His math seems pretty on point.

21          THE COURT:  Yeah.

22          I mean, do you think I should spend time on criminal

23 cases during the year?  What do you think?

24          MS. ROSEN:  Of course.

25          THE COURT:  Do you think so?

1          Yeah, okay.

2          How much time do you think I should devote to your

3    case this year?  Honestly, truly, what do you think?

4          Ms. Sansonetti, you look like you're going to

5    sprinkle the hearing with some wisdom.  What do you think?

6          MS. SANSONETTI:  Judge Seeger, I appreciate your

7    judicial perspective on this.  The only thing I was going to

8    say is that this -- the thing that sticks out for me about

9    these cases that --

10          THE COURT:  Let's go into the microphone.

11          MS. SANSONETTI:  -- that cause it to be a little bit

12    more significant maybe than other civil cases is that there's

13    taxpayer money involved, and so they're heavy and they're

14    weighty and the issues underlying them are connected to

15    criminal cases.  And so, from my perspective -- and you know

16    me -- I think they -- they matter --

17          THE COURT:  Mm-hmm.

18          MS. SANSONETTI:  -- maybe a little bit more.

19          THE COURT:  Do you think everyone in the other cases

20    would agree with you?

21          MS. SANSONETTI:  No, but that's --

22          THE COURT:  What percentage of parties in my other

23    cases think their cases are probably a little more important

24    than the other cases?  What do you think?

25          If I went down and called every plaintiff and said,

"Hey, do you think your case is more important or probably less important than everyone else's cases?"  How do you think everyone would respond?  What do you think?

MS. SANSONETTI:  I'm sure that they would have an argument.  They're not here to defend themselves.  All I'm telling in my position is that they're also taxpayers.  So --

THE COURT:  Okay.

MS. SANSONETTI:  -- having that investment, they might --

THE COURT:  So, with that said, what's your number? How much time should I spend on your case this year?

MS. SANSONETTI:  I just -- I should not engage, right?

THE COURT:  Go ahead.  You've got a question here. Let's honestly think about this.

MS. SANSONETTI:  Should we come up with a ratio based on the amount of times that the lawyers spend on these cases?

THE COURT:  I probably wouldn't go there.

MS. SANSONETTI:  Okay.

Then I would say reading 6,000 pages seems unreasonable.  I don't know how you would ever accomplish that, but I think that a lot of those pages --

THE COURT:  And here's my question:  How much time should I spend on your case this year?

MS. SANSONETTI:  It's hard to say because to get a

1   fair and judicial ruling and to understand the issues -- these

2   issues are some of the most complicated that I've ever dealt

3   with in my career.  So they are complicated.  They're not

4   simple.  We would spend less time on a two-count drug case or

5   a one-count gun case.  But this is multiple counts with

6   multiple claims with multiple consequences to the taxpayers.

7           So more time.

8           THE COURT:  Okay.  So, what's the answer?  Do you

9   think I should spend a month, a whole month?

10          MS. SANSONETTI:  How about three hours a week?

11          THE COURT:  You think three hours a week.  So you

12  think I should spend 150 hours?

13          MS. SANSONETTI:  That seems -- three hours a week, if

14  you read an hour a day or an hour every other day --

15          THE COURT:  Okay.

16          MS. SANSONETTI:  -- over five days.

17          THE COURT:  What do you think?  What do you honestly

18  think?

19          MR. ENGQUIST:  I honestly don't know how I would

20  respond to the question.

21          THE COURT:  Okay.  What do you think?

22          MR. LOEVY:  Your Honor, did you see the filing we

23  filed yesterday?

24          THE COURT:  Yeah.

25          MR. LOEVY:  Our position is zero.  This is not a

1  summary judgment case.  And you should --

2          THE COURT:  Yeah, but let's focus on my question

3  because I can't -- I can't figure that out without reading

4  stuff.

5          Why don't you focus on my question, and then it will

6  go smoothly.

7          How much time do you think I should spend on your

8  case this year?

9          MR. LOEVY:  I think our case should be the same as

10  any other summary judgment, no more, no less.  I don't presume

11  to know how much time you devote to those, but --

12          THE COURT:  How many pending motions do you think I

13  have on my docket?

14          And let me just tell you, I'm not slow.  I'm actually

15  really fast.  I'm actually really fast.

16          How many pending motions do you think I have?

17          MR. LOEVY:  150.

18          THE COURT:  Yeah, I'm not going to tell you the

19  answer.  It's a lot.  It's north of that.  And I'm really

20  fast.

21          MR. LOEVY:  I bet.

22          THE COURT:  I kick things out.

23          Is this landing with you folks at all?  Do you hear

24  what I'm trying to say to you?

25          MR. ENGQUIST:  Yes.

1          MS. ROSEN:  Yes.

2          MR. LOEVY:  We do, Your Honor.

3          THE COURT:  I mean, one option would be is like,

4    look, I'm going to set this for a month-long trial.  Okay.

5    We're just going to set it for a month-long trial.  And every

6    hour I spend working on your summary judgment briefs is coming

7    off the clock.  And if it means there's only like a week left

8    for trial, okay.  That's an idea I just came up with.

9          I have a few thoughts.  You have put an enormous

10   amount of material in front of me.  And I'm trying to cut

11   through it.

12         I hope, by the way, this point doesn't get lost in

13   all of this.  I'm trying to come up with an orderly way to

14   resolve the case on the merits, consistent with my obligations

15   to the docket writ large.

16         It's not just you; it's everybody.  I have hundreds

17   of cases.  I owe a duty to everybody.  And my time is zero

18   sum.  My time is zero sum.  Any time I spend on one case, I'm

19   taking it away from the pool of time I have for every other

20   case.  And you need to be aware of that as a lawyer.

21         Like, the -- I will say this, having taken the bench,

22   I don't think the bar fully grasps the limited judicial

23   resources that we have.  I don't.

