## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ARTURO DeLEON REYES,                )
                                    )                    1:18-cv-01028
        Plaintiff,                  )
                                    )                    Hon. Steven C. Seeger
        v.                          )                    District Judge
                                    )
REYNALDO GUEVARA, *et al.*,         )                    Sunil R. Harjani
                                    )                     Magistrate Judge
        Defendants.                 )
                                    )                    JURY TRIAL DEMANDED
                                    )


GABRIEL SOLACHE,                    )
                                    )                    1:18-cv-02312
        Plaintiff,                  )
                                    )                    Hon. Steven C. Seeger
        v.                          )                    District Judge
                                    )
CITY OF CHICAGO, *et al.*,          )                    Hon. Sunil Harjani
                                    )                    Magistrate Judge
        Defendants.                 )
                                    )                    JURY TRIAL DEMANDED
                                    )


### PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF FACTS
### IN SUPPORT OF THEIR MOTION FOR PARTIAL
### SUMMARY JUDGMENT AGAINST THE CITY OF CHICAGO

Jon Loevy                     Jan Susler
Anand Swaminathan             Ben H. Elson
Steve Art                     Nora P. Snyder
Rachel Brady                  **PEOPLE'S LAW OFFICE**
Sean Starr                    1180 N. Milwaukee Avenue
Annie Prossnitz               3rd Floor
Meg Gould                     Chicago, IL 60642
**LOEVY & LOEVY**             (312) 235-0070
311 N. Aberdeen Street        jsusler@peopleslawoffice.com
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

## *MONELL* THEORIES

1.      One of Plaintiffs' Monell theories in this case is that before, during, and after the events in this case, Defendant City of Chicago had an express policy of withholding or failing to disclose exculpatory or impeachment evidence. They contend that, during the investigation of the Soto homicides and kidnappings, Defendants (among other things) suppressed evidence, including by refusing to document investigative steps and by withholding information that would have shown that Plaintiffs were innocent and that could have been used to undermine the testimony of the State's witnesses. That suppression included the non-disclosure to prosecutors or criminal defendants of mugshots of four individuals taken by the detectives at Area 5, the suppression of other exculpatory witness information known to detectives but not disclosed to prosecutors or the criminal defendants, the suppression of notes of interviews and identification procedures conducted by Defendants, including notes of interviews with Plaintiffs, the suppression and destruction of original crime scene photos, the non-documentation of physical evidence recovered from the crime scene, the non-documentation of the CPD's coordination with the FBI on investigative leads, the non-disclosure of alternative suspects and alternative theories of how the crimes occurred, and the non-documentation of tampering that occurred at the crime scene, including notes of interviews with Plaintiffs and Adriana and Rosauro Mejia. Plaintiffs contend that the suppression and concealment of exculpatory evidence in his criminal case was done pursuant to the City's official policy of suppressing investigative information in homicide investigations. In support of this claim, Plaintiffs rely on substantial evidence, including the City's past litigation concerning this issue, written policies, testimony of the City's Rule 30(b)(6) designees, the homicide file in his case, the hundreds of additional Area 5 homicide files produced in this case and in earlier litigation; the corresponding Cook County Public Defender

and Cook County State's Attorney's Office files in this case and in previous litigation; the City's documentation, notetaking and file keeping policies, and lack thereof; and the qualitative and quantitative findings in Plaintiffs' experts. Ex. 1 (Plaintiffs' Resp. to Def. City of Chicago's First Set of Interrog. to Plaintiff, Nos. 1, 2, 4, 10, 12) at 2, 6-10, 14-15, 18-24; Dkt. 396 (Second Amend. Compl.) at ¶¶ 8, 74-80, 136, 151-158.

## NOTICE OF EVIDENCE SUPPRESSION

2.      In the early 1980s, City of Chicago final policymakers were made aware that police officers were engaged in an unconstitutional pattern of suppressing investigative materials through two cases: *Palmer v. City of Chicago* and *Jones v. City of Chicago*. In April 1982, Chicago officials, including Chicago Police Department Superintendent Richard Brzeczek, became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional street files practice that caused his wrongful prosecution. Ex. 2 (*Palmer v. City of Chicago*, 562 F. Supp. 1067, 1073 (N.D. Ill. 1983) (J. Shadur) (hereinafter "Shadur Order") (Brzeczek testified at hearing); Ex. 3 (Hickey Dep. in Rivera) at 207:15-209:8, 83:21-24:4 (Brzeczek testified at injunction hearing); Ex. 4 (2016 Hickey Fields Trial Testimony) at 12:3-7 ("It is true that the City got put on notice that there was a problem with the way it was handling the topics I mentioned a minute ago, correct? A. Correct."); 19:13-22.

3.      In *Jones*, a detective named Frank Laverty developed strong evidence that Jones could not have committed the murder. But, as stated by the Seventh Circuit, this evidence was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files." *Jones v. City of Chicago*, 856 F.2d 985, 995-96 (7th Cir. 1988). In the spring

of 1982, Detective Laverty learned that Jones was on trial for the murder; he went to his

Commander to tell him that an innocent person was being prosecuted, but his Commander took

no action; and Laverty then informed Jones's criminal defense attorney about the information in

the street file. The court declared a mistrial, and the State's Attorney dropped all charges against

Jones. Jones then filed a civil lawsuit stemming from the withholding of important investigative

information in a street file, resulting in his wrongful prosecution. His case resulted in a jury

verdict finding a custom of maintaining "street files" that were withheld from the State's

Attorney's Office and criminal defendants. *Jones*, 856 F.2d at 988; *see also* Ex. 3 (Hickey Dep.

in *Rivera*) at 61:3-23, 63:6-9, 67:9-68:3.

