**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| ARTURO DeLEON-REYES, | ) | |
| | ) | Case No. 18 C 1028 |
| *Plaintiff,* | ) | |
| | ) | Hon. Steven C. Seeger, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

| | | |
|---|---|---|
| GABRIEL SOLACHE, | ) | |
| | ) | Case No. 18 C 2312 |
| *Plaintiff,* | ) | |
| | ) | Hon. Steven C. Seeger, |
| *v.* | ) | District Judge |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANTS' RESPONSE TO PLAINTFFS' *DAUBERT* MOTION TO BAR
DEFENDANTS' EXPERT WITNESS DR. MICHAEL WELNER**

Defendants JoAnn Halvorsen, as Special Representative of Defendant Ernest Halvorsen

(deceased), Edwin Dickinson, Robert Rutherford, Daniel Trevino, Reynaldo Guevara, and the

City of Chicago, ("Defendants") by their undersigned attorneys, respond to Plaintiffs' *Daubert*

motion to bar Defendants' disputed confession expert, Dr. Michael Welner, and state:

**INTRODUCTION**

Dr. Welner's testimony fits squarely within the role of a rebuttal expert. He evaluates the

reliability of the "false confession" framework advanced by Plaintiffs' expert, Dr. Leo, critiques

the research on which it relies, and assesses whether those concepts apply to the facts of this

case. Plaintiffs move to exclude his testimony based on a series of mischaracterizations of his

opinions and an unduly narrow view of expert qualification—a view that courts universally reject.

At its core, the motion asks the Court to exclude a qualified rebuttal expert not because his methodology is unreliable, but because he disagrees with Plaintiffs' expert and challenges the assumptions underlying his opinions. That is not a basis for exclusion under Rule 702. Because Dr. Welner's opinions are grounded in his expertise, supported by the record, and directed at assisting the jury in evaluating competing expert testimony, Plaintiffs' motion should be denied.

## ARGUMENT

### I.      Dr. Welner is Qualified to Opine on the Study of False Confessions

Plaintiffs' primary challenge to Dr. Welner's testimony is that he is not qualified to testify about false confessions or how that body of research bears on Plaintiffs' interrogation. (Mot. at 3–8.) Initially, Plaintiffs' position disregards the many courts that have found Dr. Welner is qualified to opine on false confessions. *See, e.g.*, *Olson v. Gomez*, 2024 WL 3455066, at *14 (N.D. Ill. July 18, 2024) (finding Dr. Welner qualified after examining his field experience and his publication of articles, case commentaries, and presentations on the topic of confession research).[1]

Plaintiffs' position also largely ignores Dr. Welner's extensive background and experience in the field of false confessions. (*See* Mot. at 4.) In short, he is a board-certified physician in psychiatry and forensic psychiatry. (Ex. 1, Welner CV at 1.) As other courts have noted, Dr. Welner's career involved evaluating issues related to criminal defendants' experiences with the

---

[1] *See also Brown v. City of Chicago*, 2024 WL 3791634, at *21 (N.D. Ill. Aug. 13, 2024) (finding Dr. Welner qualified to offer opinion about false confessions "given his medical training, his work with criminal defendants related to confessions, and his research into this subject"); *Taylor*, 2021 WL 12242781, at *8 (finding Dr. Welner qualified to opine on false confession theory because of his "substantial field work reviewing the confessions of inmates awaiting trial").

police, their decisions to confess, and their appraisal of the evidence against them. *E.g.*, *Olson*, 2024 WL 3455066 at *14; *Brown*, 2024 WL 3791634, at *21.

Plaintiffs do not just ignore Dr. Welner's experience, they go one step further in making the inaccurate claim that Dr. Welner "has not contributed to the literature—indeed, he is not familiar with it." (Mot. at 7.) Dr. Welner has published several articles and commentaries in this subject area, including the research articles "Competency to Waive *Miranda* & Grisso Scales," and "Confession Evidence & the Gudjonsson Suggestibility Scales," as well as case commentaries on *State v. Blackstock*, *Com v. Crawford*, and *Beltran v. State*. (Ex. 1, Welner CV at 6–7, 10, 12.) More recently, in September 2024, Dr. Welner published an article in *Behavioral Sciences & the Law* titled "False Confessions: An Integrative Review of the Phenomenon" that is available on his website.[2]

Plaintiffs' decision to ignore Dr. Welner's contributions is troubling, considering they possess Dr. Welner's CV, which provided this information (aside from his publicly available 2024 article, which was published after expert discovery). Indeed, other courts have recognized Dr. Welner's contributions based on a review of his CV. *Olson*, 2024 WL 3455066 at *14 ("This experience is supported by a review of his curriculum vitae"). There is no reason Plaintiffs could not have done the same here before making this inaccurate claim.