24         I didn't.  When I was a lawyer, I didn't.  You hear

25   about judicial resources, and you believe it but sort of not.

1    It's a very real thing.  People are stretched really, really

2    thin.  I've got to work like basically 24/7 just to keep up,

3    candidly.  Okay.  I have an obligation to my entire docket,

4    including not just you folks, but to everybody.  I've got to

5    give my criminal defendants their fair day in court.  I've got

6    to give them whatever time they need to defend themselves.

7    I've got to put thought into sentencings.  You know, I've got

8    to take whatever time I need at a change of plea hearing to

9    make sure the person really understands what he or she is

10   doing.

11            You know, I've got to give everybody a fair trial.

12   I've got to give everybody due consideration at summary

13   judgment.  I do.

14            I've got to do that for the group.  I'm like the

15   shepherd for my flock here, so to speak, right?  I've got to

16   take care of everybody.  So, when one case goes I think

17   completely off the rails, even if you think you have a more

18   important case than average -- and maybe you're right on

19   that -- it creates an issue.

20            So, I want this to come through loud and clear.  I'm

21   trying to come up with a way to work through the issues in a

22   cooperative, thoughtful, orderly way.  Okay?  So, I hope that

23   comes out.  I'm trying to give you folks perspective on what

24   the fire-bombing of Dresden feels like from the perspective of

25   Dresden.

1          Dresden sees over 6,800 pages of armaments dumped

2     upon it, and Dresden is trying to share the perspective that

3     it's a lot.  Maybe a little too much.  Maybe a little too

4     much.

5          So here are some ideas that I have.  One idea is that

6     I could deny the motions for extensions of pages.  None.  You

7     get 15 pages.  That's the rules.

8          That's an option.

9          Another option is unlimited.  Do whatever you want.

10    That's probably the most punitive to you folks.  Unlimited.

11    Your adversary.

12         By the way, people sometimes oppose page limits.  And

13    sometimes I think, if you really wanted your adversary to hurt

14    himself or hurt herself, say file a 50-page brief.  I don't

15    care.  Make it as long and as boring as you want.

16         Anyway.

17         So, that's one option.  I could just say, you know

18    what, folks, you want unlimited -- you know, you want to file

19    so many pages, have at it.

20         You know, for example, the City of Chicago has 313

21    paragraphs of facts.  Maybe I should just say, have at it,

22    people.  Good luck to you.  Bless you.  Good luck.

23         That's an option.

24         Another option is this:  I could say, look, you can

25    file as long of a brief as you want.  After 15 pages, if you

1   make an argument that I reject, everything else in your brief
2   is rejected.

3        It's kind of like -- you know what baseball
4   arbitration rules are?  Each side makes the best proposal.
5   I'm going to adopt the whole thing.

6        I'm not exactly proposing baseball arbitration here.
7   I'm not sure I could do that, but that thought also occurred
8   to me.

9        I did think, though, north of 15 pages, if you make
10  one -- you better put it in order.  As soon as I rule against
11  you, you're done.  So you have leave to file as long of a
12  brief as you want, and as soon as I rule against you, no más.

13       Here's another idea I had:  We can break this out
14  into individual claims.  One step at a time.

15       Let's imagine a world in which there are eight
16  claims, just for easy math.  You can move for summary judgment
17  on claim one on a Friday.  You get ten pages.  You get a dozen
18  paragraphs of facts.  That's it.  The other side responds on
19  Tuesday.  You come into court on Thursday for an oral ruling
20  on the claim.  And we do it all summer.  Every day.  We'll get
21  to know each other.

22       MR. LOEVY:  Share the pain.

23       THE COURT:  Share the pain.  We'll spread it around.
24  Maybe we could start a little book club over there.

25       These are ideas I have.

1        Let me tell you another thought I had.  You're

2   putting a lot on my plate.  This would actually help me.  I

3   would like a ten-page summary of your position by a week from

4   Friday.  And because I actually like you people, I am hereby

5   prohibiting you from working on it before Tuesday.  You are

6   hereby directed to not work on it this weekend so you can

7   enjoy your holiday.  Okay.  I don't need the most polished

8   thing ever.  Just give me the gist of it.

9        See what I'm saying?

10       MR. LOEVY:  Yes.

11       THE COURT:  Just give me the overview.  What's this

12  about?  It will help me.  Like a little CliffsNotes version.

13       All of this, I think, is a long way of saying this:

14  I really, truly want to give you folks a ruling.  I know this

15  stuff is important.  I do.  I get it.  You have also, in

16  fairness, consumed an enormous amount of judicial resources

17  already.  Do you know how many docket entries you're at?

18  You're at 699.  And you've only moved for summary judgment.

19       Anybody want to predict when the docket entry has a

20  comma in it?  I don't know.  It's coming.

21       You're taking a lot of time drinking at the drinking

22  fountain.  Do you remember in elementary school when there is

23  a drinking fountain, there's a line and some kid up there

24  after gym class would keep drinking and drinking, and you're

25  like, "Come on, buddy, finish."  You've had a lot of time

1    drinking already.  You've drunk a lot of judicial resources

2    already.  A lot.

3           I am trying to come up with a way to get you a ruling

4    that is thoughtful and correct in an orderly way.

5           I am not necessarily convinced that the *status quo* is

6    best designed to give you a ruling.

7           I actually thought to myself, if we keep on this

8    trajectory, what year do you think it will be when I give you

9    a ruling?

10          Let me tell you about my trial calendar this year.

11   It's pretty full.  Next month, in June, I have two trials.

12   I'm on the bench -- I've got a three-week jury trial and then

13   a one-week civil trial.  I've got a final pretrial conference

14   this afternoon, for example.

15          When I am on the bench up here, it is hard to be back

16   there working on your summary judgment brief.  Does that make

17   sense?  So when you think about my time, we didn't even talk

18   about trials.  I have to resolve all of my motions in all of

19   my cases with the time that I have where I'm back in chambers.