4.    In 1988, in *Jones v. City of Chicago,* 856 F. 2d 985 (7th Cir. 1988), the Seventh

Circuit affirmed the jury verdict in favor of George Jones, including the finding that the City of

Chicago had maintained an unconstitutional practice of permitting detectives to keep street files

undisclosed to criminal defendants. The appellate decision that (a) the case disclosed

"frightening abuse of power by members of the Chicago police force and unlawful conduct by

the City itself"; (b) Laverty was charged with a disciplinary infraction, "transferred out of the

detective division, ostracized by his fellow officers, and assigned to a series of menial tasks

culminating in the monitoring of police recruits giving urine samples" while "none of the

defendants has been disciplined for misconduct"; (c) there was "enough evidence to enable the

jury to infer that [a Chicago Police Department Commander, Lieutenant and Sergeant] had

known . . . [and] had approved every false step"; and (d) there was sufficient evidence against the

City that the street files practice existed, caused Jones' injuries, and was "consciously approved

at the highest policy-making level." 856 F. 2d 985, at 988, 991, 993, 996.

5.      In April 1982, shortly after the Laverty revelations about street files, a class action lawsuit called *Palmer v. City of Chicago* was filed to challenge the use of street files to suppress investigative materials, and, days later, the Honorable Judge McMillen issued a temporary restraining order requiring the CPD to preserve all street files. Ex. 2 (Shadur Order) at 2. By September 1982, the action was transferred to the docket of the Honorable Milton Shadur, who thereafter granted a preliminary injunction on the matter. *Id*. at 1; Ex. 3 (Hickey Dep. in Rivera) at 69:22-70:12; 79:21-80:6.

6.      James Hickey authored the policies regarding the file disclosure policies for homicide investigations for the City of Chicago in 1983. Ex. 5 (Hickey Dep. in *Fields*) at 50:12-16 ("I was the primary drafter of this order [83-1] on behalf of the chief of detectives."); Ex. 3 (Hickey Dep. in *Rivera*) at 116:22-23 ("When 83-2 was generated you wrote it? A. I drafted it, yes.").

7.      Hickey was designated by the City of Chicago under Rule 30(b)(6) in subsequent litigation, including *Fields v. Chicago*, and *Rivera v. Chicago*. See Ex. 5 (Hickey Dep. in *Fields*); Ex. 3 (Hickey Dep. in *Rivera*, 5/6/14) at 47:21-48:18.

8.      In his capacity as the City's Rule 30(b)(6) witness, Hickey testified that (a) in light of *Palmer* and *Jones*, and as early as 1982, City policymakers knew they had a street file problem; (b) that he reviewed file disclosure practices across the department prior to 1983 and determined that the problem as citywide; (c) that the problem stemmed from a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files; and (d) entire branches of an investigation, including investigation into

4

alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed. Ex. 5 (April 10, 2014 Hickey Testimony, *Fields v. City of Chicago*) at 2043:22-2044:11, 2044-2045:7; 2048:2- 2052:9; Ex. 3 (Hickey Dep. in *Rivera*) at 57:17-58:13, 222:11-22, 228:9-229:3; Ex. 4 (Hickey Fields Trial Testimony 11/23/16) at 23:11-20.

9.      As a result of the developments in *Jones* and *Palmer*, Hickey conducted an internal review of Chicago Police Department practices related to street files, the results of which he shared with senior Department officials including Chief of Detectives, William Hanhardt. Ex. 3 (Hickey Dep. in Rivera) at 200-201, 223:5-225:13; Ex. 6 (2014 Hickey Fields Trial Testimony) at 2049-2051.

10.     Hickey found that there was a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files that were not subject to disclosure. The information in the memos and notes was not making it into official reports. In addition, official reports often were not written right away, and instead were written only once they had settled on a suspect, at which point investigators might consider alternate suspects and other evidence to be non-pertinent. As a result, entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed once an investigation was complete. Ex. 3 (Hickey Dep. in *Rivera*) at 58:10-13, 72:3-15, 95:14-96:20, 204:3-21, 215:10-16:15, 219:9-221:6; Ex. 6 (April 10, 2014 Hickey Testimony, *Fields v. City of Chicago*) 2043:22-25; 2044-45, 2050:4-51:20; Ex. 7 (Hickey Dep. in *Kluppelberg* (pt. 1), at

85-89, 94:14-20 ("Q. Generally speaking, what happened to a detective's notes prior to 1983? A. The detective kept the notes until such time as they prepared the supplementary report, at which time they destroyed their notes, threw them in the garbage can or whatever, including myself.").

11. City officials were aware of resistance within the Police Department to changing the street files practice of keeping parallel, "personal" files not available to the criminal justice system, and of the risk of wrongful prosecutions and convictions if the street file problem was not solved. *See infra* SOF 12-13.

12. The City was aware that there was resistance within the Chicago Police Department to changing the street practice. Judge Shadur's April 1982 Order was amended in September 1982 when it was learned that detectives were circumventing the court's order, and Detective Division Notice 82-2 was issued by the Superintendent to preserve all notes. In addition, on March 31, 1983, Judge Shadur issued an order in which he found (a) CPD personnel were applying Detective Division Notice 82-2 "in an improperly restrictive and grudging manner under which detectives could consider their investigative writings as their personal property (and thus not under Detective Division control)"; (b) two Area Commanders interpreted the new directive so that detectives were still free to destroy their own investigative writings under the guise of "personal property"; (c) official reports were sometimes "prepared from the perspective of what fits the preparer's concept of the crime," thereby omitting "highly relevant and sometimes exculpatory" information that "the preparer does not deem 'pertinent.'" Ex. 2 (Shadur Order) at 5-6; Ex. 3 (Hickey Dep. in *Rivera*) at 72:9-73:4, 76:9-24, 203:19-204:21, 214:18-24; Ex. 8 (Tiderington Report) at 43-47.