Moreover, Plaintiffs' contention that Dr. Welner "is not familiar" with the literature is further undermined by the fact that he has provided numerous presentations on false confession research, including to legislators, prosecutors, city corporate counsels, and homicide investigators. (Ex. 1, Welner CV at 16, 19, 21.) He has also sat on the editorial board for several publications in these same disciplines including the Journal of Forensic & Legal Medicine,

---

[2] https://www.forensicpanel.com/media_center.html

International Journal of Criminal and Community Justice, and the Journal of Practicing Forensic Psychology. (*Id.* at 3.)

Plaintiffs are right about one thing: Dr. Welner has not devoted his entire career to academia. But Plaintiffs presume that false confession experts fall solely "within the domain of social scientists and social psychologists." (Mot. at 6.) Thus, only a background identical to their expert, Dr. Leo, is qualified as an expert under Rule 702. (Mot. at 7.)

Not so. Dr. Welner's expertise developed from more than 30 years of clinical experience examining, assessing, and treating hundreds of criminal defendants. Dr. Welner's career required real-world application of the research to his casework that involved actual consequences that do not exist in academia. *Olson*, 2024 WL 3455066, at *14 ("Dr. Welner has not dedicated his career to the academic study of false confessions, as defendants readily acknowledge, but he does have decades of experience assessing and providing treatment to criminal defendants, many of whom have confessed.").

In sum, the universe of experts in false confessions is not and cannot be limited to social science academics. Dr. Welner is more than qualified to opine on false confessions based on his career experience. well-documented contributions, and knowledge of the research literature.

## II.  It is Well-Established that Dr. Welner is Permitted to Criticize Leo's Methodology

Plaintiffs identify a series of statements from Dr. Welner's report that they characterize as improper and that "stray into the realm of legal argument." (Mot. at 9.) Those statements fall into three categories: (1) Dr. Welner's critique of the false confession research, including its reliance on mock experiments that do not replicate real-world conditions, a lack of known error rates, and the use of terms that are not consistently defined; (2) his assessment regarding the scope of, and consensus within, the academic literature  (or lack thereof); and (3) his assessment of Dr. Leo's

4

motivations in reaching his opinions. The third category is moot because Defendants do not intend to elicit testimony from Dr. Welner about Leo's motivations, nor will Dr. Welner offer any legal opinion about whether Leo should be permitted to testify.

The remaining categories fall squarely within the permissible scope of rebuttal expert testimony. It is well established that Dr. Welner's criticism of Leo's methodology, assumptions, and opinions is fair game and falls well within the bounds of admissible testimony from a rebuttal expert. *Brown*, 2024 WL 3791634, at *21 (permitting Dr. Welner to critique a false confession expert's methodology while precluding legal conclusions regarding admissibility); *Accord Tankersley v. Harvey*, 2015 WL 12567256, at *3 (N.D. Tx. Oct. 20, 2015) (collecting cases recognizing that experts may challenge the reliability and basis of opposing expert opinions).

Plaintiffs' reliance on *Harris v. City of Chicago* and *Chatman v. City of Chicago* does not compel a different result. In *Harris*, the court excluded portions of a rebuttal expert's testimony where the expert opined that Dr. Leo's opinions were generally unreliable or unhelpful to the jury, a sweeping pronouncement that the court deemed to be a legal conclusion. 2017 WL 3142755, at *5 (N.D. Ill. July 25, 2017).

Similar opinions offered by Dr. Welner in *Chatman* were also deemed inadmissible legal conclusions. 2018 WL 11426158, at *3 (N.D. Ill. Oct. 30, 2018). But Plaintiffs disregard that the court also found that it was proper for Dr. Welner to rebut the opposing expert's methodology by critiquing the literature, identifying limitations in the studies, and pointing out gaps in the research. *Id.* at *5. *Chatman* is instructive because it draws a clear and consistent line between permissible expert testimony that criticizes methodology versus testimony that leaps to legal conclusions. *See also Angelopoulos v. Keystone Orthopedic Specialists*, 2017 WL 2178504, at

*10 (N.D. Ill. May 16, 2017) (noting distinction between impermissible legal conclusions and permissible criticism of expert's methodology, assumptions, and conclusions.)