20   And it's a challenge.  That's why I have to be fast.

21          So, I would like you to do two things by a week from

22   Friday:  I would like you to file a ten-page just overview.

23   It doesn't have to be the fanciest legal product ever.  Just

24   talk to me.  All right.  Take ten pages and just talk to me.

25   Tell me what the case is about from your perspective.  Say

1  whatever you want.  Tell me -- you know, basically like on

2  summary judgment, "This is our position, Judge, we think we've

3  got the world's greatest claim and here's why" or "We think

4  their claim stinks, and here's why."  Just talk to me.

5        Separately, I want you to file something that lets me

6  know how much time you would need for trial.  Don't anybody

7  read anything into that.

8        Don't get excited, plaintiffs.

9        Defendants, don't get disappointed, and *vice versa*.

10       We should start thinking about putting something on

11 my docket.  I couldn't see you before next summer my trial

12 calendar is so full, and I don't know that I could see you

13 next summer.

14       I am going to keep my powder dry on how best to

15 proceed with the summary judgment.  I would invite you to have

16 a talk with your team.  I would welcome any constructive

17 suggestions you have.  I'm just going to issue an order at

18 some point.  Not before next Friday.  But I'll be issuing an

19 order saying this is how we're going to do things.

20       If I had to decide right now, right this second, I

21 kind of like the one-claim-a-week approach.  We're going to

22 spend the summer together.  We're going to do it one at a

23 time.  That's less for me to digest in one sitting.  A little

24 more digestible.  It forces you to be brief.

25       I've never done this before.  I have never heard of a

1    judge doing this before.  I thought of it on Lake Shore Drive.

2         I don't want this point to get lost, and because I'm

3    sufficiently self conscious, I'm going to say it again.  I'm

4    trying really hard to figure out an orderly way to get this

5    done that is thoughtful and correct and not too hard on all of

6    us, including you folks.

7         I remembered the pain of getting the other side's

8    summary judgment brief.  And the pain of getting a Rule 56.1

9    statement.  I cannot begin to imagine the feeling that some of

10   you got when you saw the other side's statement of material

11   facts.  Responding to those is one of the worst projects in

12   the law.  Right?  I think the only thing worse is doing the

13   pretrial order.

14        Let me ask you this:  What do you think the responses

15   to the Rule 56.1 statements are going to look like for me?

16        How long do you think it would take me to go through

17   the record and the responses to the Rule 56.1 statements?

18   Honestly, truly, what do we think that would look like?

19        If I were in an igloo in Finland and I had no other

20   cases, this wouldn't be a problem.  It's just little ole me up

21   here on the 23rd floor of the Dirksen Federal Building with

22   hundreds of other cases, and we've got to figure this out.

23        So, it's a long, long, long way of saying, thank you

24   for being here.  We're going to figure this out.  We're going

25   to work together.  We're going to come up with a cooperative

1  way to sort through everything because I have a few concerns

2  about the trajectory.

3          So, I'd invite you to say whatever you want.

4          I'll start with the plaintiff.

5          MR. LOEVY:  Your Honor, we appreciate --

6          THE COURT:  Go ahead and say your name so my court

7  reporter will be happy.

8          MR. LOEVY:  Jonathan Loevy for the plaintiffs.

9          We appreciate putting the time in now to get it right

10  because I do believe you --

11          THE COURT:  This doesn't count against your clock, by

12  the way.

13          MR. LOEVY:  Right.

14          THE COURT:  No, go ahead.

15          MR. LOEVY:  No, I think you're correct, Your Honor.

16  Let's get this right because this has a potential to be a

17  train wreck.

18          And, you know, from our perspective, whenever you're

19  talking about thousands of pages on both sides, it surely

20  means there are disputed facts.  And we're going to get our

21  opportunity to show you that this is a misguided summary

22  judgment motion.

23          THE COURT:  Well, can I tell you on that?

24          MR. LOEVY:  Sure.

25          THE COURT:  Sometimes when -- when the responses are

1    really long, I actually get suspicious the other way, like

2    somebody is hiding something.  They're trying to -- they're

3    trying to snow me in volume.

4          Whenever I get the sense that somebody is trying to

5    snow me with pages, my ears perk up.

6          See what I'm saying?

7          MR. LOEVY:  Sure.

8          THE COURT:  I work a little harder.

9          So, go ahead.

10         MR. LOEVY:  Well, you know, Your Honor, you're not

11   going to prejudge it, and you haven't read it all yet, but

12   this is a case where there's an alleged coerced confession.

13   It's binary; either they're guilty, and they confessed, or in

14   fact, they were abused and falsely confessed.  Our plaintiffs

15   allege that's exactly what happened.

16         The defendant took the Fifth, didn't deny it, yet

17   moved for summary judgment.  And this is not the first time

18   that this sort of pattern has played out.  So it's -- we're

19   not just guessing; it's happened in other cases.  These are

20   completely frivolous and misguided summary judgment motions.

21   And our position is going to be -- you know, you saw what we

22   did.  We said let's cut off all summary judgment briefing.  We

23   will eliminate anything that's even arguably summary judgment,

24   and you are left with the stuff where there's just no argument

25   for summary judgment.

1          Let's skip the whole thing -- the proper amount of

2    time is zero -- and go to trial.  That was rejected.  And you

3    don't know yet if I'm speaking accurately or not, but if they

4    insist on persisting, another sort of game paradigm here could

5    be, like, you might look at them and say, look, you're saying

6    you have a legitimate summary judgment motion, you're asking

7    me to invest in it.  If the plaintiff attorney is accurate and

8    I agree with him that this is beyond ridiculous, then there is

9    going to be a consequence.  And then they have to decide if

10   they really want to waste everybody's time.  Because we think

11   it's a waste of time.