13. City officials were aware at the time that the street files practice documented above resulted in wrongful prosecutions and convictions. Ex. 3 (Hickey Dep. in *Rivera*) at 102:2-

23, 205:18-206:12; Ex. 4 (Hickey 2016 *Fields* Trial Testimony) at 2019:6-9; *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) (finding that the failure to retain street file documents "creates a serious potential of deprivation of defendants' constitutional rights," and that "[s]uch deprivations have in fact occurred in the past.").)

## POLICY OF WITHHOLDING EXCULPATORY EVIDENCE

14.     In April 1982, after a Temporary Restraining Order was issued in the Palmer litigation, CPD issued a teletype to commanding officers informing them of the TRO, as well as Detective Division Notice 82-2.94. See Ex. 9 (S.O. 82-2 and Memo) at 4; Ex. 7 (Hickey Dep. in *Kluppelberg*) at 201.

15.     CPD Rule 30(b)(6) designee Hickey explained that Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable." Ex. 7 (Hickey Dep. in *Kluppelberg*) at 221-22, 224.

16.     Notice 82-2 and the corresponding teletype did not require detectives to put notes or memos into a central repository, and it did not require detectives to preserve notes or memos that had not already been turned into a police file. Ex. 9 (S.O. 82-2 and Memo) at 7; Ex. 7 (Hickey Dep. in *Kluppelberg*) at 212-13.

17.     Notice 82-2 lacked procedures to gather or inventory notes, memos, or other documents, and did not require that detectives put notes or memos into unit investigative files, or even whether they had to preserve such notes not in the file. Ex. 9 (S.O. 82-2 and Memo); Ex. 7 (Hickey Dep. in *Kluppelberg*) at 161, 212-13; see also Ex. 8 (Tiderington Report) at 40.

18.     Six months after Notice 82-2 went into effect, Commander Stibich testified that detectives continued to believe that their notes and memos were personal property, for personal use, and that they were not required to turn them into a department file, or even preserve them at

all. Ex. 2 (Shadur Order), at 12. Commander Stibich acknowledged that "[w]hat's pertinent to one [detective] might not be to another." *Id*. at 6.

19.     Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2." Ex. 2 (Shadur Order) at 12.

20.     In January 1983, Special Order 83-1 replaced Detective Division Notice 82-2. It applied only to detectives assigned to Violent Crimes. Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. Special Order 83-1 also created an "Investigative File inventory sheet," to catalog all the documents placed in the Investigative File, that was to be forwarded to the Records Division when felony charges were approved. Special Order 83-1 also created General Progress Reports ("GPRs"). The GPR forms were to be used by detectives for taking handwritten notes or writing "to-from memos" to their colleagues. Ex. 10 (S.O. 83-1); Ex. 7 (Hickey Dep. in *Kluppelberg*) at 170:7-9; Ex. 3 (Hickey Dep. in *Rivera*) at 227; Ex. 8 (Tiderington Report) at 40-41.

21.     Special Order 83-1 created a requirement for detectives to place handwritten GPRs and other investigative materials in the investigative file. It also required detectives to fill out CPD case report forms, such as supplementary reports, documenting relevant information previously recorded on a GPR or other miscellaneous documents. Ex. 10 (S.O. 83-1); Ex. 8 (Tiderington Report) at 41.

22.     Hickey considered S.O. 83-1 a "major change in the way notes were considered within the police department," yet acknowledged there was never a survey or audit about how its

implementation went. Ex. 6 (April 10, 2014 Hickey Testimony, Fields v. City of Chicago) at 2053:24-2054:1; Ex. 5 (Hickey Dep. in Fields) at 43:1-4 ("Q. Was there anything done after the implementation of 83-1 to survey or to audit how the process was going, the new process? A. Not to my knowledge.").

23. Judge Shadur found Special Order 83-1 to be deficient, including for the following reasons: (1) there was no obligation to create an investigative case file folder until someone was arrested and charges were approved, leaving the risk of selective retention/disclosure during the investigation; (2) it offered no guidance on what information a detective should deem "relevant" information to include in official reports, leaving discretion for detectives to withhold information on their subjective assessment of its relevance; (3) it failed to ensure that any detective receiving information related to an investigation not assumed to him will forward the information to the assigned detective, so that information is included in the investigative file folder; and (4) it omits any provision defining how the CPD responds to a subpoena or request to produce information related to a criminal proceeding. Ex. 2 (Shadur Order) at 16-17; Ex. 8 (Tiderington Report) at 41.

24. Special Order 83-1 was replaced by Special Order 83-2 in May 1983. Exs. 10, 11 (Special Orders 83-1, 83-2); Ex. 3 (Hickey Dep. in Rivera) at 225, 227:7-229:6.

25. Special Order 83-2 made a few changes: (1) to require detectives to create records reflecting all relevant information; (2) to require detectives to pass along information they receive about another crime to the detective investigating that other crime; (3) to transmit a copy of the investigative file inventory sheet to either the Office of Legal Affairs or State's Attorney's Office for its proper disclosure to criminal defendants; and (4) to create an Investigative File Control Card. Ex. 11 (S.O. 83-2); Ex. 8 (Tiderington Report) at 41-42.

26.     S.O. 83-2 still: (1) did not require a single repository for all investigative information maintained by a lead investigator; (2) applied only to detectives, and explicitly excluded from its directives all other officers involved in investigative major crimes; (3) provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed relevant, (4) provided no guidance about how information should be communicated or documented among detectives; (5) provided no policy directive or procedure to ensure production of investigative files; (6) relied on inventory sheets instead of actual file disclosures; and (7) lacked an audit/oversight mechanism. Ex. 11 (S.O. 83-2); Ex. 7 (Hickey Dep. in *Kluppelberg*) at 236-38; Ex. 8 (Tiderington Report) at 42.