Defendants agree that similar parameters are appropriate here. Consistent with the above authorities, Dr. Welner should be permitted to offer testimony critiquing Dr. Leo's methodology and the research on which he relies, including (1) whether the methodology accounts for error or success rates; (2) differences in the interpretation of relevant literature; (3) variations in the rigor of the peer-review process for certain studies; and (4) the limitations of experimental studies when comparing them to real-world interrogations. These opinions fall well within the proper scope of rebuttal expert testimony and will assist the jury in evaluating the competing expert's analysis. *See Brown*, 2024 WL 3791634, at *21 (allowing Dr. Welner to critique plaintiff's expert's methodology); *see also Taylor*, 2021 WL 12242781, at *8 (same).

### III. Dr. Welner Opines on the "Risk Factors" that Leo Claims Led to Plaintiffs' Purported False Confessions, Not on Plaintiffs' States of Mind

Plaintiffs contend that Dr. Welner offers opinions about Plaintiffs' mental states despite not conducting a clinical interview, contrary to his prior statements that an in-person psychiatric evaluation is required to assess susceptibility to false confession. (Mot. at 11 (citing Ex. 2, Welner Report at 27–29.)) This argument rests on a mischaracterization of Dr. Welner's opinions.

Dr. Welner does not purport to offer a clinical or psychiatric assessment of Plaintiffs' subjective mental states during their interrogations. Rather, he evaluates the validity and applicability of the so-called "risk factors" identified by Dr. Leo—lengthy interrogation, sleep deprivation, guilt-presumptive questioning, and false evidence ploys—and examines whether those concepts are supported by reliable research and meaningfully apply to the facts of this case.

For example, his discussion of "sleep deprivation" (1) addresses how that term is defined in the research and is understood to affect a person's willingness to confess, (2) explains that Dr.

Leo's opinions misapply this research, and (3) discusses whether the record supports that such a condition existed here, as opposed to mere fatigue or periods of wakefulness. (Ex. 2, Welner Report at 26–28.)

Similarly, he rebuts Dr. Leo's assertion that Plaintiffs were at an increased risk of falsely confessing because they were subjected to a "false-evidence ploy" by offering an alternative explanation: that the literature recognizes that individuals confess when confronted with evidence they perceive as truthful, i.e., "perception of proof." (*Id.* at 29–30.) Here, Plaintiffs were confronted with statements from Adriana Mejia, an undisputed participant who identified them as co-conspirators, which Dr. Welner opines reflects a perception of proof rather than the use of false evidence. (*Id.*)

These are not psychiatric evaluations of Plaintiffs. They are critiques of the assumptions and analytical framework underlying Dr. Leo's opinions. Plaintiffs' reliance on forensic psychiatry guidelines concerning clinical evaluations is therefore misplaced.

Even setting Plaintiffs' mischaracterizations aside, their basis for exclusion—that Dr. Welner opined on Plaintiffs' mental state without conducting a clinical interview—lacks merit because it ignores the procedural history of this case. Defendants sought to have Dr. Welner interview Plaintiffs, and Plaintiffs declined. (Ex. 3, Email.) Instead, Plaintiffs directed Defendants to rely on the existing record, including medical records, interrogatory responses, and deposition testimony. (*Id.*)

Consistent with that limitation, Dr. Welner reviewed Plaintiffs' medical records, discovery responses, and testimony in forming his opinions. (Ex. 2, Welner Report at 3 ¶¶ 11–12, 24, 46.) But Plaintiffs now reverse court and fault Dr. Welner for not conducting an interview. They even assert that the "most he conceivably did was review the limited health records" from Plaintiffs'

incarceration. (Mot. at 11 n.3.) This contention ignores both the scope of the materials he actually reviewed and Plaintiffs' own position that those records were enough. Plaintiffs cannot now recast that limitation as a defect in Dr. Welner's methodology.

Lastly, Plaintiffs contend that Dr. Welner's opinions "merely reflect" his "negative judgment of Plaintiffs," which they claim are driven by racial bias. (Mot. at 11.) That is a serious accusation, but Plaintiffs do not identify any portion of Dr. Welner's report that supports it. Instead, they rely on selective, out-of-context statements from unrelated matters to invite a prejudicial inference that is unwarranted.