12          THE COURT:  What did you think of my idea about

13   giving everybody a clock and saying any time I spend on

14   summary judgment, you lose trial time?  What do you think of

15   that?

16          MR. LOEVY:  I don't think it's fair to the plaintiff

17   because what they've done is brought --

18          THE COURT:  If you're right on summary judgment, the

19   clock would come off their side.

20          MR. LOEVY:  Oh, the loser?  We'll take loser.  Loser

21   pays all day.

22          THE COURT:  Loser pays.

23          MR. LOEVY:  Done.

24          THE COURT:  The loser pays with trial time.

25          MR. LOEVY:  I am here to say that --

1    THE COURT:  Depending on if I think, you know, you

2  lost on seven of the ten, so you should be punished on

3  something.

4    Go ahead.

5    MR. LOEVY:  That's our point.  There should be a

6  consequence.

7    THE COURT:  Yeah.

8    MR. LOEVY:  We are -- without conferring with my

9  team, I will tell you right here right now, if there is a

10  consequence to summary judgment, people will rethink what

11  they're doing.

12    THE COURT:  Do you think the *status quo* was a

13  reasonable way to proceed?

14    MR. LOEVY:  No.  No.

15    THE COURT:  Okay.  Defense team, go ahead.

16    Just as long as you say your name, I'll be happy.

17    Go ahead.

18    MS. ROSEN:  Sure.

19    Eileen Rosen on behalf of the City of Chicago.

20    First, no defendant moved on the coerced confession

21  claim.

22    THE COURT:  I didn't --

23    MS. ROSEN:  No defendant moved on the coerced

24  confession claim.  There are a myriad of other claims that

25  plaintiff is pursuing, and that's what all the individual

1    defendants are moving on to some degree or another.  Some

2    defendants -- let me amend that.  No defendant that was

3    personally involved in the alleged conversion -- coercion

4    moved for summary judgment.  There are tangential defendants

5    who were not a part of the interrogations that have moved

6    based on personal responsibility.

7          So it is -- the bulk of the motions have to do with

8    personal responsibility for the individuals and, quite

9    frankly, the *Monell* claims, which, I agree, take up a lot of

10   time and space.  Plaintiff is pursuing basically three *Monell*

11   theories.  One has to do with what they call a street file

12   claim, which is *Brady* evidence being suppressed in police

13   records and not produced to the criminal defendant.  The other

14   has to do with an alleged pattern and practice of coerced

15   confessions.  And the third has to do with failure to

16   discipline and supervision.

17         This Court might recall that at one point in time in

18   this case, approximately four years ago, that you had to rule

19   on a Rule 72 motion --

20         THE COURT:  Yeah.

21         MS. ROSEN:  -- related to the scope of the discovery

22   plaintiff was seeking --

23         THE COURT:  Right.

24         MS. ROSEN:  -- to pursue those claims.

25         THE COURT:  Right.

1          MS. ROSEN:  So, from the City's perspective, those

2    are obviously very important claims.  The City believes that

3    it has strong grounds to move on those claims, that the

4    plaintiff hasn't developed that evidence.

5          But to your point about appreciating the volume that

6    we have put on this Court to wade through, we do that in the

7    opening brief because this isn't our first time doing this in

8    these types of claims.  And I can tell you that in other cases

9    right now with very similar claims involving Detective Guevara

10   where we are briefing summary judgment, what we get in

11   response from this firm, Mr. Loevy's firm, is often a 160-page

12   brief, 550 additional facts.  And so the defendants front-load

13   their facts.

14         Now, could the parties work out a different solution?

15   Sure.  One solution -- quite frankly, the *Daubert* motions all

16   have to do with the *Monell* claim.  One solution is the Court

17   could just bifurcate the *Monell* claims and deal with the

18   underlying case.  It sort of goes along with your proposal

19   about doing it one claim at a time.  You could do the

20   claims -- I'm sorry.  You could do the claims related to the

21   underlying case, and then figure out what's left.

22         Because, quite frankly, their *Monell* theories are not

23   tethered in the way that I think they need to be in the fact

24   that -- in the fact -- in the way that this Court actually

25   previewed in the order on the Rule 72 motion, which I took a

1   look at again this morning.

2          And so, if we get rid of *Monell* entirely, you don't

3   have to deal with the *Daubert* motions, you don't have to deal

4   with the *Monell* claim on summary judgment and, quite frankly,

5   it shrinks the trial.

6          But we understand and we hear you and we're happy --

7   and part of the volume, quite frankly -- I spoke with

8   Mr. Loevy about this this morning.  Part of the volume in

9   pages is obviously coming from the exhibits.  And what --

10  what's happening is that multiple exhibits are being -- the

11  same exhibits are being filed on both sides.  And to my mind,

12  there's no reason to do that, right?  We don't each need to be

13  filing the same deposition transcript.

14         THE COURT:  Well, plaintiffs filed 6,514 pages of

15  exhibits.

16         MS. ROSEN:  Yeah.

17         THE COURT:  And the City filed 313 paragraphs of

18  facts.

19         MS. ROSEN:  Right.

20         THE COURT:  The local rules say 80.

21         MS. ROSEN:  No, I appreciate that, Judge.

22         THE COURT:  You went over it by a factor of four.

23         MS. ROSEN:  I appreciate that.

24         THE COURT:  313.

25         MS. ROSEN:  Appreciate that, Judge.  Understood.

1        And I can tell you -- like, we certainly -- there are

2   ways to streamline it, but then it has to be streamlined

3   when -- you know, this is -- you know, an anticipation about

4   what we expect to get back, right?

5        But I agree that this is a lot for any Court.  It's a

6   lot for us to put together.

7        So, like, we hear you.  And certainly, you know,

8   we're open to figuring out a way to streamline it so that you

9   can rule on the merits.