27.     Special Order 86-3 replaced S.O. 83-2 in May 1986. It was substantively identical to S.O. 83-2, except for the addition of an auditing provision. Compare Ex. 11 (Special Order 83-2) with; Ex. 12 (Special Order 86-3); Ex. 3 (Hickey Dep. in *Rivera*) at 100: 9-101:12, 227, 246-47, 249, 174.

28.     The modifications in S.O. 86-3 eliminated the requirement that the inventory sheet be forwarded to defense attorneys when a criminal subpoena or discovery motion was received and eliminated the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)." Compare Ex. 11 (Special Order 83-2) at 4 with Ex. 12 (Special Order 86-3); Ex. 13 (Winstrom Dep) at 106-07; Ex. 8 (Tiderington Report) at 42.

29.     S.O. 86-3 still (1) did not require a single repository for all investigative information maintained by a lead investigator; (2) permitted detectives to maintain handwritten notes as personal files for longer periods of time, by removing the requirement of "prompt" documentation; (3) provided no guidance about what information a detective was required to

include in a supplementary report beyond information deemed relevant; (4) and left defense attorneys with no mechanisms to determine whether their materials were complete without an inventory sheet. Ex. 12 (S.O. 86-3); Ex. 13 (Winstrom Dep. in *Reyes*) at 98:13-99:10; Ex. 8 (Tiderington Report) at 43.

30.     In 1988, Standard Operating Procedures (SOP) were created to govern the work of detectives. Chapter 18 of the SOP, the relevant portion of the new SOPs dealing with the documentation and disclosure of investigative information, contains "no substantive changes of any kind" from S.O. 86-3. Ex. 3 (Hickey Dep. in Rivera) at 244, 249:19-251:5; Ex. 13 (Winstrom Dep in *Reyes*) at 125:5-126:7 ("Q. And would you agree with me that looking at the [SOP] policy here, it is basically the same policy as what is contained in [S.O.] 86-3? A. I agree."), 208-210.

**THE CITY'S ADMISSIONS REGARDING POLICY DEFICIENCIES**

31.     Despite an auditing requirement added to Special Order 86-3, the City's designated representatives were unaware of a single instance of such auditing ever taking place, or of any document in existence indicating that someone had done the type of inspection required by S.O. 86-3. Ex. 3 (Hickey Dep. in Rivera) at 178:4-13, 244-45, 249:11-17; Ex. 13 (Winstrom Dep.) at 208-210, 120-121; Ex. 4 (2016 Hickey Fields Testimony) at 43:1-4; Ex. 14 (Cline Dep. in *Reyes*) at 43:13-15, 47:5-13.

32.     Detectives were not disciplined for failure to comply with the new Special Orders. Ex. 3 (Hickey Dep. in Rivera) at 178:15-179:2, 187:6-10; Ex. 5 (Hickey Fields Dep) at 10; Ex. 8 (Tiderington Report) at 59.

33.     Hickey admitted that he did not know if every detective followed S.O. 86-3. Ex. 4 (2016 Hickey Fields Testimony) at 37:13-20.

11

34.     Despite Judge Shadur's guidance regarding the deficiencies in the CPD policies, CPD never included a statement or directive in its policy to produce the entire contents of the investigative files, including the newly created General Progress Reports. Instead, the Special Orders contained only an instruction to forward a copy of the inventory sheet to the CPD's Record Division, without ever stating that the actual police reports in the files must be disclosed to prosecutors and criminal defendants. See, e.g., Ex. 12 (S.O. 86-3) (lacking any instruction to disclose entire investigative file and/or all supplementary reports and general progress reports to prosecutors and/or criminal defendants); Ex. 10 (S.O. 83-1) (same); Ex. 13 (Winstrom Dep.) at 106:7-14, 20-24 ("Q. Is there some document that -- is there some other policy document that says, copy the entire investigative file and distribute this file in response to subpoenas? A. Policy document? Not that I'm aware of, no."), 107:21-24; Ex. 8 (Tiderington Report) at 44.

35.     Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, CPD never updated its policy to stop permitting a system of multiple, parallel files rather than a single centralized file. Ex. 12 (S.O. 86-3); Ex. 15 (Noble Testimony) at 4832, 4818-19 ("[T]he Chicago Police Department has . . . essentially, three separate filing systems"--the investigative file, permanent retention file, and "working file"); Ex. 3 (Hickey Dep. in *Rivera*) at 192-94; Ex. 7 (Hickey Dep. in *Kluppelberg*) at 295:20-296:4;  Ex. 13 (Winstrom Dep.) at 110-115.

36.     The City acknowledges that its continued system of having multiple files of a centralized file, coupled with the lack of instruction or directive ordering or ensuring that the entire contents of the investigative files be produced, left detectives and subpoena personnel confused about their disclosure obligations. Ex. 3 (Hickey Dep. in *Rivera*) at 36-37, 162-64, 253-54 (testifying to subpoena clerks and detectives questioning what they were required to produce

12

in response to subpoenas, including whether investigative files had to be produced); Ex. 56 (Hickey/Spratte Trial Testimony in *Rivera*) at 3285:5-8; Ex. 13 (Winstrom Dep.) at 106-107 (S.O. 86-3 does not direct to turn the investigative file over to prosecutors and criminal defense), 192-94 (no instructions to subpoena clerks for responding to subpoena in homicide case), 209 (no audits or inspections to ensure that all documents related to homicide investigations be produced in response to subpoenas); Ex. 12 (S.O. 86-3); Ex. 2 (Shadur Order) at 9-10.

37.     Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, the policy applied only to the Detective Division, and not investigators in other divisions and special units, including patrol officers and gang crimes officers. Ex. 12 (S.O. 86-3); Ex. 3 (Hickey Dep. in Rivera) at 54-55, 86-88; Ex. 16 (Hickey/Spratte Trial Testimony in Rivera) at 3388:9-3389:5.