More fundamentally, Plaintiffs conflate the permissible analytical considerations of an individual's experience with law enforcement and the criminal justice system with improper bias. Evaluating an individual's experience with law enforcement and the criminal justice system is not evidence of racial animus; it is a routinely accepted factor in assessing the circumstances surrounding a confession. *Yarborough v. Alvarado*, 541 U.S. 652, 667–68 (2004) (explaining that the voluntariness of a statement may "depend on 'the characteristics of the accused,'" which includes age, intelligence, "as well as a suspect's prior experience with law enforcement").

In sum, Plaintiffs attempt to bar Dr. Welner by mischaracterizing his opinions, ignoring the procedural history in this case, and asserting unsupported *ad hominem* attacks. None of these arguments provide a basis for exclusion under Rule 702.

## IV. Dr. Welner's Opinions Do Not Exceed His Expertise

Plaintiffs further assert that Dr. Welner should be barred from opining on topics outside his expertise. (Mot. at 12–14.) Defendants do not dispute that Dr. Welner is not a police practices or gang expert. He has never held himself out to be one.

8

But Plaintiffs' argument misconstrues Dr. Welner's opinions. Dr. Welner's analysis was in response to Leo's opinion that one of the risk factors for a false confession is an officer's "rush to judgment" in which the officers employ a guilt-presumptive interrogation. (Ex. 2, Welner Report at 28, 39–41.) Dr. Welner also responded to Leo's opinions that Plaintiffs' confessions were scripted. (*Id.* at 35–39.) For each response, Dr. Welner explains that Leo's opinions are not supported by literature and he highlights the evidence that shows Plaintiffs' interrogations were not guilt-presumptive or the product of scripting. Dr. Welner stayed well within his lane of expertise when offering these opinions.

At bottom, Dr. Welner is not opining on police practices or gangs generally. He is applying his vast investigatory background, informed by his forensic work, to rebut Leo's opinions.

## V.      Dr. Welner Does Not Opine on Credibility

Plaintiffs lastly take issue with what they deem as Dr. Welner's "credibility determinations" of Plaintiffs and witnesses and his assessment of their motives, along with his opinions that Plaintiffs contend "are pure speculation." (Mot. at 14–15.)

Plaintiffs specifically claim that Dr. Welner's opinions about contamination are replete with speculation. (Mot. at 15 (citing Ex. 2, Welner Report at 35–36.)) But Dr. Welner explicitly avoided such conclusions. Dr. Welner stated that "whether contamination did or did not occur cannot be ascertained" because, at a basic level, it requires a determination of whether their confessions were, in fact, false or whether they were involved in the murders. (Ex. 2, Welner Report at 36.) More generally, Dr. Welner was critiquing Leo's speculative opinions.

Plaintiffs also contend that Dr. Welner assessed witness credibility when rendering his opinions about scripting. (Mot. at 14 (citing Ex. 2, Welner Report at 36–39.)) Not true. Dr. Welner merely identified holes in Dr. Leo's analysis and logical fallacies. For example, he

9

explained that scripting reflects conformity, thus, if police scripted Plaintiffs' confession, it follows that they "would not be contradictory and would be devoid of seeming implausibility." (Ex. 2, Welner Report at 37–38.) In doing so, Dr. Welner provides a counterexample to exemplify his opinion. He points to Plaintiffs' complaints about police abuse, made months after their confessions, and explains that they may have been scripted because of their similar narratives and their motivations to suppress their confessions as demonstrated by the criminal trial record. (*Id.*)

Far from engaging in credibility determinations or speculation, Dr. Welner offers a reasoned critique of Dr. Leo's methodology and conclusions, which is precisely the type of expert analysis Rule 702 permits.

Date: April 3, 2026                                          Respectfully submitted,

/s/ Eileen E. Rosen
Eileen E. Rosen
Rock Fusco & Connelly LLC
333 W. Wacker Dr., 19th Fl.
Chicago, IL 60606
*One of the Attorneys for City of Chicago*

/s/ Timothy P. Scahill
Timothy P. Scahill
Borkan & Scahill, Ltd.
20 South Clark Street, Suite 1700
Chicago, IL 60603
*One of the Attorneys for Reynaldo Guevara*

/s/ Josh M. Engquist
JOSH M. ENGQUIST, Attorney No. 6242849
Special Assistant Corporation Counsel
*One of the Attorneys for Defendants Halvorsen, Dickinson, Rutherford, Trevino, Mingey, Biebel, and Cappitelli*

James G. Sotos
Josh M. Engquist
Caroline P. Golden
Elizabeth R. Fleming

THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
jengquist@jsotoslaw.com