10        MR. ENGQUIST:  So, Your Honor, just from the

11   officer's perspective --

12        THE COURT:  As long as you say your name, I'll make

13   my court reporter happy.

14        Let's go into the microphone.

15        Go ahead.

16        MR. ENGQUIST:  Josh Engquist for the officers with

17   the exception of Guevara.

18        Just from our perspective, we have seven different --

19   I have seven different clients.  That's why we divided up the

20   supervisors from the detectives.  And that's why we have -- we

21   went slightly over for the three.  We went to 18 pages to

22   cover that with a lot of fact stuff just because this has to

23   -- all has to do with personal responsibility for the

24   supervisors, for the most part, and then 45 pages for the four

25   people.

1          We did try to keep that down.  We could shrink it

2     down more.  And I understand that.  And we'll give our

3     perspective, our position.

4          And the only other question I have, the ten pages you

5     want by next Friday, I'm assuming you want that ten pages

6     just -- like, the defense?

7          MS. ROSEN:  For all defendants?

8          THE COURT:  The team.

9          MR. ENGQUIST:  That's what I wanted to make sure of.

10         THE COURT:  Do submissions, yeah.

11         It doesn't have to be fancy.  I just want the gist

12    of -- gist of what your argument is.  CliffsNotes.

13         MR. ENGQUIST:  That's no problem.

14         THE COURT:  CliffsNotes aren't fancy.

15         MS. SANSONETTI:  Judge, Gabrielle Sansonetti for

16    Guevara.

17         I just wanted to flag one thing.  As we're conferring

18    about how to streamline this effort, Guevara was going to move

19    for leave to file a corrected brief because there's some

20    citation errors in the brief that we filed.

21         THE COURT:  Yeah, you've got leave.  Go ahead.

22         MS. ROSEN:  Thank you.

23         THE COURT:  Yeah, go ahead.

24         What do you think?

25         MR. LOEVY:  Your Honor --

1        THE COURT:  I'm talking to your colleague.

2        What do you think?

3        MS. BRADY:  Your Honor, this is Rachel Brady on

4    behalf of Plaintiff Reyes also.

5        I agree that the approach that the parties are taking

6    now is untenable.  And for whatever has happened in the other

7    Guevara cases that are pending before other judges in this

8    district, plaintiffs have to respond.  And so whatever the

9    defendants file, plaintiff has an obligation to respond.  And

10   so in earlier iterations of Guevara cases, the first Guevara

11   case nobody moved for summary judgment.

12        In the second Guevara case, the summary judgment

13   briefing was 25 pages.  The City lost.  The defendants lost.

14        Recently I worked on a case that has since settled.

15   The summary judgment briefing was 40 pages or so.  The

16   defendants lost on almost everything.

17        The escalation is because we have an obligation to

18   respond and tell our story and convince the Court that there

19   is a triable issue.

20        So that would be my piece.

21        THE COURT:  All right.  So, well said.

22        Are you the person tasked with responding to 313

23   paragraphs of facts?  Is that you?

24        MS. BRADY:  You bet I am, Your Honor.

25        THE COURT:  So, I've been around the block long

1    enough to know where things tend to flow in the pyramid of

2    work.

3              What do you think?

4              MS. SUSLER:  This is Jan Susler, Your Honor, for the

5    plaintiff, Gabriel Solache.

6              I have nothing to add to what my co-counsel has told

7    the Court.

8              THE COURT:  Okay.

9              MS. SANSONETTI:  Judge?

10             THE COURT:  Yeah.

11             MS. SANSONETTI:  Sorry.  Gabrielle Sansonetti.

12             I wanted to just respond to two things.

13             The summary judgment filings are a construct of the

14   breadth of the complaint.

15             THE COURT:  Are . . . ?

16             MS. SANSONETTI:  A construct of the breadth --

17             THE COURT:  Yes.

18             MS. SANSONETTI:  -- of the complaint.

19             THE COURT:  Yes.

20             MS. SANSONETTI:  So to the extent that a complaint is

21   filed with vast claims, there has to be multiple issues in a

22   summary judgment motion.  Of course if the plaintiff were

23   amenable to narrowing claims that are actually viable, then

24   the summary judgment motions also get more narrow.

25             And with respect to the Fifth Amendment comment that

1  Mr. Loevy made, the law is pretty clear that Fifth

2  Amendment -- exercising your Fifth Amendment in a later

3  deposition is not a bar and should not be a bar to a defendant

4  either being granted summary judgment or a bar against the

5  plaintiff from moving for summary judgment.

6           So, that is an issue to litigate, for sure, but it

7  isn't a closed door.

8           And we hope that Your Honor will take a look at that

9  closely, as I know you will, as you do in all of your cases.

10 But I just felt like I needed to respond to that.

11          THE COURT:  Okay.  What else?

12          MR. LOEVY:  Well, if we could reply on the *Monell* --

13          THE COURT:  If you want to.

14          MR. LOEVY:  The plaintiff suggested you should just

15 deny all the summary judgment motions, and that wasn't the --

16 appealing.

17          Really what Ms. Rosen's proposal is, hey, bifurcate

18 it, just basically grant the summary judgment motion, get rid

19 of the claim.

20          You know, neither proposal would be fair to either

21 side.  And, well, I guess we can address it in our written

22 filing, but this is not a summary judgment case on the *Monell*

23 claim.  And the *Monell* claim has been tried by other Courts in

24 this building on this exact claim, and it has added maybe a

25 day to the trial, and it has been important to the proof.  And

1   I don't know -- want to test your patience.  I don't know how

2   deep you want to go right now.

3           THE COURT:  I'm a patient guy.  I've got life tenure.

4           MR. LOEVY:  All right.  Well, the *Monell* claim is

5   interesting in this case, Your Honor.  The street file claim

6   that we're arguing is that the City of Chicago, when they

7   would investigate -- are you sure you want to go here?