38.     Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, the policy failed to provide any definition of what was "relevant" or "pertinent" information that needed to be documented, thus permitting detectives to make subjective decisions about what was relevant, and could do so based on subsequent information learned during the investigation. The City's designees acknowledged that given this lack of instruction, detectives could reach different decisions about what needed to be documented. Detectives could, for example, determine that leads and investigative efforts into an alternate suspect could be deemed not pertinent or irrelevant, and thus would not need to be documented or disclosed. Ex. 12 (S.O. 86-3); Ex. 2 (Shadur Order) at 5-6; Ex. 7 (Hickey Dep. in Kluppelberg) at 237:17-22 (not the policy of the department to require eliminated suspects to be identified in supplemental reports), 339; Ex. 13 (Winstrom Dep.) at 64-66, 89-90, 99:6-10 ("Q. Does this

policy provide any guidance about what information is to be treated as relevant and not relevant? A. This policy just says relevant information, no.").

39.     The Subpoena Service Unit in the Records Division handled requests for discovery from prosecutors and criminal defendants, but CPD had no policies, procedures, checklists, or other documents requiring, or explaining, how the Subpoena Service Unit staff were supposed to gather all responsive documents, or providing guidance to assist them in requesting material from all the right repositories. As a result, the process of responding to requests for police files was more of an "art," and whether prosecutors and criminal defendants received all of the documents and investigative material associated with a case was primarily a question of luck. Ex. 16 (Hickey Trial Testimony in Rivera) at 3284:17-19; Ex. 7 (Hickey Dep. in Kluppelberg) at 362-63; Ex. 3 (Hickey Dep. in Rivera) at 36:11-37:4, 43-46, 185-87; Ex. 13 (Winstrom Dep.) at 192-94.

40.     In 2020, the City of Chicago's Office of Inspector General issued a report regarding the CPD's practices concerning the disclosure of police records to criminal defendants and civil plaintiffs, which included a review of case studies from 2010-2013, information regarding nine instances in which the City was sanctioned by federal judges from May 2011 through February 2018, and interviews with more than a dozen CPD employees. The OIG found that "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations." Ex. 17 (June 2020 OIG Report) at 4-5 (finding that the units responsible for responding to subpoenas and records requests "cannot ensure that they are identifying and locating all responsive records for production" and that "members [of the Subpoena Unit] routinely do not attempt to identify paper records, as they cannot determine

which of the CPD's units may hold such records"); see also Ex. 18 (Sept. 2021 OIG Follow-Up Report) at 2; Ex. 8 (Tiderington Report) at 34.

41.     During expert discovery, the Defendants disclosed five retained experts. Among them, they disclosed one former law enforcement practitioner to opine about the underlying investigation in this matter and whether it comported with generally accepted police practices, Nelson Andreu. Andreu is not offering any opinions whatsoever about whether CPD's policies regarding documentation and disclosure generally, and Special Orders 83-1 and its progeny specifically is an adequate or sound policy. In addition, the City also disclosed a former prosecutor, Bernard Murray, to opine about criminal discovery in Cook County; Mr. Murray has never worked in a police department and concedes he is not offering any opinions about whether the documentation and disclosure policies at issue are adequate or sound policies. Ex. 19 (Defendants' Rule 26(a)(2) Disclosures); Ex. 20 (Andreu Report) (no opinions regarding Monell claims, including the policies at issue or their adequacy to address problems identified during Jones/Palmer); Ex. 21 (Murray Report) (same); Ex. 22 (Murray Dep. in Solache/Reyes) at 38:21-25 (only professional experience is as a prosecutor); 87:13-19, 107:18-109:19, 114:12-115:12.

## POLICIES DID NOT MEANINGFULLY CHANGE OVER TIME

42.     The City of Chicago has admitted that its written policies regarding the documentation and disclosure of investigative information did not change between 1983 and 2012. Ex. 23 (Loughran Dep. in Taylor) at 40:12-16 (testifying that the CPD policy regarding homicide files did not change from 1992 to 2012); Ex. 13 (Winstrom Dep.) at 43:7-46:2 (agreeing that the policies applying to documentation in homicide investigations from 1986 to 1998 were "nearly identical," and despite some "difference[s] in wording," the "overall policy is the same"); see also id. at 46:19-23 ("Q. Okay. So in the period from 1986 through 1998, is it

correct that the policies with regard to documentation of homicide investigations were the same across all detective areas? A. Correct."); Ex. 3 (Hickey Dep. in Rivera) at 119:7-9 (testifying that the policy regarding records retention was consistent from 1983 to 2011); see also id. at 123:11-17 (same); Ex. 5 (Hickey Dep. in Fields) at 43:1-7 (noting that nothing was done after S.O. 83-1, effective in 1983, to review the document retention process, nor was there any new directive as to documentation in investigative or street files).

43.     Even though S.O. 83-1 was considered a "major change" in policy, no steps were ever taken to establish any clear guidelines or protocols on how to check or audit whether these "major changes" were actually being implemented and no steps were ever taken to record, or document any auditing to establish that the "major change" required by the Special Order was actually being implemented and followed. Ex. 6 (April 10, 2014 Hickey Testimony, Fields v. City of Chicago) at 2053:24-2054:1; Ex. 3 (Hickey Dep. in Rivera) at 244, 247, 249; Ex. 4 (Hickey Testimony from 2016 Fields Trial) at 35:11-25; Ex. 14 (Cline Dep. in *Reyes*) at 43:13-15, 47:5-13.

44.     Rather than checking out the investigative file, where all memos and notes were supposed to be stored and preserved (on general progress reports), detectives reverted back to keeping personal files with their own copies of investigative material. Ex. 7 (Hickey Dep. in Kluppelberg) at 327-29.