8           THE COURT:  I'm not sure.

9           Go ahead.

10          MS. SANSONETTI:  Judge, I just wanted to note, I have

11  a 10:30 hearing in front of Judge Kness.  So I'll have to step

12  out at some point.

13          THE COURT:  Okay.  You can tell him I said hello.

14          MS. SANSONETTI:  Okay, I will.

15          THE COURT:  I'm going to direct you to tell him I

16  said hello.

17          Go ahead.

18          MR. LOEVY:  So back in the relevant --

19          THE COURT:  You'll make that.  I have a final --

20          MS. SANSONETTI:  I hope so.

21          THE COURT:  -- pretrial conference.

22          MS. SANSONETTI:  Okay, good.

23          MR. LOEVY:  Back during the relevant --

24          THE COURT:  I do enjoy talking to you, and it's

25  within my bandwidth to keep talking for another half an hour.

1          Go ahead.

2          MR. LOEVY:  During the relevant time period, the City

3   of Chicago would investigate, the detectives would investigate

4   these murders.  And they would have an official file, and they

5   would have a street file.  And in the street file, they would

6   put their investigative notes, their alternate suspects,

7   *et cetera*.  And when it came time who they decided was guilty,

8   they created official typed reports of everybody that -- all

9   of the information that implicated the suspect.  And then they

10  didn't produce the street files.  And that was an allegation.

11  And it all blew up when a whistleblower said it.  But that has

12  now been litigated.

13          In the Guevara case that we brought against the City,

14  we alleged that what I've just described was the pattern and

15  practice, that they had a parallel set of files that didn't

16  get turned over as a matter of course.

17          The City didn't move for summary judgment.  We tried

18  it with the underlying case, and we won.  The jury said during

19  this time period, this street file practice existed.  We tried

20  it again in the Fields case.  The same time period, the same

21  evidence.  It really -- like I said, it was an extra day.  An

22  expert and some testimony proved to the jury that, you know

23  what, there was a parallel set of files, and it was a

24  systematic *Brady* violation.

25          And the reason it was important to try that with the

1   underlying claims is because we were alleging in both of those

2   two cases, and in this one, that there was a street file in

3   which exculpatory information was secreted from the official

4   file.  So it was relevant to us proving that claim to say not

5   only did it happen here -- because they're like, "Oh, it

6   didn't happen."  It's like, no, that was the practice.  During

7   that time period, that was the expectation, that's how you did

8   it.

9         So it doesn't make sense to bifurcate that claim away

10  from the underlying claim because they get tried together

11  because they're relevant together.  Now it's not good for the

12  City or the defendants to have them tried together, but it's

13  very relevant.  And the important thing is the sky didn't fall

14  in.  It added maybe a day to the trial, and it was all very

15  relevant testimony.

16        So, I'll end it here, Your Honor, if they didn't move

17  for summary judgment in either of those cases and then we got

18  to trial and a jury said there was a policy and practice, the

19  reason we're moving affirmatively for summary judgment is they

20  don't get to relitigate that.  They had a chance to litigate

21  it.  They lost.  Judge Lefkow reached that in the Kluppelberg

22  case.  This is done.  You guys had your chace.  Two juries

23  have said this practice existed.

24        Not only are we moving for summary judgment, but

25  their city summary judgment on street file claim is, "There is

1  no dispute of fact.  Judge Seeger, knock this claim out of the

2  case."

3         That's nonsensical.  You know, we've won it twice

4  now, and at least one other judge has said it's now settled in

5  our favor.  So, you've got me worked up, but this is not a

6  summary judgment case.  There are other strands of the *Monell*

7  claim --

8         THE COURT:  I think you worked yourself up, I think.

9         MR. LOEVY:  Yeah, I did.

10         THE COURT:  I don't think I worked you up.

11         MR. LOEVY:  Sorry.

12         THE COURT:  But, you know, I'll take judicial notice

13  that you're worked up in a lighthearted way.

14         So, there was a lot there.  Thank you for that.

15         I noticed from the body language on the defense team

16  that there was some degree of discomfort here about what was

17  articulated.  And if you are chomping at the bit to add your

18  two cents, I will give you a budget of two cents.

19         Go ahead.

20         MS. ROSEN:  Thank you, Judge.

21         First, there are three *Monell* theories in this case:

22  street files, coerced confession, failure to discipline and

23  supervise.

24         Coerced confession, failure to discipline and

25  supervise were not tried in any of the other cases.  So that's

1    number one.

2            Number two, as to street files, if Mr. Loevy is

3    correct in his presentation that the City has already lost

4    that issue and is precluded from relitigating, then I question

5    why we spent three years doing *Monell* discovery on street

6    files.  Because if he already thought he had issue preclusion,

7    there would be no reason for the City and the parties to have

8    gone through the discovery that entailed producing hundreds

9    and hundreds of homicide files, produce -- requesting of both

10   the Cook County Public Defender's Office and the Cook County

11   State's Attorney's Office of producing all of -- whatever

12   companion files they could find for the homicide files that

13   the City produced.  Because if it was already won, then there

14   was no reason to do that.

15           So that's number one.

16           Number two, the distinguishing feature between

17   Guevara and Fields is that in Guevara and Fields, plaintiff

18   could identify a file -- I'm using quotation marks, for the

19   record, around the word "file" -- that plaintiff claimed was

20   not produced to him in the criminal case.  That is not the

21   case here.  We have one of the three criminal defense files in

22   this case.  We don't have -- there were three people charged.

23   One of them remains convicted.  The one that remains convicted

24   still says that Mr. Solache and Mr. Reyes helped her in the

25   murders and the kidnapping.  But we have one of those criminal

1    defense files.  And all of the documents that are in the

2    investigative file as it exists today within the Chicago

3    Police Department, including the GPRs, which are the notes

4    that Mr. Loevy is talking about that are in the unofficial

5    file -- all of those notes are in the criminal defense file.