45.     The substantively unchanged documentation policy resulted in other wrongful prosecutions and convictions in which relevant investigative information was withheld from criminal defendants, including for example, Nathson Fields, James Kluppelberg, and Jacques Rivera. Ex. 3 (Hickey Dep. in Rivera) at 55:5-24; *Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394, at *7 (N.D. Ill. Feb. 6, 2014)(citing to Fields' street file); Ex. 24 (Fields Street File);

*Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1028 (N.D. Ill. 2018), op. clarified, No. 12-CV-04428, 2018 WL 11469072 (N.D. Ill. May 17, 2018); Ex. 25 (Rivera Street File); Ex. 26 (Rivera Permanent Retention File); Ex. 27 (Order on Kluppelberg Certificate of Innocence); Ex. 28 (Brasfield Report) Attachment I at 11, Attachment H at 40-45; *Fields v. City of Chicago*, No. 10 C 1168, 2017 WL 4553411, at *3 (N.D. Ill. Oct. 12, 2017), aff'd, 981 F.3d 534 (7th Cir. 2020); Ex. 8 (Tiderington Report) at 60-62.

46.     Fields's police practices expert, Michael Brasfield, conducted a comprehensive analysis of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999 to 2009, across the City of Chicago, in Chicago Police Department Detective Areas 1, 2, 3, and 4. Ex. 29 (Fields AM Trial Tr. 11/29/16) at 120:9-19, 121-133; Ex. 30 (Brasfield Summary of Voluminous Records—Comparing Basement, Criminal Defense and Permanent Retention Files).

47.     Brasfield testified that approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives take notes), and 36% were missing inventories. Ex. 31 (Fields PM Trial Tr. 11/29/16) at 3:6-4:13, 7:7-8:8 (citing statistics referenced above), 126:4-130:14.

48.     In December 2016, the jury in Fields found that the failure to disclose the street file to Mr. Fields was the result of a pattern and practice of the Chicago Police Department, and awarded Mr. Fields compensatory damages of $22 million. Discovery in Fields revealed dozens of other street files in the Area Central basement. Ex. 30 (Brasfield Summary of Voluminous Records—Comparing Basement, Criminal Defense and Permanent Retention Files). At the trial

in Mr. Fields's case, additional evidence in support of the conclusion that the City had a street file practice was presented, including the following:

    a.    Defendants and other CPD employees testified that there were frequently widespread departures from written policies; that they did not even know new written policies had been put in place in the 1980s; that they considered investigative materials their personal property, and would not transcribe all investigative leads into official reports; and that there was no mechanism for reporting missing investigative materials. *See* Ex. 32 (*Fields* Trial Tr. 11/23/16) at 78:8-25, 79:1-8; Ex. 33 (*Fields* Trial Tr. 12/1/16) at 124:25-125:23; Ex. 34 (*Fields* Trial Tr. 11/17/16) at 103:5-8, 112:3-9; Ex. 35 (*Fields* Trial Tr. 11/28/16) at 30:23-31:22, 31:23- 25, 32:14-24, 52:5-112; Ex. 36 (*Fields* Trial Tr. 12/6/16) at 85:8-86:7, 95:22-96:5, 97:2-19; Ex. 37 (*Fields* Trial Tr. 12/5/16) at 137:5-22.

    b.    Street files were kept and suppressed in violation of Brady in the cases of Jon Fulton, Timothy Malone, and James Crockett. Ex. 32 (*Fields* Trial Tr. 11/23/16) at 12:3-14:15, 17:1-21:12, 18:10-17; Ex. 29 (*Fields* AM Trial Tr. 11/29/16) at 111:2-115:18; Ex. 38 (Fields Trial Tr. 12/8/16) at 29:13-31:8, 31:9-34:5, Ex. 39 (Fields Trial Tr. 12/7/16) at 69:8-21; Ex. 40 (Fields Trial Tr. 11/30/16) at 31:2-15, 32:11-33:20, 41:8-42:8; 58:1-61:1.

49.    Police practices expert Tom Tiderington confirms that his findings—that the CPD's policies related to the documentation, storage/preservation, and disclosure of information learned during homicide investigations was contrary to generally accepted police practices—are consistent with the findings of the City of Chicago's own Office of Inspector General, whose 2020 report stated that "CPD's records management and production processes are inadequate to

meet its constitutional and legal obligations." Ex. 8 (Tiderington Report) at 34; Ex. 17 (June

2020 OIG Report) at 4-5 (finding that the units responsible for responding to subpoenas and

records requests "cannot ensure that they are identifying and locating all responsive records for

production" and that "members [of the Subpoena Unit] routinely do not attempt to identify paper

records, as they cannot determine which of the CPD's units may hold such records"); see also

Ex. 18 (Sept. 2021 OIG Follow-Up Report) at 2.

**POLICY DEFICIENCIES**

50.     As part of his review, Tiderington reviewed and analyzed the 344 Area 5

investigative files from 1995-1998 that were provided to him for analysis, and compared them to

available permanent retention files and criminal defense files. Ex. 8 (Tiderington Report) at 49-

60; see also Attachment B to Tiderington Report (materials reviewed). The file-by-file,

document-by-document comparison of all of these file types is contained in Attachment F to

Tiderington's Report. Ex. 8 (Tiderington Report) at 53; *see* Attachment F. Tiderington reached a

number of conclusions, including that none of the Special Orders implemented after *Jones/*

*Palmer* rectified the problems with filekeeping, documentation, and disclosure within the CPD

uncovered during Jones/Palmer. Id. at 49-66.

51.     Tiderington also reviewed the expert reports of Michael Brasfield in *Fields v. City*

*of Chicago* and *Rivera v. City of Chicago*, which involve a similar review of hundreds more

homicide files and corresponding files, as well as the police homicide files in Rivera, Fields and

Kluppelberg. Ex. 8 (Tiderington Report) at 33-34, 49-51; see also Attachments G & H to

Tiderington's Report.