6         The only thing that plaintiff has identified as being

7    missing is a couple Polaroid photographs that were taken at

8    the police station on the night of the investigation of the

9    victim's family members and some of the family members that

10   lived in the Mejia household, which is where the little boy

11   was ultimately found.

12        One of those Polaroid photographs was found in the

13   impounded evidence.

14        So, while the Polaroids are not today in the one

15   criminal defense file that was located, there's evidence that

16   obviously those Polaroids were produced because they're in the

17   impound at the Cook County State's Attorney's Office.

18        So, setting apart all the issues we have about street

19   files generally, there's no file in this case.  And without a

20   file, you don't get to street files.

21        I won't speak to the coerced confession or the

22   discipline because I don't think we need to get into the

23   details on all of that.  But we believe firmly that there is

24   no policy claim that's tethered to any of the claims that

25   plaintiffs are making in this case.

1          THE COURT:  Got it.  Thank you.

2          MS. ROSEN:  Mm-hmm.

3          THE COURT:  I'll say this:  I brought you in today

4  because I thought we hadn't seen each other nose to nose in a

5  little while.  So I thought that would be a useful thing.  The

6  compassionate part of me felt a little sorry for you people,

7  candidly.  I couldn't bring you in sooner because I was on

8  trial.

9          I was concerned about what you were going through and

10  what I was going to get if the trajectory stayed on course.

11          I am going to give some thought to how we're going to

12  figure this out procedurally.

13          I talked about two submissions next Friday.  I'm

14  going to throw this out as a third:  If you want to make a

15  suggestion, you can.  So file your ten-page summary of your

16  summary judgment.  So, like, your vision of summary judgment.

17  I just need a preview, a helper, a CliffsNotes version.

18  What's your position?

19          You can't work on it until Tuesday morning.  Okay?

20          I want you to give me a sense of when you're going to

21  be ready for trial.  Don't anybody get excited or

22  disappointed.  I just do this at the summary judgment stage

23  just in case because of how long it takes for me to land the

24  plane.

25          But how many claims are at issue here?  How many

1    claims?

2          MR. LOEVY:  Six, seven.

3          THE COURT:  So, you know, are the defendants going

4    to --

5          MS. SANSONETTI:  Six or seven?  It would be helpful

6    if the plaintiff could identify which six or seven.

7          THE COURT:  I mean, you didn't move for summary

8    judgment on everything, did you?

9          MR. LOEVY:  No.

10          MR. ENGQUIST:  Some of our officers did, yes.

11          MS. ROSEN:  But not all the claims.  It's not going

12    to be completely dispositive.

13          THE COURT:  So this case is going to trial.

14          MS. ROSEN:  It is, yes.

15          THE COURT:  So we should get a trial date.

16          MR. LOEVY:  And from the plaintiff's perspective --

17          THE COURT:  How would that --

18          MR. LOEVY:  -- as soon as you could accommodate us.

19          THE COURT:  How would that be, you know?  So, we

20    ought to talk about that.  How long is it going to be?

21          I will say this when I think about trial dates:  It

22    is universally true that people give larger estimates than

23    what they need.

24          I often think back to the movie *A River Runs Through

25    It.*  Everybody see that movie?  It's a beautiful movie.  It's

1    the only piece of fiction written by the *University of Chicago*
2    *Press*, by the way.

3         There is a scene in there where the father is
4    teaching the son how to write, and the son turns in the paper
5    and the father scribbles it all up.  And he says, "Cut it in
6    half."  The kid goes, rewrites it.  Two days later, turns it
7    in.  The dad gets it, scribbles it all up and says, "Cut it in
8    half."  And they do this multiple times.  And that's a little
9    bit like what trial is.  It's like the Rolling Stones song.
10   It's not about what you want, it's about what you need.
11   Really think about how much time you need.  Really think about
12   it.  How much do you really need?

13        I've got a lot of planes to land.  I don't know how
14   this is going to go.

15        I have started using a chess clock.

16        Ms. Ramos, maybe you'd be kind enough to show them
17   the chess clock I purchased, the deluxe version.

18        Okay.  I have a chess clock here.  We take daily
19   score.  You know, if you object when you shouldn't, you get
20   penalized, there's all sorts of ways to make this a
21   smooth-running ship.  Think about how much time you actually
22   need.  And I don't know what the answer is.

23        The third thing I would say you can file on Friday of
24   next week is any idea about how you think I ought to cut
25   through this.  The honest truth is, folks, I don't know.  I

1    see this as a lot, and I'm not sure the best way to do it.

2    I'm just going to come to a decision about how I want to do

3    it.

4            Maybe I'll just say, you know, folks, just go forth

5    and concur.  Keep doing what you're doing.

6            Maybe I'll do the quasi-baseball approach where I

7    say, after 15 pages, you lose, you're done.  I kind of like

8    that, actually.  Because it incentivizes you to be right and

9    penalizes you for making bad arguments.  I kind of like that.

10           I kind of like the once-a-week thing.  Get to know

11   each other.  You know, it's easier to digest claim by claim.

12   I don't know exactly how viable that's going to be on this set

13   of issues.

14           I wanted to touch on something Ms. Sansonetti said

15   because I don't want this point to get lost, either.  I fully

16   acknowledge the issues that are at stake.  And I want you

17   folks to know that.  It is true that this is not an ordinary

18   case.  This is an extraordinary case in a lot of ways.  The

19   issues are significant.  They're important for a lot of

20   reasons to a lot of people.  You've done an extraordinary

21   amount of discovery.

22           I know what is at risk for the City, for example.

23           I presided over the *Bolden* trial.  Everybody is

24   familiar with the *Bolden* case.  You know, I know what can

25   happen when you get in front of a jury.  So I'm well aware.

1    So if anybody thinks that I think that this is just a

2  run-of-the-mill usual case, I don't.  So don't anybody hear

3  it.  That's not what I'm trying to tell you.  I'm not trying

4  to tell you that this is just any other case.