52.     Tiderington's review of hundreds of files from 1995-1998 confirmed that CPD's

policies were not sufficiently addressing the problems with file keeping and documentation of

19

which the City of Chicago was aware. Ex. 8 (Tiderington Report) at 49-55; *see supra* SOF 8-13, 23.

53.     Detectives consistently used handwritten notes not on GPRs, although Judge Shadur had found the practice of keeping investigative information outside of official reports deficient. Ex. 2 (Shadur Order) at 4-6; Ex. 8 (Tiderington Report) at 49.

54.     Handwritten notes not on GPRs were found in approximately 46% of the investigative files that Tiderington reviewed from 1995-1998—consistent with Brasfield's findings in Rivera (61%) and Fields (82%). Ex. 8 (Tiderington Report) at 49.

55.     Similarly, detectives continued using to-from memos, which were also not included in official forms–despite the City's knowledge of this deficiency. Ex. 2 (Shadur Order) at 4-6; Ex. 8 (Tiderington Report) at 57. To-from memos (not on official police forms) were found in approximately 28% of the files reviewed from 1995-1998—consistent with Brasfield's findings in Rivera (20%) and Fields (43%). Ex. 8 (Tiderington Report) at 49.

56.     Further, inventory sheets were not consistently included in the investigative files (and when they were included, the majority of them were incomplete). In the period from 1995-1998, 17% of total investigative files contained no inventory sheet, and 81% contained incomplete inventory sheets. Ex. 8 (Tiderington Report) at 49-50.

57.     Additionally, not all relevant information in unofficial documents—including potentially exculpatory information contained on handwritten notes—was transcribed in official reports, despite the City's continued awareness of this deficiency. Ex. 2 (Shadur Order) at 17; Ex. 8 (Tiderington Report) at 50-52.

58.     Finally, Tiderington concluded that important investigative materials were regularly withheld from the criminal defense files for criminal defendants, despite the City's

notice of this issue. For example, he found that approximately 59% of the criminal defense files analyzed were missing handwritten notes that were present in the investigative files; that 43 of the 63 criminal defense files lacked an inventory, despite the CPD's requirement; and that not all of the documents in the investigative file were disclosed to criminal defense attorneys in response to a subpoena for street files. Ex. 2 (Shadur Order) at 17; Ex. 8 (Tiderington Report) at 52-55.

59.      The analysis that Tiderington conducted in this case is the same analysis conducted by Michael Brasfield in Rivera and Fields, and his findings are entirely consistent with Brasfield's. In particular, Tiderington's finding that the 1995-1998 Area 5 investigative files demonstrate that the City's problems with filekeeping, documentation, and disclosure of investigative information first identified in *Jones/Palmer* persisted under the policies of the CPD is the same conclusion that Brasfield reached with regard to 1985-1991 Area 5 investigative files, and 1984-1989 Area 1 (primarily) investigative files. Ex. 8 (Tiderington Report) at 49; Ex. 28 (Brasfield Report in Rivera) at 43-45; Ex. 41 (Brasfield Report in *Fields*) at 15-19.

## ADJUDICATION OF ISSUE IN PAST CASES

60.      The existence of the City of Chicago's official policy of suppressing exculpatory and/or impeaching investigative information was established in the cases of, inter alia, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.); *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.); *Palmer v. City of Chicago,* 562 F. Supp. 1067 (N.D. Ill.); and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

61.      In *Fields*, the jury was instructed that, to find against the City of Chicago on the plaintiff's policy claim, Fields had to prove, in pertinent part, that "[a]t the time of the concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or

21

impeachment evidence," and that this policy (as defined in the instructions) caused the concealment of material exculpatory or impeachment evidence in the plaintiff's criminal case, which harmed plaintiff as a result. Ex. 42 (Fields Final Jury Instructions) at 14-15.

62. During trial, both sides presented extensive Monell evidence, which is collected in the parties' post-trial submissions in Fields. Ex. 43 (Defs.' Combined Post-Trial Mot. in Fields) at 9-16, 18-24; Ex. 44 (Pl.'s Resp. to Defs.' Post-Trial Mot. in Fields) at 12-25; Ex. 45 (Defs.' Reply in Support of Post-Trial Mot.) at 5-10.

63. The City lost the jury trial in *Fields*. Ex. 46 (Fields Verdict Summary). A judgment was entered against the City on the jury's verdict, awarding Fields $22 million in compensatory damages (as well as punitive damages). Ex. 47 (Fields Judgment). After fully briefing the issues, the City's post-trial motion challenging the judgment was denied. *Fields v. City of Chicago*, 2017 WL 3987356 (N.D. Ill. Sep. 11, 2017); Ex. 43 (Defs.' Combined Post-Trial Mot. in Fields) at 9-16, 18-24; Ex. 44 (Pl.'s Resp. to Defs.' Post-Trial Mot. in Fields) at 12-25; Ex. 45 (Defs.' Reply in Support of Post-Trial Mot.) at 5-10.

64. The denial of the City's post-trial motion was affirmed on direct appeal, where the U.S. Court of Appeals for the Seventh Circuit concluded that the City had notice of deficient policies with respect to withholding/disclosure of evidence "as a result of prior litigation that the use of street files and the failure to ensure the production of the evidence within those files presented a constitutional problem," and that in Fields, the evidence presented sufficiently allowed the jury "to conclude that the City had failed to take the necessary steps to address that unconstitutional practice." *Fields v. City of Chicago*, 981 F.3d 534, 563 (7th Cir. 2020).

65. Jacques Rivera was wrongfully convicted of the 1988 murder of Felix Valentin on the northwest side of Chicago, and his conviction was based on false evidence fabricated by

Chicago Police officers–including Detective Guevara–working out of Detective Area Five. *Rivera,* 319 F. Supp. 3d at 1015; Ex. 57 (Rivera Certificate of Innocence) at 1, 3-9, 10-13.