5    What I am trying to tell you is I have a duty to my

6  entire docket, and there are limits.  And those limits are

7  real.  That's what I'm trying to tell you.  There are real

8  limits here because I can't just devote all of my time and

9  attention to you folks and just neglect everybody else.  I

10  can't, you know.  Because who pays the price of that?  Do you

11  want the criminal defendants to pay the price?  How about do

12  people with civil discrimination claims, people who lost their

13  job for discrimination reasons, do you think they deserve my

14  attention?  What about people who got defrauded; do you think

15  they deserve my time, too?  See what I mean?  There is just a

16  lot to think about.

17    So I will listen to you next week.  I'll look forward

18  to getting your submission, your summary judgment submission,

19  I'll look forward to getting your trial estimate.  I would

20  invite you to make a proposal for me for how to do things.

21    I think you should talk before you file that.  Just

22  have an actual conversation, just see if you could come to

23  terms.  If you can't, you can't.

24    And then I'm going to get creative, and I'm going to

25  come up with something.

1        Maybe the easiest thing for me to say would be just
2    go do it.  I'll rule on it.  Good luck.  But, again, that
3    might be punitive.  I don't know.  That's a lot.  That's a lot
4    for you folks to respond to.
5        I honestly don't know the right way to proceed,
6    candidly.  But I did know that I thought it was overdue to
7    have a nose-to-nose conversation.  I wanted to bring you folks
8    in, and maybe we could share each other's perspective on how
9    things are going.
10        Does that make sense, everybody?
11        MR. LOEVY:  It does.
12        MS. ROSEN:  Yes, Judge.
13        THE COURT:  Does anybody think this is unreasonable?
14    Anybody?  You can actually speak up and say that to me.
15    You're getting to know me here.  But if you think something is
16    unreasonable, you can actually tell me that.
17        MS. SANSONETTI:  Judge, you know I would tell you.
18        THE COURT:  Ms. Sansonetti would have no problem
19    telling me.
20        I say that with a spirit of laughter.
21        Ms. Sansonetti, which of these books is your
22    favorite, would you say?
23        MS. SANSONETTI:  Probably the -- there is a couple
24    that I've read.
25        So probably *The Art of War*.

1          THE COURT:  Yeah.

2          MS. SANSONETTI:  It's a life -- it's a weighty life

3     book.

4          THE COURT:  You should read it every day.  It's about

5     litigation.

6          MS. SANSONETTI:  Yes, but it's also about life.

7          THE COURT:  Yeah.  If you read the book and replace

8     the word "litigation" -- excuse me -- replace the word "war"

9     with "litigation," it's like a light bulb going off.  I'm

10     telling you.  He was talking about litigation, I'm pretty

11     sure.  Sun Tzu.

12          Mr. Loevy, how about your perspective?  What's your

13     favorite of these books?

14          MR. LOEVY:  I am ignorant of all six of them.

15          THE COURT:  You've got a whole summer ahead of you.

16          MR. LOEVY:  I'm going to be working on this, Your

17     Honor.

18          THE COURT:  I understand.

19          I would recommend the *Federalist Papers*.  I think

20     it's useful.  The fact that it's marked up in this courtroom

21     should tell you something.  It's a data point for you.

22          I genuinely appreciate you folks coming in.

23          MS. SANSONETTI:  I do have a question.

24          THE COURT:  Yeah.

25          MS. SANSONETTI:  Are those your favorite books?

1  Which one is your favorite?

2        THE COURT:  I think the last two we were talking

3  about, honestly:  *The Art of War* and the *Federalist Papers*.  I

4  think Scalia was a joy to read each and every time.  I love

5  the Rawlsian principle of crafting rules behind the veil of

6  ignorance.  Right.  You're going to write the rule, and you're

7  not going to know which side of the rule you're going to be

8  on, at least to a just result.  Do you see what I'm saying?

9        When you're incentivized to make a rule that might

10 cut in your favor and might cut against you, you are more

11 likely to come up with a rule that is fair, you know.

12       So I think that was impactful in me.

13       This is just a small sampling of what's back in the

14 chambers back there.  Do I have as much time as I want to read

15 these these days?  No, I've got summary judgment briefs to

16 deal with.

17       That's a long way of saying, thank you, folks, for

18 coming in.  I know we haven't spent a lot of personal time

19 together in this case.  You've been getting to know the

20 magistrate judge in large part.  You know, you've had --

21 you've been in front of me a couple of times but, for a

22 five-year case, not that many times, candidly.

23       I just thought it would be a good idea to get to know

24 each other a little bit, talk candidly about the issues, and

25 chart a path forward.

1    So, please take everything I've said today in a

2  productive, positive spirit, because that's how I'm trying to

3  deliver it.  I'm seeing a challenge, and I'm trying to fight

4  through the challenge.

5    Okay?  Everybody with me?

6    MULTIPLE SPEAKERS:  Yes.

7    THE COURT:  Try to hear this in that spirit.  Nobody

8  feel scolded.  That's not the point.  The point was let's work

9  together cooperatively to figure this out because I'd like to

10  figure this out.  And I could use a little help from you

11  folks.  Okay?

12    MR. LOEVY:  Thank you.

13    THE COURT:  I appreciate you folks coming in.

14    MS. ROSEN:  Thanks, Judge.

15    THE COURT:  No working on this case until Tuesday

16  morning, and then you can have at it.  Okay?  Have a good

17  weekend, folks.

18    THE CLERK:  All rise.

19    (Which were all the proceedings heard.)

20

21

22

23

24

25

1                    *   *   *   *   *   *

2                        CERTIFICATE

3          I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6    /s/ Amy Kleynhans              5/30/2024

7    _____          _____
     Amy Kleynhans, CSR, RPR, CRR   Date
8    Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25