66.     After his conviction was vacated and charges dropped in 2011, Rivera filed a lawsuit against the involved officers and the City of Chicago, alleging that the  defendants had suppressed exculpatory information throughout his criminal proceedings and that the City was liable for its official policy of suppressing exculpatory evidence. *Rivera,* 319 F. Supp. 3d at 1015-16, 1020.

67.     In *Rivera*, the plaintiff made an underdeveloped preclusion argument based on Fields which was limited to three paragraphs in the plaintiff's summary judgment response. Ex. 48 (Rivera Plaintiff's Resp. to Defendant's Summ. J. Mot.) at 54. Similarly, the Court's analysis of the issue consisted of two paragraphs. *Rivera,* 319 F. Supp. 3d at 1062-63.

68.     In *Rivera*, the jury was instructed that to find against the City of Chicago on the policy claim, Rivera had to prove by a preponderance of the evidence, in pertinent part, that "[t]he City of Chicago had a policy of concealing material exculpatory and/or impeachment evidence," and that this policy (as defined in the previous paragraph) caused the violation of the plaintiff's constitutional rights. Ex. 49 (*Rivera* Final Jury Instructions) at 26.

69.     Based on that jury instruction, in June 2018, a federal jury entered a verdict for Rivera and against the City, and a judgment was entered against the City on the jury's verdict. Ex. 50 (Rivera Judgment); Ex. 51 (Rivera Verdict).

70.     During trial, both sides presented extensive Monell evidence, which is collected in the parties' post-trial submissions in Rivera. Ex. 52 (City's Mot. for New Trial) at 2-11; Ex. 53 (Pl.'s Resp. to City's Mot. for New Trial) at 78-109; Ex. 54 (City's Reply In Support of Mot. for New Trial) at 3-23, 30-34. As reflected there, Rivera amassed evidence to show (1) that the

23

suppression of evidence was the result of municipal policy, including (1) evidence of the City's past litigation of the issue, its written policies, its designated Rule 30(b)(6) witness, and expert testimony, and (2) that the Chicago Police Department was aware post-*Jones/Palmer* of its evidence suppression problem in 1982, of its deficient subsequent policies, and of the unabated evidence suppression in homicide investigations throughout the time period that Rivera was prosecuted and convicted. Ex. 53 at 80-90 (citing supportive trial evidence); Ex. 55 (*Rivera* Trial Tr. 6/15/18) at 2210-15, 2226, 2248; Ex. 56 (Rivera Trial Tr. 6/26/18) at 3912-3919; *Rivera v. Guevara*, No. 12-CV-4428, 2019 WL 13249674, at *2-4 (N.D. Ill. Sept. 20, 2019) (denying City's sufficiency of the evidence arguments).

71.     Rivera's expert, Michael Brasfield, conducted an analysis of 138 Chicago Police Department homicide files, this time from Area Five for the years 1985 to 1991, which revealed that in more than 90% of cases information in Chicago Police Department files were not produced to prosecutors and criminal defense attorneys in the criminal justice system, and in a full 100% of cases the written policies promulgated by the City after *Palmer* were not followed. Ex. 55 (*Rivera* Trial Tr. 6/15/18) at 2210-15, 2226, 2248; Ex. 56 (Rivera Trial Tr. 6/26/18) at 3912-3919.

72.      The City's post-trial motion was denied. *Rivera*, 2019 WL 13249674, at *4.

73.     In *Kluppelberg v. Burge*, 276 F. Supp. 3d 773 (N.D. Ill. 2017), a case concerning a claim that the City had a policy of suppressing exculpatory evidence that resulted in the suppression of investigative information in a 1984 homicide arson investigation that led to James Kluppelberg's 1988 arrest and 1989 wrongful conviction, the plaintiff Kluppelberg advanced this theory with all of the same evidence offered in *Fields*, including an expert analysis of additional

homicide files from Area Three. 276 F. Supp. at 777 n.6. The district court granted

Kluppelberg's motion to apply collateral estoppel, stating that:

> To establish that the issues are the same and were necessarily decided, Kluppelberg must show that the jury in *Fields*, in order to have reached its verdict, had to have found that the City had a policy or practice of withholding material exculpatory and/or impeachment evidence, specifically street files…. The court finds that Kluppelberg has met that burden. That the jury must have found a policy or practice of withholding evidence is clear from the jury instructions in *Fields*, which stated that, to succeed on his *Monell* claim, Fields must prove by a preponderance of the evidence that 'it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence.'…. Kluppelberg's motion to apply collateral estoppel barring the City from arguing that it did not have a policy or practice of withholding material exculpatory and/or impeachment evidence contained in street files is granted."

*Id*. at 776-79.

| | |
|---|---|
| **December 17, 2024** | RESPECTFULLY SUBMITTED, |
| **ARTURO DeLEON-REYES** | **GABRIEL SOLACHE** |
| By: /s/ Steve Art | By: /s/ Ben H. Elson |
| *One of Reyes's Attorneys* | *One of Solache's Attorneys* |
| Jon Loevy | Jan Susler |
| Anand Swaminathan | Ben H. Elson |
| Steve Art | Nora P. Snyder |
| Rachel Brady | **PEOPLE'S LAW OFFICE** |
| Sean Starr | 1180 N. Milwaukee Avenue |
| Annie Prossnitz | 3rd Floor |
| Meg Gould | Chicago, IL 60642 |
| **LOEVY & LOEVY** | (312) 235-0070 |
| 311 N. Aberdeen Street | jsusler@peopleslawoffice.com |
| Chicago, IL 60607 | |
| (312) 243-5900 | |
| steve@loevy.com | |

## CERTIFICATE OF SERVICE

I, Steve Art, an attorney, hereby certify that, on December 16, 2024, I filed the foregoing PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE CITY OF CHICAGO using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Steve Art
*One of Plaintiffs' Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Annie Prossnitz
Meg Gould
**LOEVY & LOEVY**
311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
steve@loevy.com